Carl Warring
Assistant Attorney General
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Honorable Rosanna M. Peterson

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

R.W., individually and on behalf of his marital community,

Plaintiff,

v.

COLUMBIA BASIN COLLEGE, a public institution of higher education, RALPH REAGAN, in his official and individual capacities, LEE THORNTON, in his official and individual capacities,

Defendants.

NO. 4:18-05089-RMP

DEFENDANTS' MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT

August 29, 2019
10:00 a.m.
Spokane, WA

## I. MOTION

During the 2017 Winter Quarter of R.W.'s nursing program at Columbia Basin College, R.W. experienced homicidal ideation. Specifically, he had thoughts of killing three of his instructors at the College. His ideation included killing them by setting their offices on fire and by attacking them from behind with a saw. Crisis response evaluated R.W. at his primary care physician's office. After the evaluation, the crisis response provider initiated a duty to warn protocol

to ensure the College and instructors were warned of R.W.'s homicidal disclosures. In response, the College issued an interim trespass notice to R.W., temporarily precluding his return to campus until the College had an opportunity to further investigate and consider the situation. Ultimately, the College decided R.W. could return to the nursing program, if R.W. agreed to specific conditions that would allow the College to monitor if R.W. was slipping back into his homicidal thinking. Because these facts are undisputed, none of R.W.'s civil rights or disability discrimination claims can survive summary judgment. Therefore, the Defendants Columbia Basin College, Ralph Reagan and Lee Thornton move the Court for a Fed. R. Civ. P. 56 summary dismissal of R.W.'s claims in their entirety.

## II. FACTS

### A. Procedural Facts

On May 25, 2018 R.W. filed a Complaint For Damages. *See* ECF No. 1. The Complaint pleads five causes of action: (1) a 42 U.S.C. § 1983 First Amendment claim; (2) a 42 U.S.C. § 1983 Fourteenth Amendment Equal Protection claim; (3) a 42 U.S.C. § 12132 Disability Discrimination claim; (4) a 29 U.S.C. § 794 Disability Discrimination claim; and (5) a RCW 49.60 Disability Discrimination claim. ECF No. 1 at 7:1-9:11. The Complaint names Columbia Basin College, Ralph Reagan and Lee Thornton as the defendants. ECF No. 1 at 2:4-14. The Defendants jointly filed the Defendants' Answer To Plaintiff's

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Complaint For Damages And Jury Demand on August 1, 2018. ECF No. 12 at 1. In relevant part, the Answer pleaded both Eleventh Amendment Immunity and Qualified Immunity as affirmative defenses. ECF No. 12 at 8:6-11.

**B. Substantive Facts**

R.W.'s 2017 Return To The College's Nursing Program

In January 2017 R.W. re-entered the nursing program at Columbia Basin College. R.W. Dep. at 54:20-55:24.[1] He had previously withdrawn from the program in 2016 due to a back condition. R.W. Dep. at 54:20-55:24. Upon his return to the program in 2017, R.W. experienced difficulty consistently meeting the demands of the program. Cooke Dep. at 58:24-59:23, 60:23-61:11, 62:6-64:2.[2] In February 2017, he received an academic progress alert after he fell behind in assignments. R.W. Dep. at 57:22-59:17, 67:15-68:20, Ex. 5. By mid-term, R.W. was below the minimum points required to successfully complete at least one of his courses. R.W. Dep. at Ex. 4, 6-7. In March, Valerie Tucker, a faculty member in the nursing program, scheduled time to meet with R.W. on March 7th to review continuing faculty concerns about his academic performance. Cooke Dep. at 63:14-64:16, 84:4-86:5, Ex. 8; Warring Dec. at Ex.

---

[1] Excerpts of the transcript of the R.W. deposition is Exhibit 2 to the Declaration of Carl P. Warring filed contemporaneously with this motion.

[2] Excerpts of the transcript of the Valerie Cooke deposition is Exhibit 3 to the Declaration of Carl P. Warring filed contemporaneously with this motion.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

7. R.W. participated in scheduling of the meeting, but he ultimately could not attend. Cooke Dep. at 64:5-8; Warring Dec. at Ex. 7. On March 6, 2017, the day before the scheduled meeting, R.W. was admitted to Lourdes Medical Center Transitions facility for evaluation and treatment of a mental health crisis. ECF No. 1 at 3:16-4:4.

R.W.'s March 2017 Disclosure Of Homicidal Ideation & Treatment

On March 6, 2017 R.W. reported to his primary care provider that he had been having a lot of anger issues lately. Cabasug Dep. at Ex. 3 (March 6, 2017 Progress Note).[3] He also reported that he had thoughts of hurting others with a plan for about a week. Cabasug Dep. at Ex. 3 (March 6, 2017 Progress Note). R.W. himself agrees that the thoughts and imagery of the ideation he had haunted, scared and disturbed him. R.W. Dep at 72:13-17, 77:16-78:13. In response to R.W.'s disclosure, Dr. Cabasug contacted crisis response to evaluate R.W. Cabasug Dep. at Ex. 3 (March 6, 2017 Progress Note). To this date, Dr. Cabasug continues to believe that it was medically appropriate to have crisis response evaluate R.W. Cabasug Dep. at 28:8-29:14.

---

[3] Excerpts of the transcript of the Dr. Michael Cabasug deposition is Exhibit 6 to the Declaration of Carl P. Warring filed contemporaneously with this motion.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Araceli Perez, a crisis responder, met with R.W. at Dr. Cabasug's office. Perez Dep. at 16:3-15, 18:8-11.[4] R.W. told Ms. Perez that he had just returned to school after a year off, was experiencing sleep deprivation, eating poorly, and feeling overwhelmed. Perez Dep. at 25:24-27:12, Ex. 2. R.W. also reported that bad grades and feedback from his instructors had triggered his thoughts to harm them. Perez Dep. at 27:2-12, Ex. 2. Specifically, R.W. identified Kim Tucker, Valerie Cook and Ulma [*sic*] as the instructors he had thoughts of killing. Perez Dep. at 37:11-19. R.W. also disclosed he had thought of two different ways to kill his instructors – by setting their offices on fire or by attacking them with a saw. Perez Dep. at 51:3-12. Based upon what she heard, Ms. Perez recognized that she had a duty to warn the identified faculty members. Perez Dep. at 51:13. And, in her mind, the duty to disclose was not a close call. Perez Dep. at 51:13-18. Perez gave R.W. the option of voluntarily admitting himself to Transitions or being involuntarily committed. Perez Dep. at 49:10-50-10; R.W. Dep. at 83:23-84:18. R.W. elected to check himself into Transitions. R.W. Dep. at 84:16-85:9.

At his Transitions' intake, R.W. confirmed his earlier reported homicidal ideation towards his instructors, including having an idea of how he would carry out the act, but that he had not taken any steps to carry out his plan. Reagan Dep.

---

[4] Excerpts of the transcript of the Araceli Perez deposition is Exhibit 1 to the Declaration of Carl P. Warring filed contemporaneously with this motion.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

at Ex. 17 (01150028).[5] Two days after entering Transitions, R.W. sought to leave the treatment facility against medical advice, but he eventually agreed to remain after a second evaluation by Ms. Perez. Perez Dep. at 45:23-46:12, Ex. 5. R.W. was discharged from Transitions on March 10, 2017. R.W. Dep. at 97:16-18.

The College's Response To R.W.'s Disclosure Of Homicidal Ideation

On March 7, 2017 Ralph Reagan, Assistant Dean for Student Conduct and Activities, learned of R.W.'s homicidal ideation. Reagan Dep. at Ex. 2. Reagan issued a letter to R.W. establishing an interim restriction that precluded R.W. from coming on the College's campuses pending an investigation into the matter. Reagan Dep. at Ex. 2. Reagan's decision to impose the interim restriction was based upon information that R.W. had expressed homicidal ideation relating to three specific instructors and that he identified two specific ways for killing the instructors. Reagan Dep. at 26:12-23, Ex. 3 (Bates No. 01130012). Reagan considered the situation serious because the involved crisis responders had taken it seriously enough to initiate a duty to warn protocol. Reagan Dep. at 30:21-31:2. On March 8, 2017 Reagan issued a second letter to R.W. Reagan Dep. at Ex. 4. The second letter set a meeting for March 16, 2017. Reagan Dep. at Ex. 4. Reagan wanted to discuss R.W.'s disclosure of homicidal ideation as part of

---

[5] Excerpts of the transcript of the Ralph Reagan deposition is Exhibit 4 to the Declaration of Carl P. Warring filed contemporaneously with this motion.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Reagan's investigation into whether a student conduct violation had occurred. Reagan Dep. at Ex. 4.

The Interim Restriction Process

On March 10, 2017 R.W. emailed Reagan requesting an appeal of the interim restriction. Reagan Dep. at Ex. 5. On March 14, 2017 the Student Appeals Board, chaired by Pat Campbell, upheld the interim restriction. Reagan Dep. at Ex. 6. On March 22, 2017 R.W. appealed the decision of the Student Appeals Board. Reagan Dep. at Ex. 7. On April 19, 2017 President Lee Thornton modified the interim restriction, lifting R.W.'s restriction from being present on the Pasco campus, but requiring R.W. to coordinate any need to be on the Richland campus with Reagan. Reagan Dep. at Ex. 8.

The Student Conduct Process

The March 16, 2017 initial student conduct meeting between Reagan and R.W. did not actually occur until March 22, 2017. Reagan Dep. at Ex. 9. Following that meeting, Reagan sought additional information. Reagan Dep. at 62:24-63:14; 91:19-92:20. Specifically, Reagan (1) obtained and reviewed health care records from Dr. Michael Cabasug, R.W.'s primary care physician, (2) had a telephone conference with providers from Lourdes (Transitions) regarding R.W.'s evaluation and treatment, and (3) obtained and reviewed health care records from Lourdes, all as part of his information gathering process, before

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

deciding what, if any, sanction was appropriate. Reagan Dep. at 62:24-63:14; 91:19-92:20.

Reagan received Dr. Cabasug's records on April 4, 2017. Reagan Dep. at 118:22-119:6; 146:5-17. Included was a letter written by Dr. Cabasug. Reagan Dep. at 118:22-119:6; 146:5-17. Dr. Cabasug's letter described that R.W.'s homicidal ideation was out of character for R.W., Reagan Dep. at 120:15-121:11, but Dr. Cabasug stopped short of offering any assurance that R.W.'s homicidal ideation would not return if R.W. resumed the nursing program. Cabasug Dep. at 15:9-16:11. Dr. Cabasug has testified that he cannot predict if R.W. will return to homicidal thinking or not if R.W. returns to the nursing program. Cabasug Dep. at 16:12-17:13, 45:13-46:10, 48:2-20. R.W. himself described the trigger of his homicidal ideation as things that occurred in the school setting - bad grades and feedback from his instructors. Perez Dep. at 27:2-9; 54:1-10.

Reagan spoke with Lourdes providers on or around April 13, 2017 and picked up Lourdes treatment records on April 14, 2017. Reagan Dep. at 91:23-92:15, 130:22-131:15, 147:20-25. Although R.W. expected the Lourdes providers to support his return to the nursing program, Reagan remembers the providers expressing concerns about R.W.'s return. Reagan Dep. at 136:16-138:8. Concerns are consistent with the treatment recommendations by Perez, who thought R.W. should be monitored closely in an outpatient program upon his discharge from Lourdes. Perez Dep. at 59:8-60:5. Perez made this

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

recommendation because it is difficult to predict how a person will respond when they return to the community. Perez Dep. at 59:8-60:5.

In addition to the information he learned from the involved health care providers, Reagan was aware that R.W.'s homicidal ideation had already disturbed the involved instructors. Reagan Dep. at 104:1-105:13; 163:9-164:12, 169:12-170:11, 177:6-178:11, Ex. 25. The instructors expressed fear of R.W. and no longer wanted him in their program. Reagan Dep. at 163:9-164:12. One, now former instructor, has explained that she cried, changed her schedule, changed the car she drove and was afraid everywhere she went. Tucker Dep. at 76:9-19.

On April 20, 2017 Reagan issued his decision to impose sanctions. Reagan Dep. at Ex. 9. While Reagan found misconduct, he ultimately determined that R.W. could return to the nursing program in the Winter 2018 Quarter upon certain conditions.[6] Reagan Dep. at Ex. 9. R.W. appealed Reagan's decision on May 4,

---

[6] Winter 2018 would have been the first opportunity for R.W. to return to the nursing program. *See* Hoerner Dec. at 2:11-20. The nursing program is structured such that a student must successfully complete each quarter before moving on to the next quarter. Hoerner Dec. at 1:20-2:6. Here R.W. admits that as of March 9, 2017, while he was still at Transitions, it was already too late for him to successfully complete the 2017 Winter Quarter. R.W. Dep. at 90:8-91:3, Ex. 12.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

2017. Reagan Dep. at Ex. 10. The Student Appeals Board, chaired by Michael Lee, upheld the sanctions on May 24, 2017. Reagan Dep. at Ex. 11. R.W. appealed the Student Appeals Board decision on June 7, 2017. Reagan Dep. at Ex. 12. Ultimately, the President of the College, Lee Thornton, upheld the sanctions on June 12, 2017. Reagan Dep. at Ex. 13.

R.W. agrees that he was capable of complying with the conditions set by Reagan, but did not contact Reagan to resume his participation in the nursing program. R.W. Dep. at 105:24-106:18. Thus, R.W. did not resume the nursing program in 2018.

## III. ARGUMENT

### A. Standard for Granting Fed. R. Civ. P. 56 Motion for Summary Judgment.

A party is entitled to summary judgment when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine material issue of fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it "is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *T.W. Elec. Serv., Inc., v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). Facts that are irrelevant or unnecessary will have no affect on a summary

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

judgment decision.  *Id.*  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Summary judgment is designed to "dispose of the factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).

The moving party has the initial burden of showing which material facts lack a genuine issue; the nonmoving party must then identify specific facts where there exists a genuine issue of material fact.  *T.W. Elec. Serv.,* 809 F.2d at 630. A nonmoving party "may not rely on the *mere allegations* in the pleadings in order to preclude summary judgment." *Id.* (emphasis added).  Instead, they "must produce at least some *significant probative evidence* tending to support the complaint." *Id.* (emphasis added).  Judges are required to "view the evidence [and inferences] in the light most favorable to the nonmoving party." *Id.* at 630. Summary judgment is proper ". . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 884 (1990).

**B.    R.W.'s 42 U.S.C. § 1983 First Amendment and Fourteenth Amendment Claims Fail As A Matter Of Law.**

Section 1983 is a mechanism to redress violations of federal constitutional and/or federal statutory rights.  *Baker v. McCollan*, 443 U.S. 137, 144, n.3, 146,

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA  99201-1106
(509) 456-3123

99 S. Ct. 2689 (1979). Section 1983 goes no further. In other words, § 1983 does not provide a cause of action for the deprivation of state-created interests. *Lovell v. Poway Unified School Dist.,* 90 F.3d 367, 370 (9th Cir. 1996); *see also Baker*, 443 U.S. at 146 (§ 1983 is not a mechanism for enforcing tort-law rights). The Supreme Court has observed, in the context of school disciplinary proceedings and § 1983 claims, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion" and "§ 1983 was not intended to be a vehicle for federal [ ] court correction of errors . . . which do not rise to the level of violations of specific constitutional guarantees." *Wood v. Strickland*, 420 U.S. 308, 326 (1975).

The text of Section § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

42 U.S.C. § 1983. Thus, the basic elements of a colorable § 1983 claim are (1) a violation of a right protected by the Constitution or created by a federal statute (2) proximately caused (3) by the conduct of a "person" (4) acting under color of state law. *Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991). But even

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

where a colorable §1983 claim exists, qualified immunity may operate to bar the § 1983 claim. *Tolan v. Cotton*, 572 U.S. 650, 654, 134 S.Ct. 1861 (2014).

For his § 1983 claims, R.W. alleges the Defendants' actions violated two of his constitutional rights: freedom of speech under the First Amendment and equal protection under Fourteenth Amendment. ECF No. 1 at 7:1-8:5. However, R.W. cannot establish the first element of his § 1983 claims – that a constitutional right has been violated.[7] Moreover, even if R.W. could establish each element of both of his §1983 claims, qualified immunity bars both claims because the law was not clearly established.

---

[7] As to Columbia Basin College, R.W.'s § 1983 claim also fails to satisfy the third element of a § 1983 claim – conduct by a "person." State agencies are not persons within the meaning of the Act. *See Will v. Michigan,* 491 U.S. 58, 71, 109 S.Ct. 2304 (1989); *see also Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100-101, 104 S.Ct. 900 (1984) and *Sato v. Orange County Department of Education,* 861 F.3d 923, 928 (9th Cir. 2017) (explaining that State agencies enjoy Eleventh Amendment Immunity in federal court on damages <u>and injunctive relief claims</u>). Here Columbia Basin College is a state agency. *See* RCW 28B.50.020(7) (". . . community colleges are, for purposes of academic training, two year institutions, and <u>are an independent, unique, and vital section of our state's higher education system</u> . . ."). Thus, R.W.'s § 1983 claim for injunctive relief against the College must fail.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

### 1. R.W. Cannot Establish A Violation Of Freedom Of Speech Under The First Amendment Or Equal Protection Under The Fourteenth Amendment.

On at least two occasions, the Ninth Circuit has held that the First Amendment does not confer the right to make threats of school violence, even if the threats were made off-campus. *See McNeil v. Sherwood School Dist. 88J,* 918 F.3d 700 (9th Cir. 2019); *Wynar v. Douglas County School Dist.,* 728 F.3d 1062, 1069 (9th Cir. 2013) ("when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech . . ."). At least one other Ninth Circuit case affirms that the First Amendment does not extend a right to make identifiable threats of school violence. *See LaVine v. Blaine School Dist.*, 257 F.3d 981 (9th Cir. 2001) (school district did not violate student's First Amendment right when it expelled him on an emergency basis after he showed his teacher a poem he had written which was filled with imagery of violent death and suicide and the shooting of fellow students). When an Equal Protection claim under the Fourteenth Amendment is also raised based upon expressive conduct, the analysis applied is essentially the same analysis applied for a First Amendment claim. *Dariano v. Morgan Hill Unified School Dist.,* 767 F.3d 764, 779-780 (9th Cir. 2014).

The appropriate legal standard comes from *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The *Tinker* test is well described in *Dariano*:

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

> Under Tinker, schools may prohibit speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities," or that constitutes an "actual or nascent [interference] with the schools' work or ... collision with the rights of other students to be secure and to be let alone." As we have explained, "the First Amendment does not require school officials to wait until disruption actually occurs before they may act. In fact, they have a duty to prevent the occurrence of disturbances."

*Dariano*, 767 F.3d at 776. More instructive than *Dariano's* statement of the rule is *McNeil's* application of it.

In *McNeil*, CLM, a high school student, created a "hit list" in his personal journal. *McNeil*, 918 F.3d at 704. CLM did not share his journal entries with anyone; rather, CLM's mother found CLM's journal while cleaning, read the entries and shared them with a therapist while seeking guidance on the issue. *Id.* The therapist alarmed by the entries and believing she had a duty to warn, informed the Sherwood Police Department. *Id.* The therapist also directed CLM's mother to contact the local crisis hotline, which she did. *Id.* The crisis hotline also made a report to the Sherwood Police Department. *Id.* The police department searched CLM's home and confiscated weapons, including a .22 caliber rifle and 525 rounds of ammunition that belonged to CLM. However, officers found nothing to indicate any planning on how to carry out the "hit list" had occurred. *Id.*

During an interview with officers, CLM admitted to having created the "hit list" and that he sometimes thought killing people might relieve his stress. *Id.* CLM also indicated that his journal was used only to vent and he would never

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

carry out the “hit list.” *Id.* CLM also told officers that the journal entry was more than four months old. *Id.* The police department decided not to pursue any criminal charges. *Id.* The police department did notify the school of the circumstance. *Id.*

As the school dealt with the notification from the police, publicity of the circumstance grew. *Id.* at 704-05. Media inquiries ensued. *Id.* Some parents sought meetings with the principal. *Id.* at 705. Other parents pulled their children from the school temporarily or permanently. *Id.* Ultimately, the school district suspended and expelled CLM for one year for making a threat of violence that caused a distinct and substantial disruption to the school environment. *Id.*

In time, the matter became a lawsuit brought in Federal District Court. *Id.* CLM brought a First Amendment claim, among other legal theories. *Id.* The matter progressed to the Ninth Circuit Court of Appeals after the District Court granted summary judgment to the School District on CLM’s First Amendment claim. *Id.* In affirming the dismissal of CLM’s First Amendment claim, the Ninth Circuit rejected CLM’s arguments that the School District could not punish his speech because it was “off-campus” and “not intended to be communicated to anyone.” *See id.* at 706-710. The Court wrote:

> In sum, we conclude that the School District could regulate CLM’s off-campus speech without violating his First Amendment rights. Although CLM may not have foreseen his speech reaching Sherwood High, the School District, when informed of CLM’s hit list, reasonably determined that it faced a credible, identifiable threat of school violence. The speech bore a sufficient nexus to the school.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

> Accordingly, the School District could take disciplinary action consistent with *Tinker*.

*Id.* at 710. The Ninth Circuit also rejected CLM's arguments that expulsion from school was not a permissible remedy for the school district under the circumstances presented. *Id.* at 710-11. The Ninth Circuit reasoned that officials can regulate speech that "'might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities' or that collides 'with the rights of other students to be secure and to be let alone.'" *Id.* at 710 (internal citations omitted). The Court found it reasonable for the school district to forecast CLM's presence at the school would cause a substantial disruption given a credible threat of school violence. *Id.* at 710. The Court also found CLM's identification of specific victims invaded the rights of others to be secure. *Id.*

Based upon the rationale of *McNeil*, R.W.'s First Amendment claim and Equal Protection claim must be dismissed. Like the school district in *McNeil*, Reagan learned through authorities that a threat of violence had been expressed against members of its community – in particular three members of its faculty. The threat of violence also included two different specific means of carrying out the threat – setting the faculty members' offices on fire and attacking them with a saw. The threat was made more credible by surrounding circumstance. The threat was communicated by local law enforcement and crisis response, and R.W.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

was admitted to an in-patient program to address his homicidal ideation. Upon further investigation of circumstance, medical records confirmed R.W.'s homicidal ideation, that R.W. had formed a plan even if he had taken no action on it, and involved providers stopped short of reassuring the College that if R.W. returned to the nursing program the homicidal thoughts would not also return. Moreover, the College knew the involved faculty members were disturbed by the revelation their lives might be in jeopardy. Under these circumstances, R.W.'s interim suspension and the conditions set for his return to the nursing program in the 2018 Winter Quarter cannot be said to violate R.W.'s First Amendment or Equal Protection interests.

**2. Qualified Immunity Bars R.W.'s § 1983 Freedom of Speech and Equal Protection Claims.**

While qualified immunity is not applicable to prospective injunctive relief for State officials acting in their official capacities or State agencies, it is applicable to State employees named in their individual capacities. *The Presbyterian Church (U.S.A.) v. U.S.*, 570 F.2d 518, 527 (9th Cir. 1989). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ). To determine whether an official is

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

entitled to qualified immunity, courts generally apply a two-part inquiry: "First, do the facts the plaintiff alleges show a violation of a constitutional right? Second, was the right 'clearly established' at the time of the alleged misconduct." *Carrillo v. Cty. of L.A.*, 798 F.3d 1210, 1218 (9th Cir. 2015) (citations omitted). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *Carrillo*, 798 F.3d at 1218 (quoting *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)). The plaintiff bears the burden of proving that the constitutional right claimed to have been violated was clearly established at the time of the alleged violation. *Moran v. State*, 147 F.3d 839, 844 (9th Cir. 1998).

Here both prongs of qualified immunity weigh in favor of Reagan and Thornton. First, as discussed *supra* neither the First Amendment nor the Fourteenth Amendment were violated. Second, assuming *in arguendo* that a constitutional violation did occur, there is no clearly established law such that "any reasonable official in his shoes would have understood that he was violating it." *Carrillo*, 798 F.3d at 1218. At least three different published Ninth Circuit cases in the past two decades have rejected First Amendment challenges to discipline imposed based upon threats of school violence: (1) *McNeil v. Sherwood School Dist. 88J,* 918 F.3d 700 (9th Cir. 2019), (2) *Wynar v. Douglas*

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

*County School Dist.,* 728 F.3d 1062, 1069 (9th Cir. 2013), and (3) *LaVine v. Blaine School Dist.*, 257 F.3d 981 (9th Cir. 2001). One other has recognized how the same analysis is applied to Fourteenth Amendment Equal Protection challenges. *See Dariano v. Morgan Hill Unified School Dist.,* 767 F.3d 764, 779-780 (9th Cir. 2014). Thus, qualified immunity entitles both Reagan and Thornton to summary judgment on R.W.'s claims for monetary damages against them in their individual capacities.

**C. R.W.'s Americans with Disabilities Act (42 U.S.C. § 12132) and Rehabilitation Act (29 U.S.C. § 794) Claims[8] Fail As A Matter Of Law.**

The Americans with Disabilities Act (ADA) and the Rehabilitation Act are construed to impose similar requirements, so despite different language, a plaintiff must establish the nearly same elements to impose liability. *Halpern v. Wake Forest University Health Sciences,* 669 F.3d 454, 461 (4th Cir. 2012); The Fourth Circuit Court of Appeals has observed:

> In the context of a student excluded from an educational program, to prove a violation of either Act, the plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to participate in the

---

[8] R.W.'s ADA and Rehabilitation Act claims, to the extent they are brought against Reagan and Thornton in their personal or individual capacities fail as a matter of law. Neither Act permits individual liability of employees or supervisors – only agencies or agents sued in their official capacity. *See Stanek v. St. Charles Community Unit School Dist.*, 783 P.3d 634, 644 (7th Cir. 2015).

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

> defendant's program, and (3) he was excluded from the program on the basis of his disability. The two statutes differ only with respect to the third element, causation. To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded "solely by reason of" his disability; the ADA requires only that the disability was "a motivating cause" of the exclusion.

*Halpern,* 669 F.3d at 461. To recover compensatory damages under either Act, the Plaintiff must prove discriminatory intent. *Updike v. Multnomah County*, 870 F.3d 939, 950 (9th Cir. 2017). The Ninth Circuit requires showing deliberate indifference to prove discriminatory intent: (1) knowledge that a harm to a federally protected right is substantially likely and (2) a failure to act upon that likelihood. *Id.* at 950-51.

A person is not considered an "otherwise qualified" individual with a disability where restrictions that apply generally to a particular type of physical or mental impairment are legitimately and directly related to reasonable health and safety concerns. *Davis v. Meese*, 692 F. Supp. 505 (E.D. Pa. 1988), judgment aff'd, 865 F.2d 592 (3rd Cir. 1989). For example, in the employment context, in deciding whether an employee is otherwise qualified for a particular job where there is a history of mental or emotional problems, an employer is justified in considering the possibility of relapse, even if there is evidence of a cure or recovery. Moreover, an employer properly can give weight to the degree of danger involved in the type of work and the gravity of the consequences of a mishap. *D'Amico v. City of New York*, 955 F. Supp. 294, 21 A.D.D. 67 (S.D. N.Y. 1997), aff'd, 132 F.3d 145 (2d Cir. 1998). Related to the question of whether



ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

a plaintiff is a "qualified individual" is the determination if the plaintiff is a "direct threat." Regulations implementing the ADA allow public entities to exclude an individual from services when the individual poses a "direct threat" to the health and safety of others. 28 CFR § 35.139; 29 CFR § 1630.2(r). Thus, courts have found individuals who threaten violence to others are not qualified individuals because they pose a direct threat to others. For example, in *Jarvis v. Potter*, 500 F.3d 1113 (10th Cir. 2007), the court held that a Postal Service employee who suffered from PTSD and admitted his inability to stop himself from hitting coworkers that startled him was not a qualified individual under the Rehabilitation Act because he posed a direct threat to others. Similarly, in *Felix v. Wisconsin Department of Transportation*, 828 F.3d 560 (7th Cir. 2016), an employee who suffered from anxiety disorders and engaged in hysterical screaming and suicidal behavior was found to be not qualified under the Rehabilitation Act.

Here, the safety concerns presented by R.W.'s homicidal ideation remove him from the category of an otherwise qualified individual. R.W. identified three different instructors that he had thought of killing. R.W. identified two different ways in which he had thought of killing them. His mental health treatment records reflected that his homicidal ideation was triggered by the bad grades and feedback he was getting from his instructors. Because these are all legitimate

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

concerns related to the safety of the institution, R.W.'s homicidal ideation does not make him an otherwise qualified individual.

Nor is there evidence that the College excluded R.W. on the basis of a disability. Courts frequently grant deference to the schools' professional judgments regarding students' qualifications when addressing disability discrimination claims. *Campbell v. Lamar Institute of Technology*, 842 F.3d 375, 380 (5th Cir. 2016) (observing that the *Halpren* Court joined 8 other circuits in showing deference to school administrators in suits involving disability discrimination claims). For instance, in *Halpren v. Wake Forest University Health Sciences*, 669 F.3d 454 (2012) the Fourth Circuit held for the University while noting, "We have previously observed that 'misconduct – even misconduct related to a disability – is not itself a disability' and may be a basis for dismissal." *Halpern*, at 465. Similarly, the Tenth Circuit, in an unpublished, but yet persuasive opinion, refused to order the reinstatement of a medical student who brought suit under the ADA and Rehabilitation Act. *Profita v. Regents*, 709 Fed.Appx 917, 918 (10th Cir. 2017). The Tenth Circuit noted that misconduct does not have to be overlooked, even when it results from a disability. *Id.* at 920-21. Here, the College initially acted in response to a threat to the safety of its employees. Its subsequent decisions were also made from the standpoint of safeguarding its employees after it received no assurances that R.W., if he returned to the nursing program, would not have a recurrence of his homicidal

thinking. R.W. cannot present sufficient competent evidence to the contrary. Therefore, his ADA and Rehabilitation Act claims fail as a matter of law.

### D. Washington Law Against Discrimination

Similar to his claims arising under the ADA and Rehabilitation Act, R.W. raises claims for disparate treatment arising under the Washington Law Against Discrimination. Notably, R.W. does not allege a failure to offer reasonable accommodations for his disability. In order to make out a prima facie case under the Washington Law Against Discrimination ("WLAD") prohibiting discrimination against disabled individuals, plaintiffs must show that (1) they have a disability recognized under statute; (2) that defendant's business or establishment is a place of public accommodation; (3) that plaintiffs were discriminated against by receiving treatment that was not comparable to level of designated services provided to individuals without disabilities by or at the place of public accommodation; (4) and that disability was substantial factor causing discrimination. *Fell v. Spokane Transit Authority*, 128 Wn.2d 618, 911 P.2d 1319 (1996). Moreover, "the statutory mandate to provide access to places of public accommodation is not a mandate to provide services." *Id*. at 639. Washington courts look to WLAD's federal counterpart, the ADA, to help construe WLAD's provisions. *Kumar v. Gate Gourmet Inc*., 180 Wn.2d 481, 490, 325 P.3d 193 (2014).

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Similar to the ADA and Rehabilitation Act, Washington Courts have applied the same reasoning regarding qualified individuals and direct threats to others to cases arising under WLAD. *See Dedman v. Wash. Personnel Appeals Bd.,* 98 Wn. App. 471, 477, 989 P.2d 1214 (1999) ("But the prohibition against disability discrimination does not apply if the disability prevents the employee from properly performing her job."); *MacSuga v. Cty. of Spokane*, 97 Wn. App. 435, 444, 983 P.2d 1167 (1999) ("But, if the handicap prevents the employee from performing the essential functions of the job, it is not discrimination to replace her.").

While Washington courts have not directly addressed the question of whether homicidal ideations are a type of behavior that could qualify as a disability, Washington courts have re-iterated that a disability does not have to be accommodated when it would potentially place the safety and welfare of others at risk. In this regard, *Clarke v. Shoreline School Dist. No. 412, King County*, 106 Wn.2d 102, 720 P.2d 793 (1986) is instructive. In *Clarke*, a teacher who suffered from visual and hearing impairments was discharged by the school district because it found that, in part, he constituted "a hazard to the welfare and safety of students under your charge as a teacher." *Id*. at 108. There was no dispute that his disabilities were the cause of the safety hazard, and the teacher's own testimony indicated that his visual handicap and hearing impairment affected the safety of the students in his charge. *Id*. at 112. Given this safety threat posed

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

by the teacher, the court found that he was not qualified and, therefore, not entitled to reasonable accommodations:

> Maintenance of the safety and welfare of retarded students clearly is an essential function of a teacher of such students, a function Clarke was unable to perform. In other words, Clarke was not "otherwise qualified" to teach. Accordingly, we hold the School District was not required to accommodate Clarke in the manner he requested.

*Id*. at 119.

Here, R.W. posed a safety threat to the identified teachers, and potentially to others at the College. Thus, even if one assumes that R.W. had a disability cognizable under WLAD, the serious safety threat that he posed at the time of the issuance of the interim restriction rendered him not "otherwise qualified" to receive accommodation. Like federal courts applying the ADA and Rehabilitation Act, Washington courts have recognized that the rather common-sense notion that if the effect of a person's claimed disability—in R.W.'s case, the effect is threats of homicide—will pose a threat to other people's safety and welfare, then the disability does not need to be accommodated under WLAD. There can be no question that given R.W.'s specific threats of violence against identified teachers, the WLAD did not require the College to allow R.W. to continue attending classes with no further oversight.

Moreover, R.W. cannot establish that he was "receiving treatment that was not comparable to the level of designated services provided to individuals without disabilities." *Fell*, 128 Wn.2d at 637, 911 P.2d 1319. R.W. has alleged

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

disabilities of "insomnia, anxiety, and depression" that contributed to his homicidal ideations. ECF #1 at ¶ 8. Yet R.W. cannot point to any other student not suffering from these conditions and that has made specific and cognizable threats against the College's faculty, only to receive treatment not comparable to his own. Any student—regardless of disability—who made identifiable threats to the lives of College faculty or other students would immediately be subject to an interim restriction from campus. Thus, even if one were to assume that R.W. has a disability cognizable under the WLAD, he still cannot show that he received treatment that would not be comparable to an individual without a disability.

Ultimately, much like his ADA and Rehabilitation Act claims, R.W. cannot establish that he received disparate treatment under the WLAD. Thus, the Court should dismiss his WLAD claims.

## IV. CONCLUSION

For the reasons discussed above, the Court should grant the Defendants' motion and summarily dismiss R.W.'s claims in their entirety.

DATED this 3rd day of June, 2019.

ROBERT W. FERGUSON
Attorney General

s/Carl P. Warring
CARL P. WARRING
WSBA No. 27164
Assistant Attorney General
Attorney for Defendants
1116 W Riverside, Suite 100
Spokane, WA 99201

(509) 456-3123
carlw@atg.wa.gov

DEFENDANTS' MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT

28

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

**PROOF OF SERVICE**

I certify that I electronically filed the above document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Eric Eisinger eeisinger@walkerheye.com

Bret Uhrich buhrich@walkerheye.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 3rd day of June, 2019, at Spokane, Washington.

ROBERT W. FERGUSON
Attorney General

s/Carl P. Warring
CARL P. WARRING
WSBA No. 27164
Assistant Attorney General
Attorney for Defendants
1116 W Riverside, Suite 100
Spokane, WA 99201
(509) 456-3123
carlw@atg.wa.gov

DEFENDANTS' MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT

29

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123