FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 04, 2019

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| R.W., individually and on behalf of his marital community,<br><br>          Plaintiff,<br><br>  v.<br><br>COLUMBIA BASIN COLLEGE, a public institution of higher education; LEE THORNTON, in his official and individual capacities; RALPH REAGAN, in his official and individual capacities,<br><br>          Defendants. | NO: 4:18-CV-5089-RMP<br><br>ORDER RESOLVING CROSS MOTIONS FOR SUMMARY JUDGMENT |

BEFORE THE COURT are Plaintiff's Motion for Summary Judgment, ECF No. 36, and Defendants' Motion for Summary Judgment, ECF No. 31. A hearing was held in this matter on August 29, 2019. Plaintiff R.W. was represented by Bret Uhrich and Eric B. Eisinger. Defendants Columbia Basin College, Lee Thornton, and Ralph Reagan were represented by Carl P. Warring and Jacob E. Brooks from

the Attorney General of Washington's Office. The Court has considered the parties' arguments, briefing, and the record, and is fully informed.

## BACKGROUND

R.W. was enrolled in Columbia Basin College's ("CBC") nursing program, completing 177 credit hours between 2011 and 2017 and needing to complete only one more quarter of classes to graduate. ECF No. 37-4. He previously was diagnosed with a seizure disorder, chronic back pain, and depression. ECF No. 37-24 at 5. In February of 2017, R.W. experienced more frequent seizures, depression, and anger issues. *Id.*; *see also*, ECF No. 37-12. During this time, R.W. had homicidal ideations about three of his instructors at CBC, in which he imagined killing them by lighting their offices on fire and attacking them with saws. ECF No. 47-5; ECF No. 35-2 at 48.

R.W. reported his medical issues to Dr. Michael Cabasug, his primary care physician, on February 28, 2017, and scheduled an appointment for March 6. ECF No. 37-22 at 10. Between February 28 and March 6, R.W. continued to attend his nursing classes at CBC without incident. *Id.* At the March 6 appointment, R.W. told Dr. Cabasug that he had been feeling overwhelmed, helpless, and anxious because he was extremely stressed from school. ECF No. 37-24 at 5. R.W. stated that he was having trouble sleeping because of his stress from school, which Dr. Cabasug noted was likely the cause of an increase in epileptic episodes that R.W.

had been experiencing over the previous several weeks.  *Id*.  R.W. also shared with Dr. Cabasug his concerns about his violent ideations.  ECF No. 37-27.

Dr. Cabasug referred R.W. to Lourdes Hospital's Crisis Response Counseling Center for a mental health evaluation.  *Id*.  Araceli Perez, a crisis responder for Lourdes, met with R.W. at Dr. Cabasug's office.  ECF No. 35-1 at 9–10.  R.W. reported his homicidal thoughts to Ms. Perez, identified the specific professors about whom he had homicidal thoughts, and told her that his thoughts were triggered by the bad grades and feedback that they gave him.  *Id.* at 19.  He also stated the ways that he imagined killing his professors.  *Id.* at 38.  Following this evaluation, R.W. agreed to voluntarily admit himself for inpatient counseling.  ECF No. 37-27 at 2.  R.W. initially wanted to leave inpatient treatment on March 9 but was convinced to stay an extra day and was discharged on March 10.  ECF No. 35-1 at 33; ECF No. 37-12 at 1.

Defendants allege that crisis responder Ms. Perez has a duty to warn people if her patients express homicidal ideations about them.  ECF No. 35-1 at 37.  After R.W. told Ms. Perez about his homicidal thoughts, she reported them to the Richland Police Department, which then notified CBC's campus security on the morning of March 7.  ECF No. 37-10 at 2.  CBC's campus security warned the professors identified by R.W. about R.W.'s thoughts.  *Id.*  Defendant Ralph Reagan, Assistant Dean of Student Conduct for CBC, also was informed about R.W.'s thoughts.  ECF No. 37-8 at 5.  Mr. Reagan was told that R.W. "admitted to having homicidal

ideations toward staff at CBC, talking about lighting offices on fire and attacking people with saws." ECF No. 37-10 at 10; ECF No. 37-8 at 5. Additionally, Mr. Reagan was told that R.W. was at Lourdes "getting help and may not be an immediate threat." ECF No. 37-10 at 10.

The same day that Mr. Reagan learned of R.W.'s homicidal ideations, Mr. Reagan issued R.W. an interim trespass letter pending an investigation. ECF No. 37-9 at 1. According to Mr. Reagan, R.W.'s thoughts violated the school's Student Code of Conduct. The Student Code of Conduct prohibits "Abusive Conduct," which is defined under the Washington Administrative Code as:

> Physical and/or verbal abuse, threats, intimidation, harassment, online harassment, coercion, bullying, cyberbullying, retaliation, stalking, cyberstalking, and/or other conduct which threatens or endangers the health or safety of any person or which has the purpose or effect of creating a hostile or intimidating environment.

*Id.*; *see also* Wash. Admin. Code § 132S-100-205. Mr. Reagan trespassed R.W. from CBC's Richland and Pasco campuses stating that R.W.'s actions had the "effect of creating a hostile or intimidating environment." ECF No. 37-19 at 1. Mr. Reagan sent R.W. a follow up letter on March 8, 2017, which scheduled a March 16 meeting between R.W. and Mr. Reagan to discuss the trespass and to give R.W. a chance to respond to the allegations. ECF No. 37-11.

Meanwhile, R.W. appealed his interim trespass from campus to the Student Appeals Board at CBC. ECF No. 35-4 at 166. On March 14, the Student Appeals Board affirmed Mr. Reagan's decision and upheld the interim trespass, barring R.W.

from attending his classes.  ECF No. 37-13.  R.W. appealed the Student Appeals Board's decision to the Interim President of CBC, Defendant Lee Thornton, on March 22.  ECF No. 37-14.  On April 19, Mr. Thornton lifted the restriction as to CBC's Pasco campus but left the restriction in place for the Richland campus.  ECF No. 37-15.  Mr. Thornton's modifications did not allow R.W. to attend his nursing classes because the nursing program is conducted at the Richland campus.  ECF No. 37-8 at 7.

As the interim trespass was being appealed, CBC and R.W. also participated in the student conduct process to review the allegations made against R.W.  ECF No. 37-16.  On March 22, CBC held a meeting at which Mr. Reagan and R.W. discussed the allegations.  *Id.*  At the meeting, Mr. Reagan requested access to R.W.'s medical records to assess whether R.W. committed any abusive conduct, as defined by the Washington Administrative Code, which is incorporated into CBC's Student Code of Conduct.  ECF No. 37-22 at 7.  Mr. Reagan received R.W.'s medical records from Dr. Cabasug as well as a letter written by Dr. Cabasug explaining that R.W.'s homicidal thoughts were out of character for him.  ECF No. 35-4 at 53–54, 72; ECF No. 37-21; ECF No. 37-33.  Mr. Reagan also talked to the professors identified in R.W.'s homicidal thoughts, who all expressed that R.W.'s thoughts made them afraid of R.W.'s presence in classes.  ECF No. 35-4 at 130, 137–38; ECF No. 37-7.

On April 20, 2017, Mr. Reagan issued R.W. a letter stating that he found R.W. responsible for violating CBC's Student Code of Conduct.  ECF No. 37-16.  The

letter stated that, even though R.W. did not intend to intimidate anybody through his actions, his actions had that effect and therefore violated the school's regulations. *Id.* Mr. Reagan later clarified that R.W.'s violent thoughts were the conduct that violated the school's code. ECF No. 35-4 at 123. The sanctions imposed by Mr. Reagan for R.W.'s misconduct included the continuation of the trespass order until R.W. successfully re-enrolled in the nursing program, participated in mental health counseling, and completed a mental health evaluation in October of 2017. ECF No. 37-16 at 1. Through counsel, R.W. appealed Mr. Reagan's decision and imposition of sanctions to the Student Appeals Board on May 4, 2017. ECF No. 37-17. The Student Appeals Board unanimously upheld Mr. Reagan's imposition of sanctions on May 24, 2017. ECF No. 37-18. R.W. appealed the Student Appeals Board's decision to Mr. Thornton on June 7, 2017. ECF No. 37-19. Mr. Thornton affirmed the Student Appeals Board's decision on June 12, 2017. ECF No. 37-20.

Because of the classes and work that R.W. missed while admitted to inpatient treatment and while being trespassed from campus, R.W. did not complete Winter Quarter 2017, which ended on March 23, 2017. ECF No. 34 at 2. R.W. could not re-enroll in the nursing program until the following Winter Quarter because of the nursing program's progressive schedule, which requires the completion of certain classes offered only once a year before moving on to the following courses. *Id.* at 1–2.

R.W. filed a complaint against CBC, Mr. Reagan, and Mr. Thornton on May 25, 2018. ECF No. 1. R.W. claims that Mr. Reagan and Mr. Thornton violated his free speech rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 7. Further, he claims that CBC violated his rights under the Americans with Disabilities Act, the Rehabilitation Act, and that all Defendants violated his rights under the Washington Law Against Discrimination. *Id.* at 8. R.W. asks for an injunction lifting the trespass order, enjoining CBC from requiring R.W. to retake all of his nursing classes, and preventing CBC from requiring R.W. to provide regular reports of his medical treatment as a condition of re-enrollment. *Id.* at 9. He also asks for compensatory, punitive, and nominal damages, as well as attorneys' fees. *Id.*

## LEGAL STANDARD

When parties file cross-motions for summary judgment, the Court considers each motion on its own merits. *See Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may grant summary judgment where "there is no genuine dispute as to any material fact" of a party's prima facie case, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists if sufficient evidence supports the claimed factual dispute, requiring "a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,

809 F.2d 626, 630 (9th Cir. 1987). A key purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 324.

The moving party bears the burden of showing the absence of a genuine issue of material fact, or in the alternative, the moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's prima facie case. *Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *See id.* at 324. The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3 (internal quotations omitted).

The Court will not infer evidence that does not exist in the record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). However, the Court will "view the evidence in the light most favorable" to the nonmoving party. *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1111 (9th Cir. 2016). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

/ / /

/ / /

/ / /

/ / /

**DISCUSSION**

## I.     First Amendment Claim

### *Appropriate Legal Standard*

The parties have argued in favor of different standards for resolving R.W.'s First Amendment claim.  R.W. maintains that his speech is protected under traditional First Amendment principles.  ECF No. 36 at 16–20.  CBC argues that the Court should apply the more restrictive doctrine under *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 508 (1969).  ECF No. 31 at 16–18.  Under *Tinker*, primary and secondary schools may restrict speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities."  *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1070 (9th Cir. 2013) (alteration in original) (quoting *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 508 (1969)).  Primary and secondary schools may also restrict speech that interferes with "the rights of other students to be secure and to be let alone."  *Id.*

Since 1969, *Tinker* has governed elementary school and high school student speech on campus.  Recently, the Ninth Circuit explained that *Tinker* applies to certain off-campus speech as well, namely particularized, off-campus threats of school violence.  *Id.* at 1069; *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989–90 (9th Cir. 2001).  In *Wynar v. Douglas County School District*, the Ninth Circuit extended *Tinker* for a high school context, holding, "when faced with an identifiable threat of

school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker*." 728 F.3d at 1069. In reaching its decision, the *Wynar* Court considered the increased regularity of school shootings, and found that its approach properly balanced high school student freedom of expression with school safety. *Id.* at 1070.

CBC argues that these "school violence cases," developed under *Tinker*, apply directly to the university setting, thereby governing CBC's actions in this case. ECF No. 31 at 14–15. However, neither the Supreme Court nor the Ninth Circuit has directly applied *Tinker* and its progeny to college campuses. *See Healy v. James*, 408 U.S. 169, 180 (1972) (First Amendment rights do not "apply with less force on college campuses than in the community at large."); *Oyama v. Univ. of Haw.*, 813 F.3d 850, 862 (9th Cir. 2015) ("While aspects of student speech doctrine are relevant here, the Supreme Court has yet to extend this doctrine to the public university setting.") (citing *Hazelwood*, 484 U.S. at 271–72 (1988)).

When the Ninth Circuit has considered the application of *Tinker* and its progeny to the college setting, it has done so expressly. *See, e.g., Oyama*, 813 F.3d at 861–64 (expressly analyzing and rejecting the extension of the Student Speech Doctrine to college campuses). The Ninth Circuit does not automatically extend *Tinker* to universities because the doctrine is often inconsistent with the goals and duties of universities. *See id.*; *College Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp.2d 1005 (N.D. Cal. 2007). Indeed, there are important

differences between the two.  "As the courts often have acknowledged, the state does not require higher education and has much less interest in regulating it, the students in colleges and universities are not children, but emancipated (by law) adults, and, critically, the mission of institutions of higher learning is quite different from the mission of primary and secondary schools."  *College Republicans at San Francisco State Univ.*, 523 F. Supp.2d at 1015.

In *Healy v. James*, the Supreme Court explained the importance of protecting college students' First Amendment rights.  408 U.S. 169 (1972).  In that case, the Court considered whether a college campus could refuse to recognize a local Students for a Democratic Society (SDS) chapter as a student organization.  The SDS chapter argued that, by refusing to recognize the chapter as a student organization, the university had violated the students' First Amendment right to freedom of association.  *Id.* at 177.  While *Healy* did not address particularized threats of school violence, it did arise in a time of upheaval, protest, and rioting that disrupted, and even shut down, colleges across the nation.  Justice Powell, writing for the majority, described the violence that occurred on college campuses at that time:

> A climate of unrest prevailed on many college campuses in this country. There had been widespread civil disobedience on some campuses, accompanied by the seizure of buildings, vandalism, and arson.  Some colleges had been shut down altogether, while at others files were looted and manuscripts destroyed.  SDS chapters on some of those campuses had been a catalytic force during this period.  Although the causes of campus disruption were many and complex, one of the prime consequences of such activities was the denial of the lawful exercise of

First Amendment rights to the majority of students by the few. Indeed many of the most cherished characteristics long associated with institutions of higher learning appeared to be endangered . . . [I]t was in this climate of earlier unrest that this case arose.

*Id.* at 171–72. After considering this dangerous and disruptive climate, the Court still concluded that its precedents "leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Id.* at 180.

Although the Ninth Circuit recently has extended the *Tinker* doctrine to encompass off-campus, identifiable threats of violence for high school students, neither the Supreme Court nor the Ninth Circuit has extended *Tinker* to college campuses. Moreover, the Ninth Circuit has not addressed college campuses in its recent school violence decisions. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700 (9th Cir. 2019); *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062 (9th Cir. 2013); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001). Therefore, controlling precedent dictates that general First Amendment principles, not *Tinker*, apply here.

The parties agree that R.W. was sanctioned for the statements he made to his doctor. *See* ECF No. 31 at 17–18; ECF No. 36 at 16–18. CBC categorized R.W.'s speech to his doctor as "abusive conduct" under the Student Code of Conduct and trespassed him from the Richland Campus, where the nursing program is located. ECF No. 37-22 at 5. Due to a combination of the trespass and his treatment at Lourdes, R.W. was unable to complete Winter Quarter and was subsequently

unenrolled.  *See* ECF No. 34 at 2.  Because of the statements he made to his doctor, CBC placed additional requirements on R.W.'s re-enrollment in the nursing program, and it is unclear if he will be accepted back into the program at all.  *See id.*; ECF No. 37-22 at 5.  Furthermore, the school suspended R.W.'s financial aid.  ECF No. 37-2.  Now, even to qualify for reinstatement of financial aid, he must complete a five-credit, degree-required class, earning at least a 2.0 grade point average, without the assistance of financial aid.[1]  *Id*. at 2.  Therefore, CBC sanctioned R.W. for his speech to his doctor.

### *True Threat*

Because CBC sanctioned R.W. for his speech, the Court considers whether that speech was protected under the First Amendment.  First Amendment protections are not absolute.  *Virginia v. Black*, 538 U.S. 343, 358 (2003).  The Supreme Court has recognized that "true threats" are not protected speech.  *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969); *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 371–72.  "True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Black*, 583 U.S. at 359.  When the speaker targets specific individuals, courts are more likely to find that the speech is a true threat.  *Fogel v. Collins*, 531 F.3d 824, 830 (9th Cir. 2008).  However, the

---

[1] The record is unclear as to whether R.W. is eligible to receive financial aid at other schools.  *See* ECF No. 73 at 34.

defendant need not direct his speech to the target of the alleged threat. *United States v. Stewart*, 420 F.3d 1007, 1016 (9th Cir. 2005). The target of the Defendant's alleged threat may learn of the threat through a third-party. *Id.*

To decide if a statement is a true threat, the court must consider the totality of the circumstances, including the context in which the speaker made the alleged threat and how a reasonable person would have perceived it. *Fogel*, 531 F.3d at 831–32. ("[T]he 'textual context' of how the speech was communicated is key."). The purpose of the true threat doctrine is to protect people from "the fear of violence" and "the disruption that fear engenders." *Black*, 538 U.S. at 360.

Although Ninth Circuit precedent has applied an objective test to determine whether an alleged threat is a true threat, in *United States v. Cassel*, this circuit explained that it was bound to apply a subjective test due to Supreme Court precedent. 408 F.3d 622, 633 (9th Cir. 2005) ("We are therefore bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat."). The Ninth Circuit has clarified that the relevant constitutional inquiry is: "Did the speaker subjectively intend the speech as a threat?" *United States v. Bagdasarian*, 652 F.3d 1113, 1118 (9th Cir. 2011).

Here, neither party has provided R.W.'s exact statements. However, it is undisputed that R.W. described his homicidal ideations to his physician in private

while seeking medical assistance.[2]  It is undisputed that R.W. did not communicate, or exhibit any intention to communicate, his thoughts directly or indirectly to his instructors in order to harass or intimidate them.  There is no evidence supporting that R.W. ever intended or ever expected that the statements that he made to his doctor for the purposes of medical treatment would reach his instructors and intimidate them.  R.W.'s instructors only discovered his statements through an alleged mandatory reporter informing CBC officials.  ECF No. 35-1 at 37. Therefore, no reasonable factfinder could conclude that R.W. had the requisite intent to transform his statements into true threats to intimidate his instructors.  Thus, R.W.'s speech is protected by the First Amendment.

## II.    Qualified Immunity

Government officials are entitled to qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity only shields the government official from monetary damages.  It is not an immunity from suit for declaratory or injunctive relief.  *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 2002); *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991).

---

[2] Apparently R.W. also met and spoke with Ms. Perez, the crisis responder for Lourdes, because she was called into Dr. Cadasug's office.  ECF No. 35-1 at 9–10. The Court views that meeting within the confines of R.W.'s seeking treatment from his health care providers.

The purpose of qualified immunity is to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The Supreme Court has laid out a two-part test for resolving qualified immunity claims. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. at 236. First, the court must decide whether the defendant's conduct violated a constitutional right. *Id.* at 201. During this analysis, the court must assess the facts in the light most favorable to the party asserting the injury. *Id.*; *see also Scott v. Harris*, 550 U.S. 372, 377 (2007); *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). The court must define the constitutional right with particularity rather than simply naming the constitutional amendment or provision from which the right stems. *See Camarillo v. McCarthy*, 98 F.2d 638, 640 (9th Cir. 1993).

Second, the court must determine whether the identified constitutional right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201. "Whether the law was clearly established is an objective standard; the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). When deciding if the right was clearly established, the court need not identify an identical prior action. *See Anderson*, 483 U.S. at 640. The court should look to binding

precedent first. *Chappel v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2003). If no

binding precedent is on point, then the court should consider all relevant precedents,

including cases from other circuits, federal district courts, and state courts. *Id.*;

*Elder v. Holloway*, 510 U.S. 510, 516 (1994).

As part of the second step, the court also must consider whether the

defendant's interpretation of the law was reasonable given the facts with which the

defendant was presented. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th

Cir. 2006). If the court finds that the constitutional right was clearly established, but

that the defendant made a reasonable mistake in applying the law, then the defendant

is entitled to qualified immunity. *Id.* However, once a court determines that "the

law was clearly established, the immunity defense ordinarily should fail, since a

reasonably competent public official should know the law governing [their]

conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982).

Here, R.W. alleges that Defendants CBC, Reagan, and Thornton violated his

First Amendment right to free speech when they sanctioned him for making

statements to his doctor about his mental health. R.W. has sued Mr. Reagan and Mr.

Thornton in their official and individual capacities, seeking injunctive relief and

monetary damages. ECF No. 1. Mr. Reagan is the Assistant Dean of Student

Conduct for CBC who led the investigation into R.W.'s alleged student code

violation, and Mr. Thornton is the Interim President of CBC who considered and

denied R.W.'s appeal. ECF No. 37-8 at 2; ECF No. 37-15. In response, Defendants

argue that Mr. Reagan and Mr. Thornton are protected by qualified immunity. ECF No. 31 at 18–19.

### *Violation of a Constitutional Right*

To resolve Defendants' motion for summary judgment, the Court first looks at the facts in the light most favorable to R.W. to decide if CBC officials violated a constitutional right. As explained *supra*, as a matter of law R.W.'s statements were protected First Amendment Speech, not falling under the "true threat" exception to the First Amendment.[3] For purposes of qualified immunity, this Court must particularize the right before it decides if the right is clearly established. *See Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995). In other words, this Court may not simply ask if the First Amendment is clearly established. To do so would be to define the right too broadly.

To particularize the right alleged by R.W., the Court examines the context in which R.W. asserted his comments that he alleges are protected by the First Amendment. *See id.*; *Camarillo*, 98 F.2d at 640. Here, R.W. asserted his First

---

[3] R.W. also asserts a violation of the Fourteenth Amendment Equal Protection Clause through his Section 1983 claim. ECF No. 1 at 7. Although not briefed in the current motions for summary judgment, the school may have deprived R.W. of his financial aid in violation of the Fourteenth Amendment Due Process Clause. Prior to the trespass order, R.W. was receiving financial aid. He lost his financial aid mid-year after CBC concluded that he had violated the Student Code of Conduct. However, for purposes of the current motions, R.W. does not appear to argue a Due Process claim against CBC for the loss of financial aid or for loss of a liberty interest.

Amendment right to free speech to tell his doctor privately about his thoughts in order to obtain medical assistance. Therefore, this Court must ask whether it is clearly established that university officials may not punish a student's protected speech to his doctor to obtain medical assistance by sanctioning him with enforcement of university codes and regulations.

### Clearly Established Law

The next step is to determine whether the right was clearly established at the time of the alleged violation. R.W. asserts his right to tell his doctor about his thoughts to receive medical assistance without being sanctioned by the university. As R.W. points out, numerous other circuits and district courts have addressed college student speech rights in the setting of university student codes. *See, e.g., Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995); *DeJohn v. Temple Univ.*, 537 F.3d 301, (3d Cir. 2008); *College Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp.2d 1005 (N.D. Cal. 2007); *Roberts v. Haragan*, 346 F. Supp.2d 853 (N.D. Tex. 2004). In these cases, courts dealt with facial challenges to various universities' student codes and regulations. Although R.W. has not challenged CBC's Student Code of Conduct on its face, these precedents are relevant to the issue of qualified immunity in this context. These cases all prevented universities from punishing their students' protected speech under their student conduct codes. Additionally, although some of the cases cite *Tinker*, they do not apply the *Tinker* standard to university regulation of student speech. *See, e.g.,*

*Dambrot*, 55 F.3d at 1184 (using a "fighting words" analysis to decide if a university's student code of conduct violated the First Amendment rather than *Tinker*); *DeJohn*, 537 F.3d at 319 (noting that the standard for imposing speech restrictions on college campuses is more stringent than the standard for imposing the same restrictions on high school students.); *College Republicans*, 523 F. Supp.2d 1005 at 1109–10 (explaining why *Tinker* does not apply directly to college campuses); *Roberts v. Haragan*, 346 F. Supp.2d at 870–72 (citing *Tinker* but applying traditional First Amendment exceptions to conclude that the student code "would suppress substantially more than threats, 'fighting words,' or libelous statements that may be considered constitutionally unprotected speech"). Thus dating from at least 1995 to present, case law has supported that universities may not rely on student codes to punish students for protected speech. R.W.'s right is clearly established.

Defendants argue in the alternative that if *Tinker* does not apply then the law is not clearly established. Therefore, Mr. Thornton and Mr. Reagan are entitled to qualified immunity. *Id.* at 19. Defendants state that the law governing their response to threats of school violence is in flux because of the Ninth Circuit's recent cases regarding school violence. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700 (9th Cir. 2019); *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062 (9th Cir. 2013); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001). However, the Court disagrees that case law is in flux, as argued by Defendants. Rather, as

explained *supra*, the Ninth Circuit's "school violence" cases consistently extend

*Tinker* to identifiable, off-campus threats of school violence in primary and

secondary schools, but not to college campuses.  *See id.*

Moreover, a 2007 case from the Northern District of California, *College*

*Republicans at San Francisco State v. Reed*, should have put CBC officials on notice

that they may not sanction students for protected speech under CBC's Student Code

of Conduct.  523 F. Supp.2d 1005 (N.D. Cal 2007).  In that case, the university's

chapter of College Republicans held an anti-terrorism rally where students stomped

on paper-versions of flags for Hamas, the Palestinian Libertarian Organization, and

Hezbollah.  *Id.* at 1007.  At the rally, the demonstrators allegedly disparaged the

Muslim religion.  *Id.* at 1009.  A student at the university filed a formal complaint

with the school, alleging that the demonstrators' conduct violated the school's code

of conduct by disparaging the Muslim faith.  The code required students "to be civil

to one another," prohibited intimidation and harassment, and prohibited conduct that

was inconsistent with the university's "goals, principles, and policies."  *Id.* at 1010.

The court analyzed whether the student code of conduct was constitutionally

overbroad on its face.

In its decision, the court clarified that the *Tinker* standard does not apply to

college campuses and illustrated how the First Amendment applies to student codes

of conduct.  *Id.* at 1014–17.  The Court explained that a student code may not

prohibit constitutionally protected speech by labeling it as "intimidation" and

"harassment." *See id.* at 1021–22 ("Standing alone, the terms 'intimidation' and 'harassment' are not clearly self-limiting and could be understood, reasonably, to proscribe at least some expressive activity that would be protected by the First Amendment."). While this case is not binding, it provides guidance and notice to universities which CBC disregarded.

College students have a clearly established right to engage in protected speech, even if that speech violates their universities' codes of student conduct. CBC officials violated clearly established law and violated R.W.'s First Amendment rights. Therefore, CBC officials Mr. Reagan and Mr. Thornton are not entitled to qualified immunity on R.W.'s First Amendment claim.

### III.  R.W.'s Discrimination Claims

R.W. also has alleged violations of the Americans with Disabilities Act (ADA), the Rehabilitation Act (RHA), and the Washington Law Against Discrimination (WLAD). CBC and R.W. have moved for summary judgment on these claims, but genuine issues of material fact remain such that summary judgment is inappropriate on those claims.

R.W.'s claims under all three statutes require proof of closely related elements. To succeed on his ADA claim, R.W. must prove: (1) he is a "qualified individual with a disability"; (2) he is "either excluded from participation in or denied the benefits of a public entity's services, programs, or activities"; and (3) that this exclusion or denial of benefits was because of his disability. *Duvall v. Cty of*

*Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (citing *Weinreich v. Los Angeles Cty*

*Metropolitan Transp. Auth.*, 114 F.3d 976 (9th Cir. 1997)). To establish causation

under the ADA, R.W. must show that the disability was a motivating cause in the

decision to exclude him. *Id.*

Similarly, to succeed on his RHA claim, R.W. must prove that he is a

qualified individual with a disability. *Id.* However, he also must prove that CBC

receives federal funding and that CBC excluded him or chose to deny him benefits

based solely on his disability. *Id.* To receive monetary damages under either

statute, R.W. must show that CBC acted with deliberate indifference in treating him

disparately from others. *Id.* at 1138–39.

A person with a disability is not a qualified individual if he or she poses a

"direct threat" to the "health or safety of others." 28 C.F.R. § 35.139(a). Public

entities must use an objective test to determine if a person with a disability poses a

direct threat. *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998). The decisionmaker's

subjective belief, "even if maintained in good faith," does not shield him from

liability if no objective threat exists. *Id.* When a public entity must decide if a

person is a direct threat, it must make an "individualized assessment." 28 C.F.R. §

35.139(a). It must base its assessment on "reasonable judgment that relies on

current medical knowledge or on the best available objective evidence." 28 C.F.R. §

35.139(b). The entity must determine "the nature, duration and severity of the risk;

the probability that the potential injury will actually occur; and whether reasonable

modifications . . . or the provision of auxiliary aids or services will mitigate the risk." *Id.*

The Washington Law Against Discrimination also prohibits discrimination on the basis of a mental disorder. Wash. Rev. Code. § 49.60.010. Washington state courts have explained that "state law relating to disability discrimination substantially parallels federal law, and courts may look to interpretations of federal anti-discrimination laws, including the ADA, when applying WLAD." *Matthews v. NCAA*, 179 F. Supp.2d 1209, 1229 (E.D. Wash. 2001) (citing *MacSuga v. Cty. of Spokane*, 983 P.2d 1167, 1171 (Wash. Ct. App. 1999)). To make out a prima facie claim of discrimination in a place of public accommodation under the WLAD, R.W. must show: (1) he has a disability, (2) CBC is a place of public accommodation; (3) people with disabilities do not receive services comparable to the services that non-disabled people receive, and (4) the disability was a substantial factor causing the discrimination. *Duvall*, 260 F.3d at 1135–36. However, unlike ADA and RHA claims, the plaintiff need not prove that the defendants acted with deliberate indifference to seek monetary damages. *Id.*

Neither R.W. nor CBC is entitled to judgment as a matter of law on R.W.'s discrimination claims. Several issues of material fact are still in dispute: (1) whether R.W. is a qualified individual or posed a direct threat, and (2) whether CBC's adverse actions toward R.W. were because of a disability.

***Direct Threat***

Whether R.W. posed a direct threat is a genuine issue of material fact. CBC has provided evidence illustrating that R.W. posed a direct threat. The school points to R.W.'s homicidal ideations about three identified CBC instructors. In those ideations, R.W. visualized killing those instructors in specific ways, namely by lighting their offices on fire and by attacking them with a saw. ECF No. 47-5 at 3. Through its later investigation of R.W.'s medical records, CBC officials learned that R.W.'s homicidal ideations were triggered, at least in part, by bad grades and negative feedback from those particular instructors. *See id.* Finally, CBC argues that R.W.'s doctors could not ensure that R.W. would not continue to have homicidal thoughts if he returned to CBC. *See* ECF No. 35-6 at 5–6. However, the record does not establish the matter in CBC's favor as a matter of law when viewed in the light most favorable to R.W., the nonmoving party in this portion of the analysis.

R.W. has provided evidence showing that he made no threats to anybody at CBC and did not present a threat. As he points out, the first communication that CBC received regarding his ideations expressly stated that he "may not be an immediate threat." ECF No. 37-10 at 10. Furthermore, by the time the school learned of his ideations, R.W. already had checked himself into Lourdes voluntarily with the hope of receiving treatment. ECF No. 35-2 at 50. Moreover, R.W.'s medical records, which R.W. supplied to CBC, are replete with evidence that he

ORDER RESOLVING CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 25

posed no objective threat.  Through its investigation of those records, CBC had

notice that R.W. did not have a plan to harm any instructors and "didn't like having

the intrusive thoughts."  EFC 37-22 at 11.  By March 9, 2017, Ms. Perez noted that

R.W. was not a danger to others.  *Id.*  On April 4, 2017, R.W.'s therapist indicated

that R.W. "appeared to have good insight and judgment."  *Id.* at 11.  At that meeting,

R.W. stated he had no more homicidal ideations, that he did not want to hurt

anybody, that he was sleeping better, and that "adjusting his medications helped with

his overall sense of well-being."  *Id.*  Finally, Mr. Reagan stated in his deposition

that he did not believe R.W. posed a serious risk of harm to anybody at CBC.  ECF

No. 37-8 at 16.

The Court finds that both parties have provided sufficient evidence to create

genuine issues of material fact as to whether R.W. presented a direct threat.  Those

factual issues need to be resolved by a factfinder on a more robust record than the

one currently before the Court.

### *Causation*

The parties have raised numerous causation arguments regarding R.W.'s

discrimination claims.  First, CBC argues that it did not discriminate against R.W.

on the basis of his disability, as a matter of law, because R.W. failed to establish that

his homicidal ideations relate to a disability.  However, R.W. has provided evidence

that his ideations were a symptom of his anxiety and depression.  For instance, Ms.

Perez's initial notes on R.W.'s ideations diagnose him with "Adjustment Disorder"

and "Unspecified Depressive Disorder." ECF No. 45-7 at 5. Furthermore, R.W.'s therapist diagnosed him with Unspecified Depressive Disorder and Acute Stress Disorder with accompanying anxiety, and Mr. Reagan had notice of this diagnosis through his investigation. ECF 37-22 at 11. In fact, Mr. Reagan concluded on April 17, 2017, before Mr. Thornton issued his decision on behalf of CBC to continue R.W.'s Richland campus trespass, that R.W.'s ideations were the result of mental problems. ECF No. 37-35. At that time, Mr. Reagan stated, "Through my investigation, this seems to be an episode out of character for the student and was a result of a combination of stress, anxiety, sleep deprivation, depression and possibly medication issues." *Id.* Therefore, R.W. has provided evidence to show that his homicidal ideations were a symptom of his disability and that CBC had notice of his disability and the connection to the alleged threats.

Second, CBC argues that, even if R.W.'s ideations stemmed from his disability, the court should not treat those symptomatic ideations as a disability and should allow CBC to punish R.W. for having the ideations. ECF 51 at 23; ECF No. 51 at 10 ("R.W.'s homicidal ideations are not a disability.") The school urges the Court to separate the symptoms of a disability from the disability itself for the purposes of causation. *Id.* CBC relies on cases from other circuits to conclude that "misconduct—even misconduct related to a disability—is not itself a disability" and may therefore be the reason for sanctioning a student. *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (quoting *Martinson v. Kinney*

*Shoe Corp.*, 104 F.3d 683, 686 n. 3 (4th Cir. 1997)).  These cases have explained

that certain misconduct, even when tied to a disability, can provide a reason for

dismissal or exclusion.  Such conduct includes working intoxicated due to

alcoholism and missing work consistently to receive medical treatment.  *Little v. FBI*

1 F.3d 255, 259 (4th Cir. 1993); *Tyndall*, 31 F.3d 209, 214–15 (4th Cir. 1994).

Here, CBC acted on R.W.'s statements to his healthcare provider to conclude

that R.W. violated the school's Student Code of Conduct because the thoughts had

the "effect" of creating "a hostile or intimidating environment."  EFC No. 37-8 at

14.  The alleged misconduct in this case is not of the same nature as the cases cited

by CBC.  CBC asks the courts to differentiate between a mental disorder and the

thoughts that the mental disorder causes.  The line between the two is untenable.  No

precedent requires this Court to differentiate between a disorder and the disorder's

symptoms.

Finally, CBC argues that it is entitled to summary judgment because it

trespassed R.W. for safety concerns, not because of his disability.  However, R.W.

has provided evidence that calls CBC officials' motives into question.  For instance,

Mr. Reagan stated that the goal of his investigation was to determine whether R.W.

would act out his homicidal thoughts, and he decided that R.W. was unlikely to do

so.  ECF No. 37-22 at 8.  He concluded, "My decision was that he wasn't going to

act them out but that it did unintentionally create an intimidating environment."  *Id.*

Mr. Reagan also had notice that just three days after R.W.'s ideations, Lourdes

records indicated that R.W. was not a danger to others. *Id.* at 12. Whether officials at CBC believed R.W. posed a credible threat, and the extent to which they based their decision to sanction him on that conclusion or because of a disability, is an issue of material fact that must be resolved by the factfinder. Therefore, summary judgment on R.W.'s discrimination claims under the ADA, RHA, and WLAD is inappropriate.

### CONCLUSION

R.W. is entitled to summary judgment on his First Amendment claim brought under Section 1983, because CBC officials sanctioned R.W. for constitutionally protected speech. Moreover, Defendants Ralph Reagan and Lee Thornton are not entitled to qualified immunity because the facts, when taken in the light most favorable to R.W., show that they violated R.W.'s clearly established First Amendment rights. Because genuine issues of material fact remain regarding R.W.'s disability discrimination claims under the ADA, RHA, and WLAD, neither party is entitled to summary judgment on those claims.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Motion for Summary Judgment, **ECF No. 31**, is **DENIED.**

2. Plaintiff's Motion for Summary Judgment, **ECF No. 36**, is **GRANTED IN PART** with respect to liability on R.W.'s claim under 42 U.S.C. § 1983. Plaintiff's motion is **DENIED in part** with respect to liability on his

claims under the Americans with Disabilities Act, the Rehabilitation Act, and the Washington Law Against Discrimination

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order, enter Judgment as outlined, and provide copies to counsel.

**DATED** October 4, 2019.


_____s/ Rosanna Malouf Peterson_____
ROSANNA MALOUF PETERSON
United States District Judge