Carl Warring
Assistant Attorney General
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Honorable Rosanna M. Peterson

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| R.W., individually and on behalf of his marital community,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA BASIN COLLEGE, a public institution of higher education, RALPH REAGAN, in his official and individual capacities, LEE THORNTON, in his official and individual capacities,<br><br>Defendants. | NO. 4:18-05089-RMP<br><br>DEFENDANTS' TRIAL BRIEF |

## I.  INTRODUCTION

From a purely neutral point of view, it is a good thing that R.W. sought treatment for his homicidal ideation. Also from a purely neutral point of view, it is also a good thing that the College, upon learning about R.W.'s homicidal ideation from professional crisis responders and law enforcement officers, took steps to ensure the rights of members of the college community were protected until the serious matter could be fully explored and addressed. Whether the steps

taken by the College (1) violated R.W.'s rights under the First Amendment[1] or disability discrimination laws and (2) were a proximate cause of a disruption to R.W.'s ability to complete his nursing education remains a disputed issue.

## II. FACTUAL BACKGROUND

The Defendants expect the evidence presented at trial to support the following brief factual description of the case:

On March 7, 2017, the Richland Police Department informed Columbia Basin College's campus security that a student in the school's nursing program, R.W., had been admitted to the Transitions Crisis Response Center after he expressed homicidal ideations about murdering three of his instructors by attacking them with saws and setting their offices on fire. The three named instructors—Valerie Cooke, Alma Martinez, and Kim Tucker—were current faculty members and present on the College's campus that day. Recognizing the serious nature of a student making specific and credible threatens to kill his instructors, Ralph Reagan, Assistant Dean for Student Conduct and Activities, issued a letter to R.W. establishing an interim restriction that prohibited R.W. from coming on the College's campuses pending an investigation into the matter.

---

[1] Defendants acknowledge that the Court has issued its order finding a First Amendment violation as a matter of law. Defendants have filed a notice of appeal to have that decision reviewed as a matter of right and thus continue to describe it as a disputed issue.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

R.W. had been scheduled to meet that very day with Valerie Cooke regarding continuing faculty concerns about his academic performance in the nursing program. R.W. had returned to the nursing program in January 2017 after withdrawing in 2016 due to a back condition. Since his return to the nursing program in 2017, R.W. struggled to complete his assignments or, when he did complete his assignments, meet the academic standards of the program. He had also missed multiple clinical rotations due to his epilepsy—on more than one occasion, he was forced to miss a clinical session or leave the hospital due to a perceived oncoming seizure.

The result of his academic struggles was that R.W., by his own admission, found himself under a considerable amount of stress. Upon his admission to the Transitions Crisis Center, he reported that he was not sleeping, eating poorly, and feeling overwhelmed by his issues at school. R.W. attributes his homicidal ideations to stress and a lack of sleep.

Two days after entering Transitions on March 6, 2017, R.W. sought to leave the facility against medical advice, but he eventually agreed to remain after a second evaluation by one of his providers, Araceli Perez. Transitions discharged R.W. on March 10, 2017.

The immediate aftermath of R.W.'s expressed homicidal ideations was a substantial disruption to the College and faculty. The crisis center and police informed all three instructors of R.W.'s statements about murdering them. For

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

instance, one of his instructors, Valerie Cooke, reported having a "complete meltdown" upon learning that R.W. had threatened to kill her. Faculty members were upset and concerned about whether R.W. would follow through on his expressed homicidal ideations.

While R.W. was in Transitions, Reagan mailed another letter to R.W. on March 8, 2017 to set a meeting for March 16 to discuss the response to R.W.'s homicidal ideations (the meeting actually occurred on March 22). This meeting started two separate, but related, processes: the interim restriction process and the student conduct process.

The interim restriction was the restriction placed upon R.W. by Reagan immediately upon learning of his homicidal ideations from the Richland Police Department. On March 10, 2017, R.W. emailed Reagan requesting an appeal of the interim restriction. On March 14, 2017, the Student Appeals Board, chaired by Pat Campbell, upheld the interim restriction. On March 22, 2017, R.W. appealed the decision of the Student Appeals Board. On April 19, 2017, President Lee Thornton modified the interim restriction, lifting R.W.'s restriction from being present on the Pasco campus, but requiring R.W. to coordinate any need to be on the Richland campus with Reagan.

The student conduct process focused on whether R.W. violated the College's student code of conduct. Following the March 22 meeting between R.W. and Reagan, Reagan sought additional information. Specifically, Reagan

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

(1) obtained and reviewed health care records from Dr. Michael Cabasug, R.W.'s primary care physician; (2) had a telephone conference with providers from Lourdes (Transitions) regarding R.W.'s evaluation and treatment; and (3) obtained and reviewed health care records from Lourdes, all as part of his information gathering process, before deciding what, if any, sanction was appropriate.

Reagan received Dr. Cabasug's records on April 4, 2017. The records included a letter written by Dr. Cabasug. Dr. Cabasug's letter described that R.W.'s homicidal ideation was out of character for R.W., but Dr. Cabasug stopped short of offering any assurance that R.W.'s homicidal ideation would not return if R.W. resumed the nursing program, nor can Dr. Cabasug offer any such assurance.

Reagan spoke with Transitions providers on or around April 13, 2017 and picked up R.W.'s treatment records on April 14, 2017. Although R.W. expected the Lourdes providers to support his return to the nursing program, Reagan remembers the providers expressing concerns about R.W.'s return. These concerns are consistent with the treatment recommendations by Perez, who thought R.W. should be monitored closely in an outpatient program upon his discharge from the crisis center. Perez made this recommendation because it is difficult to predict how a person will respond when they return to the community.

On April 20, 2017, Reagan issued his decision to impose sanctions. While Reagan found misconduct, he ultimately determined that R.W. could return to the nursing program in the Winter 2018 Quarter upon certain conditions.[2] R.W. appealed Reagan's decision on May 4, 2017. The Student Appeals Board, chaired by Michael Lee, upheld the sanctions on May 24, 2017. R.W. appealed the Student Appeals Board decision on June 7, 2017. Ultimately, the President of the College, Lee Thornton, upheld the sanctions on June 12, 2017.

Before he could continue in the nursing program, the College required R.W. to comply with five conditions or sanctions:

- He must continue to participate in his current mental health counseling and follow his counselor's recommendations.
- He must keep in open communication with Reagan regarding the status of his continued health counseling.
- He must meet with Reagan in October 2017 and provide a status update from his counselor.

---

[2] Winter 2018 would have been the first opportunity for R.W. to return to the nursing program. The nursing program is structured such that a student must successfully complete each quarter before moving on to the next quarter. R.W. has admitted that as of March 9, 2017, while he was still at Transitions, it was already too late for him to successfully complete the 2017 Winter Quarter.

- He must meet with Reagan on a monthly basis until Reagan no longer deems the meetings necessary.
- The trespass order for the Richland campus would remain in effect until he was enrolled in a program that required him to visit the Richland campus.

R.W. agrees that he was capable of completing all of these conditions. However, he made no attempt to comply with any of the conditions. He did not contact Reagan to continue in the nursing program, and he took no steps to re-enroll in the College's nursing program.

The Defendants' experts will testify that R.W. has sustained zero lost earnings, past or future, as a direct result of any alleged wrongdoing by the Defendants and that obtaining and maintaining employment as a Registered Nurse is not a reasonable occupational possibility for R.W.

### III.  CURRENT POSTURE

The Plaintiff, R.W., has brought suit against Defendants Columbia Basin College and individually-named Defendants Ralph Reagan and Lee Thornton. Plaintiff has brought claims arising under 42 U.S.C. § 1983 alleging that Reagan and Thornton violated his rights under the First Amendment of the United States Constitution.[3] Plaintiff is also seeking prospective injunctive relief against

---

[3] Plaintiff also alleged that the Defendants violated his rights under the Equal Protection Clause of the 14th Amendment, but it appears Plaintiff

1  Columbia Basin College, Reagan, and Thornton for violating his First
2  Amendment rights under 42 U.S.C. § 1983.  Plaintiff is also bringing claims for
3  disability discrimination arising under the Washington Law Against
4  Discrimination, RCW Ch. 49.60, the Americans with Disabilities Act, 42 U.S.C.
5  § 12132, and the Rehabilitation Act, 29 U.S.C. § 794.

6  The parties filed cross-motions for summary judgment on June 3, 2019
7  (*see* ECF No. 31; 36).  The Court heard oral arguments on the cross-motions for
8  summary judgment on August 29, 2019.  (ECF No. 55).  On October 4, 2019 the
9  Court issued its order on the cross-motions for summary judgment.  ECF No. 83.
10 The Court denied the Defendants' motion for summary judgment in its entirety
11 (including qualified immunity) and partially granted the Plaintiff's motion for
12 summary judgment on the First Amendment issue.  ECF No. 83.  The Defendants
13 are seeking immediate review of the Court's ruling on the issue of qualified
14 immunity as a matter of right.  ECF No. 86.

### IV.  LEGAL ISSUES

**A.  42 U.S.C. § 1983 – First Amendment**

To prevail on his 42 U.S.C. § 1983 claim against the Defendants, R.W. must prove, by a preponderance of the evidence, that (1) the Defendants acted under the color of state law; and (2) the acts of the Defendants deprived R.W. of

---

abandoned this argument during summary judgment briefing.  Therefore, the Defendants will not address it here.

his particular rights arising under the First Amendment. *See* Ninth Circuit Model Jury Instruction 9.3. The Defendants agree that they were acting under the color of state law at all times relevant to this action and, therefore, that issue is not in dispute.

R.W. must also prove additional elements to establish that the Defendants deprived him of his rights arising under the First Amendment. R.W. must prove by a preponderance of the evidence that (1) he was engaged in a constitutionally protected activity; (2) the Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) that R.W.'s protected activity was a substantial or motivating factor in the Defendants' conduct. *See* Ninth Circuit Model Jury Instruction 9.11. At particular issue in this case will be whether R.W. engaged in a protected activity by disclosing his homicidal ideations wherein he threatened to kill three of his instructors with a saw and set fire to their offices.

On at least two occasions, the Ninth Circuit has held that the First Amendment does not confer the right to make threats of school violence, even if the threats were made off-campus. *See McNeil v. Sherwood School Dist. 88J,* 918 F.3d 700 (9th Cir. 2019); *Wynar v. Douglas County School Dist.,* 728 F.3d 1062, 1069 (9th Cir. 2013) ("when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech . . ."). At least one other Ninth Circuit case affirms that the First Amendment

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

does not extend a right to make identifiable threats of school violence. *See LaVine v. Blaine School Dist.*, 257 F.3d 981 (9th Cir. 2001) (school district did not violate student's First Amendment right when it expelled him on an emergency basis after he showed his teacher a poem he had written which was filled with imagery of violent death and suicide and the shooting of fellow students). *Dariano v. Morgan Hill Unified School Dist.,* 767 F.3d 764, 779-780 (9th Cir. 2014).

The appropriate legal standard comes from *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The *Tinker* test is well described in *Dariano*:

> Under Tinker, schools may prohibit speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities," or that constitutes an "actual or nascent [interference] with the schools' work or ... collision with the rights of other students to be secure and to be let alone." As we have explained, "the First Amendment does not require school officials to wait until disruption actually occurs before they may act. In fact, they have a duty to prevent the occurrence of disturbances."

*Dariano v. Morgan Hill Unified School Dist.,* 767 F.3d 764, 776 (9th Cir. 2014). Thus, school speech—even speech that occurs off-campus—is not constitutionally protected when the speech (1) reasonably leads school authorities to forecast substantial disruption of or material interference with school activities; or (2) interferes with the rights of other faculty, staff, or students to be secure and to be let alone.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Here, R.W.'s off-campus speech was a specific and identifiable threat to kill three of his instructors—Valerie Cooke, Alma Martinez, and Kim Tucker—by attacking them with saw and setting their offices on fire. R.W. was aware that his statements would be communicated to others—his doctor informed him on the spot that he would be reporting these statements to crisis responders. There can also be no question that R.W.'s statements caused a substantial disruption and material interference with school activities. Many of the school's staff were worried and concerned about whether R.W. would follow through with his threats. In fact, one of his intended victims, Valerie Cooke, had a self-described "complete meltdown" and undertook substantial steps to ensure her security, including being escorted by security officers on-campus. Finally, R.W.'s statements interfered with the rights of the faculty and staff to be secure and let alone because his statements caused a massive security risk. Faculty was not sure whether R.W. would follow through with his statements if allowed back on campus, and given the severity of his threats, the College simply could not take such a risk. Ultimately, R.W. cannot meet his burden to show that the College deprived him of his rights arising under the First Amendment.[4]

---

[4] Defendants understand that under the Court's recent ruling on the competing summary judgment motions, the Court has rejected the Defendants' rationale. The rationale set forth is done so to preserve the issue for review.

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

## B. Americans with Disabilities Act (42 U.S.C. § 12132) and Rehabilitation Act (29 U.S.C. § 794) - Disability Discrimination

R.W. has brought a claim alleging that the College discriminated against him on the basis of a disability under the ADA and Rehabilitation Act. It is important at the outset to note that he is *not* bringing a claim alleging that the College failed to reasonably accommodate his disability. To prevail on his claim of disability discrimination under the ADA and Rehabilitation Act, R.W. must prove by a preponderance of the evidence that (1) he has a physical or mental impairment; (2) this physical or mental impairment substantially limited one or more major life activities; (3) R.W. was a "qualified individual" under the ADA and Rehabilitation Act; and (4) R.W. was sanctioned because of his physical or mental impairment. *See* Ninth Circuit Model Jury Instruction 12.1A.

First, R.W. must prove that he has a recognized disability under the ADA and Rehabilitation Act. A "disability" is a physical or mental impairment that substantially limits one or more of the major life activities of such individual. *See* Ninth Circuit Model Jury Instruction 12.2. R.W. will present testimony from his primary care physician that he suffered from depression, but it is important to note that homicidal ideations are not in and of themselves a mental impairment. To date, R.W. has produced no expert opinions that depression causes homicidal ideations. Even if depression did cause homicidal ideations, the College is entitled to take action against harmful conduct, even if that conduct occurs as a result of a cognizable disability. *See Macy v. Hopkins Cnty. Sch. Bd. of Educ.*,

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

484 F.3d 357, 366–71 (6th Cir.2007), abrogated on other grounds, *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) ("this court has repeatedly stated that an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job.").

Second, R.W. must prove that his mental impairment substantially limited one or more major life activities. R.W. was diagnosed with depression over a year before he expressed homicidal ideations. It is R.W.'s burden to establish how his depression substantially limited his major life activities.

Third, R.W. must establish that he was an otherwise qualified individual. The term "qualified individual" means an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of a student. *See* Ninth Circuit Model Jury Instruction 12.5. The comment to the Ninth Circuit model jury instruction for a "qualified individual" under the ADA cites *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir.2015) for its holding "that under Oregon disability law, interpreted consistently with ADA, employee who makes serious and credible threats to kill coworkers is not qualified individual regardless of whether threats stem from mental illness; ADA regulations do not require employer to analyze separately whether employee poses direct threat to health or safety of others in workplace under 42 U.S.C. § 12113."

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

*Mayo* is instructive for how the Ninth Circuit treats disability claims arising from the context of an employer or school responding to serious and credible threats and bears many similarities to R.W.'s case. Plaintiff Timothy Mayo was employed by PCC Structurals and had been diagnosed with major depressive disorder for over ten years when he suddenly began making threatening comments to his co-workers about killing a supervisor and manager with a shotgun. *Id*. at 942. Eventually, his co-workers reported these threats, and his employer immediately suspended him and barred him from company property. *Id*. at 943. After police visited Mayo, he consented to being placed in hospital custody for six days because he presented a danger to himself and others, and then was on Family and Medical Leave Act leave for two months. *Id*. While his "treating psychologist cleared Mayo to return to work, as he was not a 'violent person,'" his employer terminated his employment. *Id*. Ultimately, the Ninth Circuit held that "[a]n employee whose stress leads to serious and credible threats to kill his co-workers is not qualified to work for the employer, regardless of why he makes those threats. We have not located any cases, regulations, or guidance that disagree with this common sense principle." *Id*. at 944 – 45.

Here, the Ninth Circuit's reasoning in *Mayo* is directly applicable to R.W.'s homicidal ideations expressed in the school context. R.W. has testified that his own thoughts disturbed and frightened him to the point that he felt compelled to seek medical assistance—he can hardly argue now that his threats

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

were not serious and credible. Much like the employee in *Mayo*, R.W.'s threats disqualify him from attending school. Unlike the employer in *Mayo*, the College was willing to work with R.W. to implement common-sense measures to ensure that he would not act upon the same homicidal ideations that occurred when he was in the stressful environment of the nursing program. Because of the serious and credible threats that he made against the lives of his instructors, R.W. is not a qualified individual.

Fourth, R.W. must prove that he was sanctioned because of his physical or mental impairment. It is not enough for R.W. to argue that his depression caused him to have homicidal ideations—he must establish that the College took action because of his depression, as opposed to the homicidal ideations. *See Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 366–71 (6th Cir.2007), abrogated on other grounds, *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) ("this court has repeatedly stated that an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job."). There can be no question that the College took action solely as a result of R.W.'s conduct, not any disability. In fact, the evidence will show that R.W. had never informed the College that he was diagnosed with depression at the time the College issued its temporary trespass order in response to his homicidal ideations. The College was never concerned with whether R.W. had depression. The only concern of the

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

1  College was R.W.'s homicidal ideations and whether he would act upon them.
2  Therefore, R.W. will not be able to establish that he was sanctioned because of
3  his mental impairment.

4  It is a defense to R.W.'s ADA and Rehabilitation Act claims that if he
5  posed a direct threat to the health or safety of others, then he can be excluded
6  until he no longer poses a direct threat. *See* Ninth Circuit Model Jury Instruction
7  12.11. The comment to the Ninth Circuit Model Jury Instructions for the "direct
8  threat" defense note that "[b]ecause an employee who makes serious and credible
9  threats to kill coworkers is not a qualified individual, an employer is not required
10 to invoke the direct threat defense." (*citing Mayo v. PCC Structurals, Inc.*, 795
11 F.3d 941, 945 (9th Cir.2015). If the Court does require the Defendants to invoke
12 the direct threat defense, then the Defendants must prove that R.W. posed a direct
13 threat to the health and safety of others that could not be eliminated by a
14 reasonable accommodation. *See* Ninth Circuit Model Jury Instruction 12.11. The
15 jury can consider various factors in determining whether R.W. posed a direct
16 threat, including (1) the nature and severity of the potential harm; (2) the duration
17 of the potential harm; (3) the imminence of the potential harm; and (4) the
18 probability of the harm occurring. *Id*.

19 **C.  Damages**

20 The nature and extent of the injuries—if any—suffered by R.W., as well
21 as the proper amount of compensatory damages for those injuries remains in
22

dispute. Thus, Plaintiff will be held to his burden of proof in his case-in-chief absent any stipulations reached in advance of trial.

Defendants anticipate that disputes regarding damages will focus on whether R.W. would have been able to graduate from the College's nursing program following the 2017 Winter Quarter due to his intake at the Transitions Crisis Center; whether R.W. would have been able to sustain a career as a Registered Nurse given his various health issues, such as his epilepsy and back condition; and whether R.W. would have graduated from the College's nursing program if he had pursued re-enrollment in the 2018 Winter Quarter.

## V. WITNESSES / EXHIBITS / JURY INSTRUCTIONS / MOTIONS IN LIMINE / VOIR DIRE

Both parties' witnesses, exhibits, jury instructions, motions and limine and proposed voir dire have been filed with the Court under separate pleadings.

## VI. CONCLUSION

For the reasons set forth above, Defendants Columbia Basin College, Ralph Reagan, and Lee Thornton will seek a complete dismissal of all claims brought against it through motions at the time of trial and will ask a jury for a complete defense verdict, to the extent any claims are permitted to reach the jury.

DATED this 7th day of October, 2019.

ROBERT W. FERGUSON
Attorney General

  s/Carl P. Warring
CARL P. WARRING

WSBA No. 27164
Assistant Attorney General
Attorney for Defendants
1116 W Riverside, Suite 100
Spokane, WA 99201
(509) 456-3123
carlw@atg.wa.gov

**PROOF OF SERVICE**

I certify that I electronically filed the above document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

    Eric Eisinger                eeisinger@walkerheye.com

    Bret Uhrich                 buhrich@walkerheye.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 7th day of October, 2019, at Spokane, Washington.

                                  ROBERT W. FERGUSON
                                  Attorney General

                                  _s/Carl P. Warring_
                                  CARL P. WARRING
                                  WSBA No. 27164
                                  Assistant Attorney General
                                  Attorney for Defendants
                                  1116 W Riverside, Suite 100
                                  Spokane, WA 99201
                                  (509) 456-3123
                                  carlw@atg.wa.gov