FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 30, 2023

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| R.W., individually and on behalf of his marital community,<br><br>Plaintiff,<br><br>vs.<br><br>COLUMBIA BASIN COLLEGE, a public institution of higher education; LEE THORNTON, in his individual capacity; RALPH REAGAN, in his official and individual capacities; and REBEKAH WOOD, in her official capacity,<br><br>Defendants. | No. 4:18-CV-05089-MKD<br><br>ORDER DENYING PLAINTIFF'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW AND RULE 59 MOTION FOR A NEW TRIAL AND GRANTING IN PART PLAINTIFF'S RULE 59(e) MOTION TO AMEND JUDGMENT OR ALTERNATIVELY FOR RELIEF FROM JUDGMENT UNDER RULE 60<br><br>**ECF Nos. 256, 257** |

Before the Court is Plaintiff's Rule 50(b) Motion for Judgment as a Matter of Law and Rule 59 Motion for New Trial, ECF No. 256, and Plaintiff's Rule 59(e) Motion to Amend Judgment or Alternatively for Relief from Judgment Under Rule 60, ECF No. 257. The Court has reviewed the record and is fully informed. For the reasons set forth below, the Court denies Plaintiff's Rule 50(b) Motion for

ORDER - 1

Judgment as a Matter of Law and Rule 59 Motion for New Trial, ECF No. 256, and grants in part Plaintiff's Rule 59(e) Motion to Amend Judgment or Alternatively for Relief from Judgment Under Rule 60, ECF No. 257.

Plaintiff R.W. was a nursing student at Columbia Basin Community College (CBC) and had an on-file accommodation for epilepsy and back pain. He began the program in 2014 but stepped away in 2015 and again in 2016 to attend to his health. He returned to the program in fall 2016 and anticipated graduating in 2017. During the winter 2017 quarter, R.W.'s instructors noticed he was struggling academically. An instructor also noticed that he had facial tremors during a clinical rotation and became worried for him given his epilepsy diagnosis, so the instructor brought her concerns to the Director of the Nursing Program, who informed CBC's Office of Student Services. R.W. was scheduled to meet with the Director of the Nursing Program, the clinical instructor, and the Assistant Dean of Student Services on March 7, 2017.

On March 6, 2017, R.W. met with his primary care physician and advised the doctor that he had experienced intrusive thoughts that included homicidal ideations toward three faculty and staff members at CBC. Two of those faculty and staff members were scheduled to meet with R.W. the next day. R.W. was evaluated by a Designated Crisis Responder. He voluntarily checked into a mental health facility and remained there for a few days. Law enforcement was notified of

ORDER - 2

R.W.'s disclosure of homicidal ideations, who in turn, notified CBC of R.W.'s disclosure, and CBC trespassed him from its premises.  The trespass was later lifted in part so R.W. could return to the main campus, but he was still unable to return the Richland Campus where the nursing classes were held.  A student conduct investigation also began shortly after R.W.'s disclosure.

CBC found that R.W. violated the Student Code of Conduct, but it did not expel or suspend R.W.  Instead, CBC instituted a plan to work toward R.W.'s reinstatement, which included continued mental health counseling and adhering to his counselor's recommendations, regular meetings with the Assistant Dean for Student Conduct, and informing the Assistant Dean of his progress with his counselor and, in certain instances, permit the Assistant Dean to speak with R.W.'s counselor.  R.W. elected not to pursue the reinstatement plan and appealed the results of the student conduct investigation and the recommendations.  Each appeal was denied.  R.W. filed action in federal court.  After a six-day jury trial on R.W.'s Washington Law Against Discrimination (WLAD), Americans with Disabilities Act (ADA), and Rehabilitation Act (RHA) claims, the jury returned verdicts for Defendants.  R.W. now seeks judgment as a matter of law in his favor.

ORDER - 3

# BACKGROUND

## A. Procedural History

On May 25, 2018, R.W. filed this suit, alleging five causes of action: (1) a First Amendment violation under 42 U.S.C. § 1983 against Defendants Reagan and Thornton in their individual capacities, ECF No. 1 at 7 ¶¶ 38-39; (2) a Fourteenth Amendment violation under 42 U.S.C. § 1983 against Defendants Reagan and Thornton in their individual capacities, ECF No. 1 at 7 ¶¶ 38-39; (3) a violation of WLAD against all Defendants, ECF No. 1 at 8 ¶¶ 42-45; (4) discrimination under the ADA against Defendant CBC, ECF No. 1 at 8-9 ¶¶ 46-53; and (5) discrimination under the RHA against Defendant CBC, ECF No. 1 at 8-9 ¶¶ 46-53.  R.W. also sought injunctive relief against Defendants CBC, Reagan, and Thornton with respect to the alleged First and Fourth Amendment violations.  ECF No. 1 at 7-8 ¶¶ 40-41.

All parties moved for summary judgment.  ECF Nos. 31, 36.  The prior judicial officer determined "neither party [was] entitled to summary judgment" with respect to "R.W.'s disability discrimination claims under the ADA, RHA, and WLAD" given "genuine issues of material fact remain[ed]."  ECF No. 83 at 29. The prior judicial officer denied Defendant Reagan and Thornton qualified

ORDER - 4

immunity with respect to R.W.'s First Amendment § 1983 claim and granted

R.W.'s motion in part with respect to the same.[1]  ECF No. 83 at 9-22; ECF No. 84.

Defendants Reagan and Thornton appealed the denial of qualified immunity

with respect to R.W.'s First Amendment claim and petitioned for discretionary

review under 28 U.S.C. §1292(b) of the denial of summary judgment with respect

to R.W.'s ADA, RHA, and WLAD claims.  ECF No. 86 at 1-2; *see* ECF No. 90.

The Ninth Circuit declined to review the denial of summary judgment with respect

to R.W.'s ADA, RHA, and WLAD claims.  ECF No. 114.  The Ninth Circuit

reversed and remanded the denial of qualified immunity for Defendants Reagan

and Thornton because a constitutional violation was not clearly established:

> Here, there is room for debate on the dispositive issues, such as what response is permitted to violent statements, what constitutes a true threat, and whether the student speech doctrine extends to colleges and universities.  Therefore, we cannot say R.W.'s right to return to campus without [CBC]'s safety conditions was "clearly established."

ECF No. 121 at 3.

On remand, all Defendants sought partial summary judgment on R.W.'s

claim for injunctive relief under §1983.  ECF Nos. 128, 143.  The prior judicial

officer denied the motion with respect to Defendants Reagan and Thornton, ruling

---

[1] The Fourteenth Amendment claim was not included in either motion for summary

judgment.  ECF No. 83 at 18 n.3.

ORDER - 5

that Defendants Reagan and Thornton were not entitled to qualified immunity and granted the motion with respect to CBC, ruling it was entitled to qualified immunity.  ECF No. 151 at 36-37.  Defendants Regan and Thornton appealed.  ECF Nos. 157, 158.  On August 14, 2023, the Ninth Circuit affirmed the Court's determination that R.W.'s action for injunctive relief against Defendants Reagan and Thornton could proceed under the *Ex parte Young* exception to the Eleventh Amendment.  ECF No. 265 at 5, 10-15, 20-27.  The Ninth Circuit also held that it "lack[ed] jurisdiction to review the district court's order declining to reconsider its partial summary judgment ruling on liability."  ECF No. 265 at 5, 12.  Accordingly, it dismissed Defendants Reagan and Thornton's appeal with respect to that claim.  ECF No. 265 at 27.

On August 1, 2022, a six-day jury trial commenced with respect to R.W.'s WLAD, ADA, and RHA claims.  On August 8, 2022, prior to the close of R.W.'s case-in-chief, Defendants filed a motion for judgment as a matter of law.  ECF No. 242.  On August 9, 2022, evidence concluded and both parties presented closing argument.  R.W. filed a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) that same day.  ECF No. 247.  Shortly thereafter, the ten-person jury returned a verdict, finding in favor of Defendants on all claims.  EFC 250.  The Court denied R.W.'s Fed. R. Civ. P. 50(a) motion as the case had already been submitted to the jury.  *See* ECF No. 255.  The Court expressed no opinion on the

1   merits of R.W.'s Fed. R. Civ. P. 50(a) motion.  ECF No. 255 at 5.  Because the

2   jury returned a defense verdict, the Court denied as moot Defendants' motion for

3   judgment as a matter of law.  *See* ECF No. 254.  Judgment was entered on August

4   10, 2022.  ECF No. 252.

5        On September 6, 2022, R.W. renewed his motion for judgment as a matter

6   of law under Fed. R. Civ. P. 50(b).  ECF No. 256.  R.W. also moved the Court to

7   amend the judgment.  ECF No. 257.

8   **B. Summary of Evidence at Trial**

9        R.W. provided testimony related to his history of medical issues.  R.W. was

10  diagnosed with epilepsy when he was twelve years old, and he has been taking

11  medications to lessen the possibility of seizures since his diagnosis.  At trial, he

12  testified that shortly before a seizure, his hands begin shaking.  He explained that

13  when he is seizing, he loses consciousness, but he normally does not need to be

14  taken to an emergency room.  While he may have a headache, rest generally allows

15  him to return to his normal day-to-day activities within one to two days.  R.W. had

16  also been treated for depression for a few years prior to the subject incident.

17        In 2014, R.W. began nursing school at CBC.  CBC's main campus is in

18  Pasco, Washington, but the nursing program and its classes are based in Richland,

19  Washington.  When he enrolled, he had a meeting with Peggy Buchmiller, now-

20  retired Assistant Dean in Student Services at CBC.  At that time, R.W. requested

accommodations for his diagnosis of epilepsy and provided the requisite paperwork to Ms. Buchmiller's office. An official accommodation memorandum was sent to each of R.W.'s teachers advising them of R.W.'s reasonable accommodations. These included extended time to make up any assignments, lab work, or tests he missed due to a seizure. R.W. missed some classes in 2015 due to seizures, but he was able to make up the course work such that he successfully completed his first year of nursing school.

Toward the end of his first year, R.W. started experiencing back pain. When the pain began, he thought it was tolerable and opted to enroll in an optional summer quarter, which required him to participate in clinical rotations at the local hospital. There, he would be required to attend to patients under the supervision of a licensed professional. Shortly after the summer 2015 quarter began, R.W. withdrew from class due to the pain.

He returned for the fall 2015 quarter and successfully completed it, and he started the winter 2016 quarter. R.W. testified that the pain had not subsided, and he was unable to manage the back pain while he was in school, so he withdrew again. He had a L5-S1 laminectomy. R.W. was medically cleared to return to classes in the fall 2017 quarter. The director of CBC's nursing program, Kim Tucker, informed R.W. that he would be required to update his CPR certification, retake a skills test, and pass a standardized math test before he could register for

ORDER - 8

classes.  He successfully completed the requirements to register for those classes.
He subsequently visited with Ms. Buchmiller and received accommodations for
epilepsy and back pain due to the L5-S1 laminectomy.  Ms. Buchmiller testified
that R.W. only sought accommodations for epilepsy and back pain, never
depression or anxiety.

R.W. testified that he was uncharacteristically stressed upon his return to the
program in 2017.  Ms. Tucker testified that the nursing program only permitted
students to withdraw twice during their tenure before its policy required students to
reapply for the program and begin anew.  R.W. testified that this was his
understanding of the program's policy.  Given that R.W. had already withdrawn
twice (once during the summer 2015 quarter and again in the winter 2016 quarter),
he knew he would be required to finish his schooling in 2017 without withdrawing,
or he would be required to reapply and start the program again.  R.W. testified that
he believed the pressure to finish the program, coupled with the stress of his
coursework, was causing his inability to get sufficient sleep.

R.W. struggled academically in the winter 2017 quarter.  When the midterm
grades were calculated, R.W. had grades below 75%, which is the requirement to
pass at the end of the quarter.  R.W. testified that he believed some of his grades
were low in part because he had missed some classes due to seizures and had not
yet had the chance to make up those assignments.

ORDER - 9

1    Ms. Tucker and other faculty of the nursing program testified that when a

2    student has a failing grade at the midterm, the teacher can initiate an "academic

3    report."  This report serves to notify the student of a failing grade.  The process

4    also serves as a mechanism to seek insight from students as to why they may be

5    struggling and to determine what, if anything, the faculty can do to support the

6    students through the end of the academic quarter.  R.W. was issued an academic

7    report for his grades in Nursing 221 and Nursing 235 on February 13, 2017.

8    On February 28, 2017, R.W. had intrusive thoughts of homicidal ideations.

9    These intrusive thoughts contained imagery in which R.W. was in a faculty

10   member's office that was on fire and in which he envisioned attacking three faculty

11   and staff members with a saw.  These homicidal ideations were directed toward

12   Ms. Tucker, the director of CBC's nursing program; Valarie Cooke, R.W.'s

13   clinical instructor; and Alma Martinez, another instructor in the nursing program.

14   After having these thoughts, R.W. made an appointment with his primary care

15   physician (PCP), Dr. Michael Casabug, for March 6, 2017.

16   On March 2, 2017, R.W. was in a second-year class comprised of clinical

17   rotations, supervised by Valerie Cooke.  She observed R.W.'s hands shaking and a

18   facial tremor.  She knew of R.W.'s condition, so she asked him to speak to him

19   privately.  She observed he still had tremors when they were speaking.  R.W.

20   advised Ms. Cooke that the tremors are generally precursors to grand mal seizures.

ORDER - 10

He advised Ms. Cooke that he was having one grand mal seizure every other week since he returned to the nursing program the previous quarter.  R.W. advised Ms. Cooke that he was not carrying anti-convulsive medication.  Ms. Cooke became concerned for R.W. and his wellbeing, especially since he was not carrying his anti-convulsive medication.  Ms. Cooke emailed Ms. Tucker about her observations of R.W. and her conversation with him.

Ms. Tucker testified that after she received Ms. Cooke's email, she became worried about the safety of R.W. and those who would be in his care while he was in the clinical rotation.  She reached out to Ms. Buchmiller to discuss appropriate action and revisit what accommodations may be necessary for R.W.  Ms. Tucker decided to ask R.W. to attend a meeting on March 7, 2017.  There, Ms. Tucker expected to speak with R.W. about his academic report and to discuss what, if any, support she, Ms. Cooke, Ms. Buchmiller, and/or Mary Horner, now-retired Dean of Health Sciences at CBC, could provide to R.W. given the increased frequency of his seizures.

On March 6, 2017, R.W. attended the appointment with his PCP that he had scheduled in late February.  When R.W. informed Dr. Casabug of his intrusive thoughts which contained homicidal ideations, Dr. Casabug called a Designated Crisis Responder (DCR) to his office.  Araceli Perez, a state-certified DCR, responded.  Ms. Perez conducted a two-hour evaluation of R.W., and she testified

ORDER - 11

that she believed R.W. was open and honest with her about his intrusive thoughts.

R.W. again described to Ms. Perez the nature of those thoughts.  Ms. Perez

reported that R.W. had thoughts of harming instructors by either setting one of

their offices on fire and fleeing or using a saw and attacking them from behind.

Ms. Perez testified that R.W. advised her that he thought the triggers for these

thoughts were bad grades and negative feedback from instructors.  Ms. Perez

reported that R.W. denied planning to act on these thoughts.  Ms. Perez also noted

that R.W. appeared remorseful for his thoughts.  However, Ms. Perez testified that

she took R.W.'s homicidal ideations, which included specific targets, seriously.

Moreover, Ms. Perez believed that by identifying mechanisms through which he

envisioned harming or killing someone, R.W. had started a plan.

Ms. Perez made notes that when she met with R.W. on March 6, 2017, he

was dressed appropriately, she saw no indications that R.W. was experiencing

hallucinations, and R.W. indicated no signs of impulsivity on that date.  She noted

that she believed R.W. was depressed and that the intrusive thoughts may have

been a result of his stress-induced depression.  However, Ms. Perez determined

that R.W. did represent a risk to others.  Given the seriousness of the potential

threat to others, and the fact that R.W. reported that these thoughts had been

occurring for approximately one week, she convinced R.W. to report to a mental

health treatment center voluntarily.  She advised R.W. that if he did not do so

voluntarily, she would petition for his involuntary commitment, which would last for at least three days. Rather than be involuntarily committed, R.W. agreed to check in to Transitions, a residential crisis triage facility, a service of Lourdes Counseling Center, in Pasco, Washington. He checked into the facility on March 6, 2017. Ms. Perez testified that she informed R.W. that if he would like to leave the facility and the facility's medical team opposed R.W.'s discharge, she would be required to reevaluate him. R.W. wished to leave the facility throughout his stay but was not discharged for four days.

While there, R.W. met with multiple staff members of Transitions. Laurie Schoffstall is a mental health professional at Transitions. She is responsible for triaging new patients. She conducted an additional evaluation of R.W., but she also relied on some of the information that was provided in Ms. Perez's report. Ms. Schoffstall reconfirmed that R.W. felt he was in a constant state of anxiety because he had fallen behind in his schoolwork and was worried about finishing the program. Ms. Schoffstall noted that R.W. reiterated the homicidal ideations toward faculty and staff of CBC. She also noted R.W. discussed with her the stress the nursing program was putting him under. He also discussed the financial stress he was dealing with. Ms. Schoffstall agreed that R.W.'s stress from school was a main contributor to his mental health crisis. She also indicated in her report that R.W. was a danger to others due to his homicidal ideations and that those

ORDER - 13

homicidal ideations were taken seriously.  R.W. also reported his lack of sleep to Ms. Schoffstall.  Ms. Schoffstall testified that she felt like R.W.'s main complaint was his difficulty falling and staying asleep.

On March 7, 2023, R.W. spoke with Michelle Arronow, a psychiatric nurse practitioner at Lourdes.  R.W. reported to Ms. Arronow that he was overwhelmed by his schoolwork and indicated that these feelings were preventing him from falling asleep and staying asleep.  R.W. also admitted to Ms. Arronow that he had the intrusive thoughts of homicidal ideations.  While testifying, Ms. Arronow acknowledged R.W.'s hypothesis that his intrusive thoughts could have included Ms. Tucker, Ms. Cooke, and Ms. Martinez because he interacted with them the most in the program.  She explained that a person's intrusive thoughts can center on individuals that are close to or around the person.  She gave the example of a postpartum mother having fleeting thoughts of harming the infant when the mother is sleep deprived.  She prescribed R.W. trazadone to help him sleep.  During this conversation, R.W. advised Ms. Arronow that he wished to leave the facility.  Ms. Arronow testified that she convinced him to remain at Lourdes given his lack of sleep and the fact that the sleep deprivation may be a contributing factor to the homicidal ideations.

On March 9, 2017, R.W. again expressed a desire to leave the facility, which was against the advice of medical professionals.  Ms. Perez was called to

ORDER - 14

Transitions, and she conducted her second evaluation of R.W.  Ms. Perez testified that she was told R.W. was providing information that conflicted with what he provided to her during the initial evaluation.  Ms. Perez indicated that she believed R.W. was attempting to minimize his intrusive thoughts and homicidal ideations.  Ultimately, Ms. Perez convinced R.W. to remain in the facility.

In Ms. Perez's initial report, she indicated that R.W. advised that he had homicidal ideations, which may have been triggered by low grades and poor feedback from instructors.  She also reported that R.W. denied actively planning to act on the homicidal ideations and testified that she had no indication from R.W. that he possessed an intent to act on the intrusive thoughts.  Her report also reflected that R.W. seemed remorseful.  At Ms. Perez's second evaluation of R.W., she believed he was minimizing his intrusive thoughts.  She and the other mental health staff at Transitions did not feel he was stable enough for voluntary discharge at that time.  After her evaluations of R.W., Ms. Perez made recommendations in her report with respect to what actions R.W. should be required to take upon his later discharge.  One of those recommendations included participating in out-patient counseling, which she believed was in the best interest of public safety.  R.W. was discharged a few days later.

As a DCR, Ms. Perez is a mandatory reporter and has a duty to warn when a person expresses homicidal ideations, which means she is required to contact the

1  possible victims and law enforcement.  The duty to warn is mandatory.  In her

2  report, she noted that she informed R.W. of this duty.  After concluding her

3  evaluation of R.W., she called and left a voicemail for Ms. Horner, the then-Dean

4  of Health Sciences at CBC, and informed the local police department.  The

5  Richland Police Department informed campus security, who informed Mr. Ralph

6  Reagan, the Assistant Dean for Student Conduct and Activities at CBC.  Levi

7  Glatt, CBC's campus security supervisor, testified that he was aware that R.W.

8  was supposed to meet with Ms. Tucker, Ms. Cooke, Ms. Thompson, and Ms.

9  Buchmiller on March 7, 2017.  He stated he was unaware that R.W. had been

10 checked into an inpatient facility at that time, so he and campus security were

11 under the impression that there was a possibility that R.W. could come to the

12 campus in an attempt to meet with those individuals.

13     On March 7, 2017, Richland Police Officer Noren went to Ms. Tucker's

14 office to inform her of R.W.'s homicidal ideations.  Ms. Tucker testified that

15 Officer Noren referred to R.W.'s disclosures as "threats."  Ms. Tucker testified she

16 was blindsided by this information as she had interacted with R.W. the previous

17 day, and she recalled him being in a good mood.  Officer Noren's report reflected

18 Ms. Perez's opinion that R.W. seemed to be remorseful and unlikely to act on his

19 intrusive thoughts.  However, Ms. Perez did not recall telling Officer Noren that

20 information.

ORDER - 16

1    On March 8, 2017, the day after Officer Noren's visit, Ms. Tucker filled out

2    a "Nursing School Discontinuation Form." Ms. Tucker testified that that form was

3    an "internal tracking system" and was not used by anyone outside of the nursing

4    program. On the same day, Ms. Tucker also drafted a letter informing R.W. that

5    he was to be dismissed from the program based upon a breach of professional

6    standards. She then emailed that letter to Virginia Tomlinson, the now-retired

7    Vice President of Instruction at CBC. Ms. Tomlinson edited that letter and gave

8    Ms. Tucker permission to serve it upon R.W. Before that service could be

9    effectuated, Defendant Reagan, the Assistant Dean for Student Conduct and

10   Activities at CBC, became aware of the letter. He informed his immediate

11   supervisor, Patricia Campbell, the now-retired Vice President of Student Services

12   at CBC about the letter. Ms. Campbell told Ms. Tomlinson the letter could not be

13   sent as it would violate R.W.'s rights. Ms. Tucker testified that Ms. Tomlinson

14   told her to shred the letter, so she did. The letter was never sent and never served

15   on R.W.

16       Defendant Reagan testified that he and his office become involved when

17   there is an allegation of a violation of the CBC Student Code of Conduct. He

18   indicated that disciplinary matters can be brought to his or his office's attention

19   through a variety of means, such as a report from campus security, an email, a

20   news report, etc. On March 7, 2017, Defendant Reagan learned of R.W.'s

ORDER - 17

homicidal ideations from a call or an email from CBC's campus security. Defendant Reagan was also informed that R.W. was in a mental health facility at that time. Upon learning of R.W.'s intrusive thoughts and homicidal ideations, Defendant Reagan began two processes: issuing an interim trespass and a student conduct investigation. Each will be discussed in turn.

When Defendant Reagan was informed of R.W.'s homicidal ideations, he spoke with Ms. Campbell about issuing an interim trespass, which would prohibit R.W. from being on CBC's Pasco or Richland campuses. Ms. Campbell agreed with the decision to issue an interim trespass given the concern for imminent danger. Defendant Reagan explained that an interim trespass is an emergency action taken as a safety measure, which permits the investigation portion of the student conduct process to begin safely. Defendant Reagan wrote and served upon R.W. a letter informing him of the trespass. On March 7, 2017, Defendant Reagan also began the investigatory process (the student conduct investigation is discussed in more detail below). While at Transitions, R.W. received the letter informing him he was trespassed from CBC's campuses. The letter included instructions on how to appeal the interim trespass. R.W. emailed Defendant Reagan with his intent to appeal the decision. Ms. Campbell drafted and sent a letter indicating that CBC had received R.W.'s notice of intent to appeal.

ORDER - 18

1      Defendant Reagan and other administrators spoke with some of R.W.'s

2   physicians and mental health providers during the time period after R.W. was

3   discharged from Transitions and before the Student Appeals Board met regarding

4   R.W.'s appeal of the interim trespass.  Dr. Casabug, R.W.'s primary care

5   physician, saw R.W. after he was discharged from Transitions.  He testified that

6   R.W. was stable and that he provided CBC with a letter indicating that he believed

7   that this conduct was out of character for R.W.  However, he also admitted that this

8   was based on knowledge and observations he had of R.W. prior to R.W. returning

9   to the rigors of the nursing program.  Dr. Casabug agreed the nursing program

10  appeared to be a precursor to the intrusive thoughts.  Thus, Dr. Casabug could not

11  provide CBC with a reasonable assurance that R.W. was not a threat to faculty,

12  staff, or the campus in the future.

13      During this time, Defendant Reagan and Ms. Campbell also spoke with Ms.

14  Arronow and Alejandro "Alex" Soulia, a therapist at Lourdes Counseling Center,

15  who R.W. began seeing once a month after R.W.'s discharge.  Ms. Arronow had

16  only seen him for a few days while he was a patient at Transitions, so she, too,

17  could not provide CBC with a reasonable assurance that R.W. was not a threat to

18  faculty, staff, the campus in the future.  Neither could Mr. Soulia as Mr. Soulia had

19  only met with R.W. once prior to his conversation with Defendant Reagan and Ms.

20  Campbell.

ORDER - 19

1    This information was provided to the Student Appeals Board (SAB).  The

2    SAB met on March 13, 2017, and affirmed the decision to issue the interim

3    trespass.  R.W. was informed of the SAB's decision and also advised of a

4    procedure to appeal the board's decision to CBC's President.  R.W. did so.  Dr.

5    Lee Thornton, the then-Interim President of CBC, reviewed the appeal and

6    affirmed the SAB's decision due to the lack of reassurance from any of R.W.'s

7    providers regarding R.W.'s future conduct.

8    The student conduct investigation began on March 8, 2017, when Defendant

9    Reagan issued a letter indicating that he opened an investigation into R.W.'s

10    conduct.  He testified that, as Assistant Dean for Student Conduct and Activities,

11    he was responsible for all investigations in which a CBC student was alleged to

12    have violated the CBC Student Code of Conduct.  R.W. was alleged to have

13    violated the provision prohibiting abusive conduct, which includes a prohibition of

14    conduct that threatens the health or safety of any person or which has the purpose

15    or effect of creating a hostile or intimidating environment.  R.W. met with

16    Defendant Reagan to discuss the student conduct investigation.  Defendant Reagan

17    testified that R.W. conveyed to him that he understood why the interim trespass

18    was issued.  Defendant Reagan also requested that R.W. provide him access to his

19    medical records, and R.W. obliged.  Defendant Reagan testified that he received

20    records from Dr. Casabug but did not believe he received documentation from

ORDER - 20

Transitions or Lourdes.  When Defendant Reagan completed his investigation, he informed R.W. of a plan that would allow R.W.'s return to campus and for him to finish his degree.

On April 19, 2017, Defendant Thornton modified the interim trespass so R.W. could be on the main campus in Pasco.  The modification also permitted R.W. to return to the Richland campus if he kept the requisite people informed prior to his presence and followed the directives enumerated below.

The parties also stipulated that Defendant Reagan found R.W. responsible for violating CBC's policy on Abusive Conduct and sanctioned R.W. for the violation.  On April 20, 2017, Defendant Reagan issued a letter outlining that decision and the parameters for R.W.'s return.

Defendant Reagan testified that for R.W. to return to CBC, R.W. was required to: (1) continue attending his monthly sessions with Mr. Soulia and follow through with Mr. Soulia's recommendations, (2) inform Defendant Reagan of his progress with Mr. Soulia and allow Defendant Reagan to speak with Mr. Soulia "if the need arises,"[2] and (3) meet with Defendant Reagan once per month beginning in October 2017 until Defendant Reagan deemed it was no longer necessary.

---

[2] The second condition indicated that Defendant Reagan would contact R.W. before reaching out to Mr. Soulia.

ORDER - 21

Defendant Reagan testified these conditions were chosen because they would allow Mr. Soulia, as the mental health professional, to guide R.W.'s treatment, which is what CBC ultimately desired.  R.W. was also required to remain away from the Richland campus until R.W. became registered for classes that required his presence there.  However, the April 20 letter also explained that if R.W. needed to visit the Richland campus prior to registering for classes, R.W. was required to contact Defendant Reagan, who would in turn make arrangements if the reason was "valid."  Defendant Reagan testified that he wanted R.W. to be successful in his return to CBC but had to balance that desire with the need to protect the safety of the faculty, staff, and campus.

Defendant Reagan testified that investigations, and any resultant disciplinary actions taken, are in accordance with the policies set forth in CBC's Student Code of Conduct.  Defendant Reagan's investigation conducted in accordance with the policies set forth by the Student Code of Conduct would have been the only authorized sanctions of the university.  Defendant Reagan explained that the nursing program faculty's desire to dismiss R.W. from the program played no role in the student conduct investigation.  Defendant Thornton and the now-President of CBC, Dr. Rebekah Woods, testified that the nursing program faculty did not have input into the outcome of the student conduct process, nor did they have the authority to remove him as a student.  The end result of the CBC's student conduct

1  investigation was not suspension or expulsion.  As explained above, R.W. was free

2  to register for classes in winter 2017 so long as he complied with the enumerated

3  conditions set forth above.

4       R.W. testified that he could have fulfilled all of the requirements Defendant

5  Reagan imposed.  However, R.W. testified that he was uncomfortable with the idea

6  of letting Defendant Reagan have "indefinite" access to his medical records and,

7  what he described as, unfettered contact with Mr. Soulia.  R.W. explained that he

8  was willing to cooperate with the investigation but was unwilling to be potentially

9  embarrassed by what may be disclosed in the future.  Because R.W. wanted to be

10  able to register for nursing classes without all the conditions Defendant Reagan

11  imposed, R.W. appealed the decision and the requirements for his return.

12       R.W. filed his appeal on May 4, 2017.  On May 24, 2017, the SAB affirmed.

13  R.W. then appealed the SAB's decision on June 7, 2017.  On June 12, 2017,

14  Defendant Thornton affirmed the SAB's decision and wrote a letter to R.W.

15  explaining his decision.  In that letter, Defendant Thornton explained that R.W.

16  had not been suspended or expelled from CBC, and it was his and CBC's

17  expectation that R.W. would return to the program for the winter 2018 quarter and

18  finish his degree.  The parties stipulated that Defendant Thornton, as the then-

19  interim President of CBC, was the final decisionmaker regarding R.W.'s appeal

20  from the SAB and the conditions imposed.

ORDER - 23

1      While the investigation and subsequent appeals were ongoing, the winter

2   2017 quarter ended on March 23, 2017.  R.W. did not finish his coursework for his

3   winter 2017 quarter, so he received failing grades in some of his classes.

4   According to Benjamin Beus, the Director of Financial Aid at CBC, these failing

5   grades caused R.W.'s financial aid to be suspended.  CBC requires students to

6   maintain satisfactory academic progress to be eligible for financial aid at CBC.

7   This suspension was only relevant to receiving financial aid at CBC, not R.W.'s

8   ability to receive financial aid if he chose to enroll at a different university.  Mr.

9   Beus testified that R.W.'s financial aid suspension would have been withdrawn

10  when his grade point average (GPA) met the college's standard.  Mr. Beus

11  explained that R.W. would have needed to complete one five-credit class and earn

12  a grade above a 2.0 in that class to be in good standing to receive financial aid

13  through CBC again.  R.W. did not enroll in one five-credit class and earn a grade

14  above a 2.0 in that class in order to return to good standing and receive financial

15  aid.

16     Additionally, R.W. did not complete the requirements set forth by Defendant

17  Reagan.  R.W. testified that he was under the impression that he would not be able

18  to return to the nursing program because of a policy in the program's handbook.

19  That policy essentially indicated that should a student be withdrawn for a third

20  time, the student would be required to reapply for the program and start anew.

ORDER - 24

However, Defendant Thornton and Dr. Woods testified that would not have been the case in this matter as R.W. was never suspended or expelled.  They and Defendant Reagan fully expected R.W. to comply with the requirements and return to CBC to finish the program.  Dr. Woods testified that R.W. cannot do so now because he failed to engage with the reinstatement process.

## PLANTIFF R.W.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL

R.W. has renewed his Rule 50(a) motion in his Rule 50(b) motion. *Compare* ECF No. 247 *with* ECF No. 256.  R.W. asserts that Defendants committed *per se* discrimination given "the sanctions imposed by Defendants placed an impermissible financial burden on [R.W.]"  ECF No. 256 at 2.  Specifically, R.W. cites to Defendants' requirement that R.W. pay for individual counseling, and only allowing him to return to campus on the condition that he do so, without financial aid.[3]  ECF No. 256 at 2.

---

[3] Plaintiff states that "R.W.'s claims for discrimination are broader than this."  ECF No. 256 at 2.  However, he does not present any other claims in this motion, nor did he advance any other claim in his Rule 50(a) motion.  The Court will only consider the argument advanced here.

ORDER - 25

1    Defendants assert R.W. has failed to establish that judgment as a matter of

2    law is appropriate because R.W. "relies on an incomplete review of the evidence

3    presented at trial, ignores competing evidence . . . and [fails] to reconcile the

4    testimony and documents admitted at trial that contradict the factual narrative he

5    advances[.]" ECF No. 259 at 3.  Specifically, Defendants assert there was

6    sufficient evidence for the jury to conclude R.W. (1) was not a qualified individual

7    with a disability and (2) was not excluded from participation solely by reason of a

8    disability or that a disability was a substantial factor in any exclusion.  ECF No.

9    259 at 4-11.

10    **A. Legal Standard**

11    Judgment as a matter of law under Rule 50 is appropriate when "the

12    evidence permits only one reasonable conclusion, and that conclusion is contrary

13    to the jury's verdict." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 455 (9th Cir.

14    2018) (quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006)); *see* Fed.

15    R. Civ. P. 50(a)(1).  "The verdict will be upheld if it is supported by substantial

16    evidence, 'even if it is also possible to draw a contrary conclusion.'" *First Nat'l*

17    *Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011) (quoting

18    *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).  A Rule 50(b) motion renews

19    a party's Rule 50(a) motion.  *See* Fed. R. Evid. Civ. P. 50(b).  Accordingly, the

20    moving party can only renew the arguments it made in its Rule 50(a) motion.  The

party "cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

"A motion for judgment as a matter of law under Rule 50(b) and a motion for a new trial under Rule 59 'have wholly distinct functions and entirely different standards govern their allowance.'" *Berg for C.K.M. v. Bethel Sch. Dist., No. 3:18-CV-5345-BHS*, 2022 WL 796315, at *2 (W.D. Wash. Mar. 16, 2022) (citing 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2531 (3d ed. 2021)). Rule 59(a) permits the Court to grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for a new trial may be granted[,]" but the Court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

ORDER - 27

**B. Elements of the Claims**

R.W. filed three disability discrimination claims under three separate statutes. R.W. alleged all Defendants violated the WLAD and that CBC violated the ADA and RHA. The jury returned defense verdicts on the three claims that proceeded to trial. ECF No. 250. Thus, the jury found that R.W. did not meet his burden to prove that (1) CBC discriminated against him under the ADA; (2) CBC discriminated against him under RHA; and (3) any of Defendants violated WLAD.

*1. WLAD Claim*

The elements of a WLAD claim are: (1) R.W. has a disability[4]; (2) CBC is a place of public accommodation; (3) Defendants discriminated against R.W. by providing treatment different than that provided to non-disabled persons; and (4) R.W.'s disability was a substantial factor[5] in Defendants' decision to treat R.W. differently than non-disabled persons. ECF No. 248 at 34.

_____

[4] "Disability" was defined for the jury as "a sensory, mental, or physical impairment that: is medically recognized or diagnosable; or exists as a record or history; or is perceived by the employer to exist, whether or not it exists in fact."

[5] The jury was instructed that a "'substantial factor' does not mean the only factor or the main factor in the challenged act or decision[.]" ECF No. 248 at 34. They were also instructed, "It is not unlawful to refuse services based on behavior or

ORDER - 28

*2.  ADA Claim*

The elements of an ADA claim are: (1) CBC is a public entity; (2) R.W. is a qualified individual with a disability; (3) R.W. was either excluded from participation in or denied the benefits of CBC's services, programs, or activities, or was otherwise discriminated against by CBC; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.  ECF No. 248 at 27.

The jury was given definitions of "qualified individual" and "disability" as defined under the ADA and RHA.  ECF No. 248 at 29, 30.  The jury was also instructed as to what "by reason of" means.  ECF No. 248 at 27.  The jury was instructed that a term "qualified individual" means:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity or an entity that receives federal financial assistance.

> Conduct arising from a disability is generally considered to be part of the disability. **However, an individual who makes serious and credible threats of harm is not a qualified individual regardless of whether such threats are a product of any disability**.

ECF No. 248 at 30 (emphasis added).  The jury was instructed that a "disability" for purposes of the ADA and Rehabilitation Act is:

> [A] physical or mental impairment, a record of physical or mental

_____

actions constituting a risk to property or other persons."  ECF No. 248 at 34.

ORDER - 29

impairment, or being regarded as having a physical or mental impairment that substantially limits one or more of the major life activities of an individual.

The terms disability and physical or mental impairment include (1) any physiological disorder, or condition affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine; or (2) any mental or psychological disorder such as intellectual disability, emotional or mental illnesses, and learning disabilities.

For the purposes of the ADA and the Rehabilitation Act, a "major life activity" includes, but is not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

ECF No. 248 at 29.  "By reason of" was defined for the jury as "but for the Plaintiff's disability, Plaintiff would not have been excluded, denied benefits, or subject to discrimination."  ECF No. 248 at 27.

*3.  RHA Claim*

The elements of an RHA claim are: (1) CBC receives federal financial assistance; (2) R.W. is a qualified individual with a disability; (3) R.W. was either excluded from participation in or denied the benefit of CBC's services, programs, or activities, or was otherwise discriminated against by CBC; and (4) such exclusion, denial of benefits, or discrimination was solely by

ORDER - 30

1  reason of his disability.  ECF No. 248 at 28.

2  **C. R.W.'s Arguments**

3  R.W.'s burden on a Rule 50 motion is substantial.  He must establish that the

4  evidence presented at trial supported "only one reasonable conclusion, and that

5  conclusion is contrary to the jury's verdict." *Rookaird*, 908 F.3d at 455; *see* Fed.

6  R. Civ. P. 50(a)(1).  He must establish that the evidence supported *only* a verdict

7  for R.W.  *First Nat'l Mortg. Co.*, 631 F.3d at 1067.  He cannot do so.

8  R.W. advances two arguments contending he is entitled to judgment as a

9  matter of law.  First, R.W. contends his homicidal ideations were a manifestation

10  of depression and CBC discriminated against him based on his depression.

11  Second, R.W. claims CBC imposed an unlawful financial burden, also known as a

12  surcharge, on R.W. by requiring he participate in outpatient mental health

13  counseling prior to his reenrollment at CBC.  The Court will address each in turn.

14  *1. Disability and Qualified Individual*

15  First, contrary to R.W.'s claim, the evidence viewed in the light most

16  favorable to Defendants, does not support only one conclusion that the homicidal

17  manifestations were the result of a disability.  There was evidence presented that

18  R.W. was suffering from depression—which is a mental impairment that is

19  medically recognized—on March 6, 2017, and that he had a history of depression.

20  R.W. asserts that depression caused him to suffer from insomnia, and lack of sleep

ORDER - 31

caused the homicidal thoughts.  There was evidence that a mental health provider believed it was reasonable for R.W. to believe his lack of sleep could have been a cause of the intrusive and homicidal thoughts.

There was conflicting evidence as to whether CBC was aware of R.W.'s depression.  Ms. Buchmiller testified that R.W. never informed her office of his diagnosis and did not request accommodations for depression.  However, Defendant Reagan testified that he was aware of R.W.'s diagnosis of depression prior to his investigation.

The question before the Court is whether the evidence was such that the jury could *only* find that Defendant discriminated against R.W. by providing treatment different than that provided to non-disabled persons, and R.W.'s disability was a substantial factor in Defendant's decision to treat R.W. differently than non-disabled persons.  The evidence presented at trial does not support that proposition.

There was evidence before the jury that R.W.'s intrusive thoughts manifested around the time he was struggling academically.  Indeed, R.W. told the DCR that his homicidal thoughts arose from the stress from being unable to master course concepts and the amount of coursework in the nursing program, as well as frustration about his low grades and the feedback he received from instructors. R.W. advised mental health providers at Transitions of the same.  Moreover, he was scheduled to meet with instructors to discuss in part his failing grades the day

ORDER - 32

after revealing his homicidal ideations to Dr. Casabug.  The evidence of R.W.'s

stress and frustration were sufficient for the jury to conclude that R.W.'s actions

were not solely attributable to depression.  Thus, R.W. is unable to establish that

the evidence supported *only* a verdict for R.W.

Second, the evidence viewed in the light most favorable to Defendants does

not support only the conclusion that R.W. is a qualified individual.  The jury was

instructed that it could determine that R.W. was not a qualified individual, if he

"ma[de] serious and credible threats of harm . . . regardless of whether such threats

are a product of any disability."  ECF No. 248 at 30.  The evidence introduced at

trial was sufficient for the jury to find that R.W. made credible and serious threats.

There was evidence that R.W.'s intrusive thoughts containing homicidal

ideations were a result of his frustration with his grades and stress from knowing

that he could not withdraw from the semester.  There was also evidence that he

had a failing grade in a class that was instructed by Ms. Cooke, and that he had

specific ideations in which he saw himself carrying out graphic, violent acts

against Ms. Cooke, Ms. Tucker, and Ms. Martinez.  Moreover, there was evidence

R.W.'s disclosure occurred the day before a planned meeting with Ms. Cooke and

Ms. Tucker, among others.  CBC's campus security was aware of this meeting and

worried about the possibility of R.W. attempting to attend that meeting.

Numerous CBC faculty, staff, and administrators testified that they believed R.W.

ORDER - 33

1    constituted a risk to multiple faculty and staff members.  Ms. Cooke was so

2    distressed by the disclosure of R.W.'s intrusive thoughts that she was afraid to

3    stay in her home alone for a period of time.  Ms. Tucker testified that she was

4    afraid R.W. was going to act on his threats and found it difficult to be in R.W.'s

5    presence, approximately five years later, during the trial.

6          Moreover, the homicidal ideations were so specific and of such significance

7    that Dr. Casabug felt it necessary to call a DCR.  After the DCR, Ms. Alvarez,

8    arrived and evaluated R.W., she, in her professional opinion, felt it necessary to

9    involuntarily commit R.W. if R.W. refused to go to a mental health facility

10   voluntarily.  Further, multiple mental health professionals discouraged R.W. from

11   leaving Transitions when he expressed his desire to leave.

12         The evidence of the timing of the disclosure, coupled with R.W.'s

13   frustration and stress resulting from his academics, and the specific and graphic

14   nature of the homicidal ideations was sufficient for the jury to conclude these

15   actions constituted a "serious and credible threat[] of harm" such that he did not

16   meet the definition of a qualified individual.  Accordingly, R.W. has failed to

17   demonstrate the evidence at trial *only* supported a verdict for R.W.

18         R.W.'s attempt to distinguish his actions from those in on *Mayo v. PCC*

19   *Structurals, Inc*., 795 F.3d 941 (9th Cir. 2015) is unpersuasive.  Plaintiff Mayo

20   began working for PCC Structurals in 1987.  *Id.* at 942.  He was diagnosed with

major depressive disorder in 1999. *Id.* Mayo began taking medication and engaging in treatment. *Id.* Mayo worked "without significant incident" until 2010. *Id.* Mayo and other coworkers were having issues with a supervisor, which led to a meeting with the human resources department. *Id.* After the meeting, Mayo made threating comments:

> He told one that he "fe[lt] like coming down [to PCC] with a shotgun an[d] blowing off" the heads of the supervisor and another manager. The co-worker need not worry, Mayo explained, because she would not be working the shift when the killing would occur. Mayo told another co-worker on several occasions that he planned to "com[e] down [to PCC] on day [shift] . . . to take out management." He told a third co-worker that he "want[ed] to bring a gun down [to PCC] and start shooting people." He explained that "all that [he] would have to do to shoot [the supervisor] is show up [at PCC] at 1:30 in the afternoon" because "that's when all the supervisors would have their walk-through."

*Id.* Mayo's coworkers reported these threats. *Id.* Mayo was suspended from employment and trespassed from the company's property. *Id.* at 943. Mayo was taken to the hospital for fear he was a threat to others and himself. *Id.* He remained there for six days before being discharged and taking leave. *Id.* Mayo's doctors sent letters to the company rendering opinions that Mayo was not violent. *Id.* The company terminated Mayo. *Id.* Mayo sued, arguing that his "disturbing statements and comments" stemmed from his depression and, therefore, he was discriminated against when he was fired. *Id.* The district court rejected this argument, granting summary judgment on behalf of PCC Structurals. *Id.*

ORDER - 35

1    The Ninth Circuit affirmed.  *Id.* at 947.  It found that Mayo could not show

2    he was a qualified individual under the ADA.  *Id.*  at 944.  It reasoned that

3    appropriately handling stress is "[a]n essential function of almost every job."  *Id.*

4    (citing *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002)).  "And

5    while an employee can be qualified despite adverse reactions to stress, he is not

6    qualified when that stress leads him to threaten to kill his co-workers in chilling

7    detail and on multiple occasions (here, at least five times)."  *Id.*  The Ninth Circuit

8    held that Mayo's disproportionate reaction meant Mayo was unable to perform an

9    essential function of his job.  *Id.*  It was irrelevant that "Mayo's threats stemmed

10   from his major depressive disorder."  *Id.*  "'Put simply, the ADA does not require

11   that an employee whose unacceptable behavior threatens the safety of others be

12   retained, even if the behavior stems from a mental disability.  Such an employee is

13   not qualified.'"  *Id.* (quoting *Calef v. Gillette Co.*, 322 F.3d 75, 87 (1st Cir. 2003)).

14       The Ninth Circuit cited to the decisions of other circuits, *id.* at 944-45, and

15   multiple district courts which have all similarly concluded that an employee's

16   threats to the safety of others can render them not "qualified" within the meaning

17   of the ADA.  *Id.* at 944 n.2.  The Ninth Circuit summarized: "We agree with our

18   sister circuits.  An employee whose stress leads to serious and credible threats to

19   kill his co-workers is not qualified to work for the employer, regardless of why he

20   makes those threats."  *Id.* at 944-45.  R.W. asserts that his conduct must have been

ORDER - 36

"egregious and criminal" for his status as a qualified individual to be affected.

ECF No. 256 at 6-8 ("R.W. did not engage in egregious and illegal conduct . . .;"

"[E]ven under the Defendant's articulated standard of 'serious and credible

threats' . . ."). R.W. makes this assertion based upon the premise that he did not

have the subjective intent to place the instructors in fear of imminent bodily harm.

*See* ECF No. 256 at 8 (citing *United States v. Bagdasarian*, 652 F.3d 1113, 1119

(9th Cir. 2011) (citing 18 U.S.C. § 879(a)(3))). R.W. cites to *Newland*—a 1996

case to which *Mayo* cites—for the "egregious and criminal" standard. *See* ECF

No. 256 at 7. *Mayo* does not require Defendants to establish the requisite *mens rea*

to prove a criminal case as R.W. asserts. 795 F.3d at 944-45. The Court declines

to adopt R.W.'s preferred standard. While instructive, the Court cannot rely on the

additional cases to which R.W. cites, which assessed the facts at the summary

judgment stage. ECF No. 256 at 8 (citing *Reaves v. Nexstar Broad., Inc.*, 327 F.

Supp. 3d 1352 (D. Or. 2018), *D.W. v. Fresenius Med. Care N. Am.*, 534 F. Supp.

3d 1274, 1281-82, 1288 (D. Or. 2021)). These are not applicable here as R.W.

was afforded the opportunity to present evidence and cross-examine Defendants'

witnesses, leaving the jury with the determination as to whether his actions

constituted serious and credible threats.

     R.W., at this stage, must establish that the evidence presented at trial

supported "only one reasonable conclusion, and that conclusion is contrary to the

ORDER - 37

1  jury's verdict." *Rookaird*, 908 F.3d at 455.  He must establish that the evidence

2  supported *only* a verdict for R.W.  *First Nat'l Mortg. Co.*, 631 F.3d at 1067.  He

3  cannot.  For the reasons articulated above, it was reasonable for the jury to

4  determine that R.W.'s homicidal ideations constituted a serious and credible threat

5  to maim or kill instructors and thereby negated his status as a qualified individual

6  under the ADA.  R.W. has failed to meet his burden.

7       *2.  Unlawful Surcharge*

8       R.W. contends that CBC improperly imposed a surcharge to reenroll at the

9  university by requiring him to pay for counseling.  R.W.'s argument is also without

10  merit.  For the reasons stated above, R.W. has not established that he is disabled as

11  defined under the ADA or RHA.  R.W.'s failure to meet his burden above is

12  sufficient to end this inquiry.  *See Bragdon v. Abbott*, 524 U.S. 624, 632-42 (1998)

13  (first analyzing whether being HIV-positive is a disability under the RHA before a

14  determination regarding costs imposed was discriminatory).  However, even if the

15  Court assumes for the purposes of this portion of the order that R.W. is disabled as

16  defined under the ADA or RHA, R.W. has not established that CBC improperly

17  imposed upon him an impermissible cost or fee.

18       28 C.F.R. § 35.130(f) provides:

19       A public entity may not place a surcharge on a particular individual
         with a disability or any group of individuals with disabilities to cover
20       the costs of measures, such as the provision of auxiliary aids or program

ORDER - 38

accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

The Ninth Circuit employs a two-part test to determine if a fee or cost constitutes an unlawful surcharge under the ADA. *Dare v. California*, 191 F.3d 1167, 1171 (9th Cir. 1999). The first consideration is whether the cost or fee is "required to provide that individual or group nondiscriminatory treatment[.]" *Id.* (quoting 28 C.F.R. § 35.130(f)). In *Dare*, the Ninth Circuit found that "[c]harging disabled people for parking that would otherwise be free constitutes discrimination in the provision of access to public buildings, a measure required under the ADA." *Id.* at 1173. The evidence presented at trial demonstrated that R.W. was required to attend outpatient mental health treatment as part of the reengagement protocol to reenroll at CBC. R.W. testified at trial that he had to pay for that treatment. When asked whether he had to pay for that treatment through his insurance or out-of-pocket, R.W. answered yes. It was not explored further, so it is not clear whether R.W.'s insurance paid for all, a portion, or none of his treatment. Assuming for the purposes of this section of the order that R.W. was disabled, the evidence only supports that a cost may have been attributed to R.W. to receive nondiscriminatory treatment, not access to campus or the ability to reenroll at CBC. This is insufficient. The second consideration is

ORDER - 39

1    "whether the fee for the measure is a surcharge; in other words, . . . whether

2    it constitutes a charge that nondisabled people would not incur." *Id.* at 1171.

3    For example, "a state can charge a fee for disabled license plates," but it can

4    only "do so as long as it charges the same fee for nondisabled license

5    plates." *Id.*  Accordingly, CBC was not prohibited from requiring R.W. to

6    incur costs.  It could not, however, have required R.W. to incur a cost that a

7    nondisabled person did not have to incur.

8         There was no evidence at trial discussing other sanctions CBC

9    imposed upon students as a result of a similar violation of the Student Code

10   of Conduct.  Thus, there is no evidence before the Court that CBC permitted

11   other students in a similar disciplinary posture to reenroll in CBC without

12   having incurred separate fees.  Without such evidence, the Court is unable to

13   find that CBC unlawfully imposed a surcharge upon R.W.

14   **D. Discussion of Rule 59 Motion**

15        R.W. argues he is entitled to a new trial under Fed. R. Civ. P. 59 because the

16   verdict was contrary to the weight of the evidence.  ECF No. 256 at 13.  When a

17   party seeks a new trial for this reason, the Court has "the duty… to weigh the

18   evidence as [the court] saw it, and to set aside the verdict of the jury, even though

19   supported by substantial evidence, where, in [the court's] conscientious opinion,

20   the verdict was contrary to the clear weight of the evidence." *Molski v. M.J.*

ORDER - 40

*Cable*, *Inc.*, 481 F.3d at 729 (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)) (alterations in original).  The Court has conscientiously weighed the evidence as outlined above.  The Court finds that the verdict was not contrary to the clear weight of the evidence.

## PLANTIFF R.W.'S RULE 59(e) MOTION TO AMEND JUDGMENT OR ALTERNATIVELY FOR RELIEF FROM JUDGMENT UNDER RULE 60

Following the jury trial on R.W.'s WLAD, ADA, and RHA claims, the Court entered judgment dismissing this action in its entirety.  *See* ECF No. 252. The trial did not include R.W.'s § 1983 claims against Defendants Reagan and Thornton.[6]  The issue of prospective injunctive relief involving these claims was argued and submitted to the Ninth Circuit.  *See R.W. v. Columbia Basin College, et al*, Case No. 21-35995 (9th Cir. 2021), Dkt. No. 43.  On August 14, 2023, the Ninth Circuit affirmed the Court's prior determination that R.W.'s action for injunctive relief against Defendants Reagan and Thornton could proceed under the *Ex parte Young* exception to the Eleventh Amendment.  ECF No. 265 at 5, 10-15, 20-27.  Because two of R.W.'s claims have not been resolved, Defendants defer to the Court as to whether the Court's judgment, ECF No. 252, should be amended.

_____

[6] The prior judicial officer previously dismissed R.W.'s request for injunctive relief against CBC.  ECF No. 151 at 36-37.

ORDER - 41

*See* ECF No. 258.  Given the Ninth Circuit's ruling, the Court enters an amended judgment specifying that R.W. may not recover from Defendants with respect to his discrimination claims under the WLAD, ADA, and RHA, and those claims may be dismissed, and all Defendants may recover costs from R.W. with respect to these three claims.  The motion is granted.

Accordingly, **IT IS HEREBY ORDERED**:

1.  Plaintiff's Rule 50(b) Motion for Judgment as a Matter of Law and Rule 59 Motion for New Trial, **ECF No. 256**, is **DENIED.**

2.  Plaintiff's Rule 59(e) Motion to Amend Judgment or Alternatively for Relief from Judgment Under Rule 60, **ECF No. 257**, is **GRANTED in part.**  An amended judgment shall issue with the "Other" box checked.  It shall state, "The plaintiff, R.W., may not recover anything from the defendants, Columbia Basin College, Lee Thornton, and Ralph Reagan, with respect to the plaintiff's WLAD, RHA, and ADA claims, and the defendants may recover costs from the plaintiff with respect to these claims.  These claims are dismissed on the merits."

ORDER - 42

1    **IT IS ORDERED.**  The Clerk's Office is directed to file this Order and

2    provide copies to counsel and to issue an amended judgment to include the

3    specified language above.

4    **DATED** August 30, 2023.

5                                  *s/Mary K. Dimke*
                                 MARY K. DIMKE
6                      UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

-

ORDER - 43