FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 16, 2025

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| R.W., individually and on behalf of his marital community,<br><br>           Plaintiff,<br><br>   vs.<br><br>COLUMBIA BASIN COLLEGE, a public institution of higher education; RALPH REAGAN, in his official and individual capacities; LEE THORNTON, in his individual capacity; and REBEKAH WOODS, in her official capacity,<br><br>           Defendants. | No. 4:18-CV-05089-MKD<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

On February 3, 2025, the Court conducted a bench trial on Plaintiff's Section 1983 First Amendment claim for injunctive relief. ECF No. 349. Plaintiff was represented by Bret Uhrich. Defendants were represented by Carl Warring and Andrew Brown.

ORDER - 1

The Court previously conducted a jury trial on Plaintiff's separate claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RHA"), and the Washington Law Against Discrimination ("WLAD").  At Defendants' request, which Plaintiff did not oppose, the Court admitted, for purposes of the bench trial, all witness testimony and exhibits admitted at the jury trial.  ECF No. 350 at 2.

The Court has considered the evidence from both trials, has heard from counsel, has reviewed the record, and is fully informed.  This Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## BACKGROUND

This is a civil dispute brought by R.W. against Columbia Basin College ("CBC") and CBC officials in their individual and official capacities.  R.W. was a nursing student at CBC who, in March 2017, reported to his doctor that he experienced homicidal ideations toward three of his nursing instructors.  His doctor referred him for a mental health crisis evaluation, after which the crisis evaluator reported R.W.'s homicidal ideations to law enforcement and CBC.  CBC officials responded by temporarily trespassing R.W. from its campuses, commencing an investigation, finding R.W. responsible for a student code violation, and imposing prerequisites on his return to campus.  R.W. brought various constitutional and statutory claims against CBC; Ralph Reagan, CBC's Assistant Dean for Student

ORDER - 2

Conduct as of March 2017, and Lee Thornton, CBC's acting President as of March 2017.

**A. Procedural History**

On May 25, 2018, Plaintiff filed the Complaint in this matter, bringing claims for violations of the First Amendment and Fourteenth Amendment, pursuant to 42 U.S.C. § 1983;[1] the WLAD; the ADA; and the RHA.  ECF No. 1 at 7-9.  For the Section 1983 claims, Plaintiff sought damages from Mr. Reagan and Dr. Thornton in their individual capacities, and injunctive relief from CBC and Mr. Reagan and Dr. Thornton in their official capacities.  *Id.* at 7-8. Dr. Thornton's successor, Rebekah Woods, was substituted in as a defendant on the Section 1983 claim for injunctive relief.  *See R.W. II*, 77 F.4th at 1222-23.  As Mr. Reagan has left his position at CBC, the parties agreed to dismiss the First Amendment claim for injunctive relief against Mr. Reagan in his official capacity, though he remains a party to this case for purposes of final judgment on R.W.'s other claims.

_____

[1] Plaintiff's Section 1983 claims included a "claim for violation of the Equal Protection Clause" of the Fourteenth Amendment, "which he has since abandoned."  *R.W. v. Columbia Basin Coll.* (*R.W. II*), 77 F.4th 1214, 1219 n.2 (9th Cir. 2023).

ORDER - 3

*1. First Motions for Summary Judgment & First Appeal*

In June 2019, the parties filed cross motions for summary judgment. ECF Nos. 31, 36. The previously assigned judicial officer granted summary judgment for Plaintiff on liability for the Section 1983 First Amendment claim; denied summary judgment for Defendants on qualified immunity from the Section 1983 claims; and denied summary judgment for both parties on the WLAD, ADA, and RHA claims. ECF No. 83. Defendants filed an interlocutory appeal of the denial of qualified immunity and sought discretionary review of the other determinations in the summary judgment order. ECF Nos. 86, 90. The Ninth Circuit denied the petition for discretionary review. ECF No. 115.

On March 31, 2021, the Ninth Circuit reversed the denial of qualified immunity for Mr. Reagan and Dr. Thornton, finding that Plaintiff had not demonstrated that his "right to return to campus without [CBC's] safety conditions was 'clearly established.'" ECF No. 121; *see also R.W. v. Columbia Basin Coll.* (*R.W. I*), 842 F. App'x 153 (9th Cir. 2021).

*2. Second Motion for Summary Judgment, Second Appeal, and Jury Trial*

On remand, the prior judicial officer permitted Defendants to file a second motion for summary judgment on issues not previously raised. ECF No. 126. The court subsequently found CBC immune from suit under the Eleventh Amendment on the Section 1983 claim for injunctive relief, while denying summary judgment

ORDER - 4

1    for Defendants on all other grounds raised, including their request to reconsider the

2    issue of First Amendment liability.  ECF No. 151.  Defendants filed a second

3    interlocutory appeal.  ECF Nos. 157, 158.

4         The case was reassigned to this judicial officer on December 22, 2021.  ECF

5    No. 174.  While the second interlocutory appeal was pending, the Court conducted

6    a six-day jury trial on Plaintiff's WLAD, ADA, and RHA claims.  ECF Nos. 228,

7    231, 233, 235, 243, 249.  On August 9, 2022, the jury returned a verdict for

8    Defendants on all tried claims.  ECF No. 250.  Plaintiff filed, and the Court denied,

9    motions for judgment as a matter of law on the claims that proceeded to a jury trial

10   pursuant to Fed. R. Civ. P. 50(a) and (b).  ECF No. 247, 255, 256, 266.

11        On August 14, 2023, the Ninth Circuit affirmed the court's summary

12   judgment rulings on Eleventh Amendment immunity, while dismissing the

13   remaining issues for lack of jurisdiction on interlocutory review.  ECF No. 265; *see*

14   *also R.W. II*, 77 F.4th 1214.  In particular, the Ninth Circuit dismissed "the CBC

15   officials' claim that the district court erred in refusing to reconsider its prior ruling

16   that they violated R.W.'s First Amendment rights," noting that "[t]he district

17   court's partial grant of summary judgment regarding liability can be reviewable

18   upon entry of final judgment."  *See R.W. II*, 77 F.4th at 1222 (citation omitted).

19

20

ORDER - 5

*3. Case Posture After Second Remand*

The only pending claim is Plaintiff's First Amendment claim for injunctive relief against Dr. Woods in her official capacity.

The previously assigned judicial officer granted summary judgment for Plaintiff on this claim in 2019. ECF No. 83. Accordingly, after the second remand, the Court set an evidentiary hearing to determine the appropriate scope of injunctive relief. ECF No. 280. Defendants moved for reconsideration of the summary judgment order on their Section 1983 liability. ECF No. 285. The Court granted reconsideration and vacated the prior summary judgment order. ECF No. 303.

The parties filed further motions for summary judgment, ECF Nos. 304, 306, which the Court denied based on the material factual disputes that remained, ECF No. 350 at 2. On February 3, 2025, the parties proceeded to a bench trial on the First Amendment claim for injunctive relief. The Court incorporated all testimony and exhibits admitted at the 2022 jury trial, and the parties presented further argument and testimony at the bench trial.

**EVIDENTIARY RECORD**

The record for the Court's consideration consists of two trials, conducted more than two years apart, which addressed the same events. Below the Court summarizes the material testimony and evidence that it relies upon in reaching its

ORDER - 6

1    Findings of Fact and Conclusions of Law, either because the Court finds such

2    evidence credible, or because the Court finds such evidence relevant

3    notwithstanding its credibility.

4    **A. Academic Quarters from 2014 to 2016**

5        1.    R.W. began CBC's nursing program in Fall 2014.  ECF No. 287 at

6    255; ECF No. 288 at 51; ECF No. 290 at 57, 59.

7        2.    CBC's nursing program typically lasts six quarters, or two academic

8    years, with an optional summer quarter.  After completing this program, students

9    receive an associate's degree in nursing and are eligible to take the licensing exam

10   to become a Registered Nurse.  ECF No. 288 at 51; ECF No. 290 at 58-59.

11       3.    CBC has campuses in Pasco and Richland.  CBC's nursing program is

12   located on the Richland campus.  ECF No. 288 at 106, 108.

13       4.    R.W. was diagnosed with epilepsy long before he enrolled at CBC.

14   ECF No. 290 at 66.

15       5.    Approximately 30 to 60 minutes before a seizure, R.W. would

16   experience warning signs, such as hand tremors, body shakes, or brain fog.  R.W.

17   could lose consciousness during a seizure, have headaches and fatigue, and be "out

18   of commission for at least a few hours" afterward.  ECF No. 290 at 66-69.

19       6.    The longer it had been since his last seizure, the more severe his

20   seizure symptoms were.  ECF No. 290 at 68, 77-78.

ORDER - 7

7.     R.W. felt that his epilepsy was well controlled by medication so long as he was getting enough sleep.  ECF No. 290 at 68; *see also* ECF No. 290 at 45.

8.     R.W. had no issues with his epilepsy condition when beginning CBC's nursing program, although he had obtained an accommodation for it in case issues did arise.  ECF No. 290 at 69-70.

9.     In 2015, R.W. began experiencing severe back pain that made it difficult for him to move or walk.  ECF No. 290 at 71-72.

10.     R.W. completed Fall Quarter 2014, Winter Quarter 2015, and Spring Quarter 2015 with passing grades, though he needed to make up some days he missed due to a seizure, illness, and back pain.  ECF No. 288 at 51-52; ECF No. 290 at 77-79, 85-86; Tr. Ex. 44 at 1.[2]

11.     In February 2015, R.W. considered dropping out of the nursing program due to the return of his seizures, his illness, and increasing sleep issues. ECF No. 290 at 79-80; Tr. Ex. 44 at 1.

12.     Shortly after being diagnosed with back pain, he was also diagnosed with depression and anxiety and was prescribed medication.  ECF No. 290 at 73.

_____

[2] The Court cites to exhibits admitted at the jury trial as "Tr. Ex." and to exhibits admitted only at the bench trial as "Bench Tr. Ex."

ORDER - 8

13.     The depression and anxiety increased his stress levels and made it difficult for him to sleep, which in turn exacerbated his epilepsy symptoms and back pain.  ECF No. 290 at 74, 76; *see also* ECF No. 290 at 45.

14.     R.W. began the optional Summer Quarter 2015 but withdrew early on due to back pain.  ECF No. 287 at 283-84; ECF No. 288 at 52-53; ECF No. 290 at 82-83, 86.

15.     R.W. completed Fall Quarter 2015 notwithstanding some sick days due to epilepsy symptoms, back pain, food poisoning, and difficulty sleeping.  ECF No. 288 at 53; ECF No. 290 at 87-88.

16.     R.W. began Winter Quarter 2016 and submitted a doctor's note clearing him to return to school and clinical work without restrictions.  However, he withdrew in February 2016 due to back pain issues.  ECF No. 288 at 53-54, 99-100; ECF No. 290 at 89-91; Tr. Ex. 54.

17.     Kim Tucker has been the Director of CBC's nursing program since July 2014.  ECF No. 287 at 254; ECF No. 288 at 128; ECF No. 349[3] (testimony of K. Tucker).

_____

[3] As there is no transcript of the bench trial proceedings in the record, the Court cites to the bench trial minute order, ECF No. 349, when referencing witness testimony at the February 2025 bench trial.

ORDER - 9

18.     When noting R.W.'s withdrawal in 2016, Ms. Tucker indicated that R.W. intended to return to the program assuming his back issues resolved.  ECF No. 288 at 100; Tr. Ex. 54.

19.     Nursing students must take classes in a particular order.  ECF No. 290 at 65.

20.     Nursing students who withdraw from courses must wait to retake those courses when they are next reoffered.  R.W.'s Winter Quarter 2016 courses were not reoffered until Winter Quarter 2017.  ECF No. 288 at 54.

21.     In July 2016, R.W. discussed his increasing seizures with his epilepsy specialist, Dr. Timothy Powell, who increased his epilepsy medication by 50%.  ECF No. 290 at 97-98.

22.     R.W. believed that if he failed to return to CBC for Winter Quarter 2017, he would need to restart the nursing program from the beginning.  ECF No. 290 at 98-99.

23.     CBC's nursing program requires students seeking to reenter the program after a period of absence to either restart the program or pass competency and skill testing, as a student's skills and knowledge may become outdated or deteriorate while they are absent from the program.  ECF No. 349 (testimony of K. Tucker).

ORDER - 10

24.    R.W. corresponded with Ms. Tucker in July 2016 about what he needed to provide to return to the nursing program for Winter Quarter 2017, which included reentry testing and providing a doctor's note releasing him back to school without restrictions.  ECF No. 290 at 99-101; Tr. Ex. 55 at 1.

**B. January 2017 to March 5, 2017**

25.    Winter Quarter 2017 began on January 3, 2017, and ended with final exams on March 23, 2017.  ECF No. 288 at 55-56; Tr. Ex. 244.

26.    R.W. completed the testing required to return to the nursing program for Winter Quarter 2017.  ECF No. 288 at 56; ECF No. 290 at 101-02.

27.    R.W. was enrolled in four nursing courses during Winter Quarter 2017.  ECF No. 338 at 3 (stipulated fact no. 2); ECF No. 349 (testimony of K. Tucker).

28.    Valerie Cooke (previously Valerie Topham) was R.W.'s clinical instructor during Winter Quarter 2017.  ECF No. 290 at 245, 247-48.  She knew that R.W. was absent from the nursing program due to a back problem.  ECF No. 290 at 266-67.

29.    On January 6, 2017, Ms. Tucker asked Ms. Cooke to remind R.W. to bring a doctor's note releasing him for clinical work without restrictions, and Ms. Cooke conveyed this to R.W.  ECF No. 288 at 56; ECF No. 290 at 266-67; Tr. Ex. 44 at 3; Tr. Ex. 55 at 4.

ORDER - 11

30.    On January 12, 2017, R.W.'s longtime physician, Dr. Michael Cabasug, wrote a letter stating that R.W. could return to school without restrictions.  ECF No. 287 at 91-92; Tr. Ex. 57.

31.    At that time, R.W. had current diagnoses of epilepsy, back pain, and depression.  ECF No. 287 at 91-92; *see also* ECF No. 290 at 66, 102-04.

32.    On January 30, 2017, R.W. renewed his accommodation for epilepsy for the quarter.  ECF No. 289 at 209; ECF No. 290 at 102-03; Tr. Ex. 63 at 1.

### *Academic Progress*

33.    In January and February 2017, R.W. was experiencing seizures at home about twice per month.  He attributed the seizures to stress from his medical and mental health issues, his concern that any issues during Winter Quarter 2017 would mean he was out of the nursing program, and his related trouble sleeping. The seizures had "become a normal thing" for him then, although they were not otherwise "a normal occurrence" for him.  ECF No. 290 at 103-04.

34.    On January 31, 2017, R.W. informed one of his instructors, Becky Phillips, that he would be absent from her Nursing 235 course that day because he was having signs of an oncoming seizure.  ECF No. 291 at 61-62.

35.    In January and February 2017, R.W. missed one day of classes due to weather and two days due to having the flu, and he was required to make up the work missed on those days.  ECF No. 288 at 56-57; Tr. Ex. 44 at 3.

ORDER - 12

36.     R.W. was aware he was "struggling academically" during the first six weeks of Winter Quarter 2017, though he felt he was performing well during clinical work.  ECF No. 290 at 105.

37.     CBC faculty may issue an Academic Progress Alert to a student when the student is at risk of failing a course; in the nursing program, these are typically issued if the student is not meeting the 75% minimum grade by the midterm period.  ECF No. 287 at 273; ECF No. 288 at 45; ECF No. 349 (testimony of K. Tucker).

38.     Ms. Tucker typically discusses the matter underlying an Academic Progress Alert with the reporting instructor before it is issued, and after the Academic Progress Alert is issued, Ms. Tucker receives a copy to keep in the student's file.  ECF No. 288 at 58-59, 89.

39.     On February 13, 2017, Ms. Phillips issued an Academic Progress Alert for R.W. for his Nursing 235 lab class due to "multiple preparatory assignments and makeup assignments not done."  ECF No. 288 at 59-61; ECF No. 291 at 62; ECF No. 349 (testimony of K. Tucker); Tr. Ex. 61 at 1.

40.     Although Nursing 235 was a pass/fail course, R.W. was at risk of failing the course given the missing assignments.  ECF No. 291 at 63.

41.     Ms. Phillips noted R.W. had absences from Nursing 235 in weeks four, five, and six of Winter Quarter 2017, in addition to week 10 (the week of

ORDER - 13

March 6, 2017), but he had completed makeup work for each absence.  ECF No. 291 at 59-60.

42.     Ms. Phillips noted R.W had absences in weeks two and six of Nursing 222, for which he had completed the makeup work.  ECF No. 291 at 60-61.

43.     Ms. Phillips and R.W. completed an Academic Support Plan, which is a document where students who are struggling academically are asked to identify the reasons why they are struggling and to meet with the instructor to discuss potential resources for improvement.  ECF No. 288 at 57, 90; ECF No. 290 at 107, 156; Tr. Ex. 61 at 2-3.

44.     Ms. Tucker receives a copy of the Academic Support Plans and places them in the student's file.  ECF No. 288 at 90.

45.     R.W. had previously completed an Academic Support Plan with Ms. Tucker and another instructor in February 2015.  ECF No. 290 at 80-81.

46.     In the Academic Support Plan for Nursing 235, R.W. identified "difficulty mastering course content," "finding time to do [his] homework," and "test anxiety" as areas of difficulty on the Academic Support Plan.  He noted he normally did not have test anxiety but was experiencing it now due to not sleeping for two days, "other problems in [his] life as of recently," a "massive essay" assignment, recovering from an illness, having "loads of homework and studying

ORDER - 14

to catch up on," his epilepsy condition, and having insufficient time for personal health.  ECF No. 288 at 61-63; ECF No. 290 at 108, 156-57; Tr. Ex. 61 at 2-3.

47.    He also noted difficulty keeping up with study groups and managing his schedule.  ECF No. 290 at 108-09; Tr. Ex. 61 at 4.

48.    R.W. completed some make-up work with Ms. Phillips pursuant to the Academic Progress Alert but was unsure whether he had completed all the make-up work by March 6, 2017.  He felt like he had been "doing makeup work almost the whole winter quarter" because that quarter had been challenging for him.  ECF No. 290 at 174-75.

### *Onset of Homicidal Ideations*

49.    In late February 2017, R.W. experienced homicidal ideations involving his CBC instructors.  ECF No. 290 at 111-12; ECF No. 349 (testimony of R.W.).

50.    R.W. testified that he envisioned himself in a nursing faculty office that was on fire, alongside a person whose face changed between three specific individuals, and his arms moved "against [his] will with a saw at" the person.  ECF No. 290 at 112.

51.    R.W. testified that he was frightened by these homicidal ideations and had difficulty sleeping that night.  ECF No. 290 at 111-12, 179 ("scared the tar out of me"); ECF No. 349 (testimony of R.W.).

ORDER - 15

52.    R.W. attributed these homicidal ideations to being in a period of increased stress over his upcoming exams, poor sleep, poor health, and his depression.  ECF No. 290 at 111, 117-18; ECF No. 349 (testimony of R.W.).

53.    School, grades, and progressing in the nursing program had been a source of great stress for R.W. on previous occasions.  ECF No. 287 at 93; ECF No. 289 at 219 (referencing Tr. Ex. 63 at 12); ECF No. 290 at 64-65; Tr. Ex. 67 at 10 ("Has been having suicidal thoughts lately but not currently.  No specific plan or method.  Extremely stressed from school.  Grades are worsening.").

54.    Between classes the following day, R.W. called and made an appointment with Dr. Cabasug.  ECF No. 290 at 111; ECF No. 349 (testimony of R.W.).

55.    R.W. continued to attend classes in the days leading up to his appointment with Dr. Cabasug.  ECF No. 290 at 113; ECF No. 349 (testimony of R.W.).

56.    R.W. did not tell anyone about the homicidal ideations before his appointment with Dr. Cabasug.  ECF No. 290 at 120.

57.    R.W. remained concerned about the homicidal ideations during the week.  ECF No. 349 (testimony of R.W.).

ORDER - 16

*Academic Progress Alerts*

58.     On March 2, 2017, Ms. Cooke emailed Ms. Tucker to report an interaction with R.W. earlier that morning.  ECF No. 287 at 265-66; ECF No. 290 at 247-48, 250; Tr. Ex. 19 at 1.  She observed R.W. with a facial twitch and hand tremors.  R.W. asked to speak with Ms. Cooke privately and told her that those were the signs of an oncoming grand mal seizure, and that he had been having grand mal seizures every other week since returning to nursing school.  ECF No. 287 at 265-66; ECF No. 290 at 114, 248-49; Tr. Ex. 19 at 1.

59.     R.W. told Ms. Cooke that he needed to go home and lie down.  His wife picked him up, and he had a seizure after returning home.  ECF No. 290 at 114-15.

60.     Ms. Tucker recognized a grand mal seizure as a serious seizure that generally causes a period of incapacitation.  ECF No. 288 at 63-64.

61.     Ms. Cooke told R.W. that she was concerned about him not having anticonvulsive medications available in case of an emergency.  R.W. told her he would ask his doctor about such medications the following Monday, March 6, 2017.  ECF No. 287 at 266; ECF No. 290 at 249-50; Tr. Ex. 19 at 2.

62.     On March 3, 2017, Ms. Tucker spoke with Mary Hoerner, the Dean for Health Sciences, and Peggy Buchmiller, Director of the Resource Center within

ORDER - 17

1  CBC's Disability Support Services.  ECF No. 287 at 267; ECF No. 288 at 70, 83,

2  128; ECF No. 289 at 204-05; Tr. Ex. 19 at 1; Tr. Ex. 44 at 3.

3    63.    On March 4, 2017, Ms. Cooke scheduled a meeting between herself,

4  Ms. Tucker, Ms. Buchmiller, and R.W. for noon on March 7, 2017, to discuss his

5  increasing epilepsy symptoms.  ECF No. 287 at 267-70; ECF No. 288 at 70; ECF

6  No. 289 at 213; ECF No. 290 at 251-52; Tr. Ex. 19 at 1; Tr. Ex. 44 at 3.

7    64.    Ms. Tucker wanted an update on the status of R.W.'s epilepsy

8  condition due to concern for R.W.'s safety while performing clinical coursework,

9  which required him to provide patient care once per week, as well as the safety of

10  his patients.  ECF No. 287 at 268-69; ECF No. 288 at 64.  She also wanted to

11  evaluate whether R.W.'s accommodation with the Disability Center might need to

12  be adjusted.  ECF No. 288 at 64-65.

13    65.    Ms. Cooke set the meeting for noon on March 7, 2017, specifically

14  because R.W. told her he could ask for an updated evaluation at his doctor's

15  appointment on March 6, and because Ms. Cooke would have prepared midterm

16  grades by then.  ECF No. 287 at 267-70; ECF No. 288 at 70; ECF No. 290 at 251-

17  52; Tr. Ex. 19 at 2; Tr. Ex. 44 at 3.

18    66.    At that time, Ms. Cooke was aware that R.W. had a below-passing

19  grade in her class, which would require a meeting.  ECF No. 290 at 251-52.

20

ORDER - 18

1    67.    On March 4, 2017, Ms. Tucker noted Ms. Cooke would prepare two

2  Academic Progress Alerts to give to R.W. at the March 7 meeting.  ECF No. 288 at

3  37-38, 71; ECF No. 349 (testimony of K. Tucker); Tr. Ex. 44 at 3.

4    68.    Ms. Cooke prepared two Academic Progress Alerts designed to notify

5  R.W. that he was making unsatisfactory progress in Nursing 223 and Nursing 221

6  due to "Lack of progression/critical thinking" and "Low PSP Scores" (i.e., low

7  scores in his written clinical assignments) in Nursing 223, and "Low examination

8  scores" in Nursing 221.  ECF No. 288 at 65-66, 85-86; ECF No. 290 at 252-55;

9  ECF No. 349 (testimony of K. Tucker); Tr. Ex. 3; Tr. Ex. 44 at 3.

10    69.    Ms. Cooke typically prepared the Academic Progress Alerts after

11  running the student's grades and setting up a meeting with the student.  ECF

12  No. 290 at 275.  She typically dated Academic Progress Alerts for the day she

13  planned to meet with the student to discuss them, rather than the date she prepared

14  them.  ECF No. 290 at 253-54, 269.

15    70.    R.W. had a grade of 68% in Nursing 221 at the midterm mark and

16  needed a grade of 75% to pass.  ECF No. 288 at 67, 88-89; Tr. Ex. 204.

17    71.    Ms. Tucker understood that R.W. was struggling academically in all

18  of his courses during Winter Quarter 2017.  ECF No. 288 at 15-16.

19    72.    At that time, R.W. had make-up coursework to do.  ECF No. 287 at

20  273; ECF No. 288 at 68-69; Tr. Ex. 211 at 1.

ORDER - 19

73.    He had an accommodation on file directing instructors to allow him to make up any coursework he missed due to his seizure disorder, or to contact Ms. Buchmiller if his absences were affecting his ability to meet course requirements.  ECF No. 287 at 273; ECF No. 288 at 83-84; ECF No. 289 at 210; Tr. Ex. 63 at 3.

74.    Make-up coursework had to be arranged with the relevant instructor based on the type of work missed.  For example, clinical makeup days had to be set on days when the instructor and the facility were available.  ECF No. 288 at 80-81.

75.    From March 5 through the morning of March 6, 2017, R.W. corresponded with Ms. Cooke about times for make-up clinical work, and R.W. planned to discuss this further with Ms. Cooke on March 7, 2017.  ECF No. 288 at 68-69; Tr. Ex. 211 at 1.

**C. March 6, 2017**

76.    On March 6, 2017, before his doctor's appointment, R.W. met with Ms. Tucker to get information he needed for Spring Quarter 2017.  ECF No. 287 at 275-76; ECF No. 290 at 115.

### *Visit with Dr. Cabasug*

77.    On March 6, 2017, R.W.'s wife took him to his appointment with Dr. Cabasug at Trios Southridge ("Trios"), in Kennewick.  ECF No. 290 at 118.

ORDER - 20

78.    R.W. informed Dr. Cabasug that he had not been sleeping well, had experienced increasing seizures, and was having thoughts about hurting or killing his CBC instructors.  ECF No. 287 at 29-30, 39-40; ECF No. 290 at 117-19; ECF No. 349 (testimony of R.W.); Tr. Ex. 67 at 92.

79.    R.W. was uncomfortable telling Dr. Cabasug about the homicidal ideations despite the fact that the ideations felt out of his control.  ECF No. 290 at 119.

80.    Dr. Cabasug noted that R.W. reported having a plan to act on the homicidal ideations for about one week prior.  ECF No. 290 at 154; ECF No. 349 (testimony of R.W.); Tr. Ex. 67 at 92.

81.    R.W. disclosed to Dr. Cabasug that he owned a handgun.  ECF No. 287 at 39; Tr. Ex. 67 at 92.

82.    Dr. Cabasug suspected that R.W.'s homicidal ideations were caused by his depression and lack of sleep.  ECF No. 287 at 40-41.

83.    Dr. Cabasug requested that R.W. be evaluated by Crisis Response. ECF No. 287 at 29-30, 104-05; ECF No. 349 (testimony of R.W.).

84.    R.W. understood that Dr. Cabasug felt the homicidal ideations were "serious enough" to require him to contact Crisis Response.  ECF No. 290 at 119.

ORDER - 21

1

***Evaluation by DCR Perez***

2          85.     On the same day, R.W. met with Designated Crisis Responder

3   ("DCR") Araceli Perez at Trios.  ECF No. 287 at 125; ECF No. 349 (testimony of

4   R.W.); Tr. Ex. 69 at 2.

5          86.     As a DCR for Lourdes Health, DCR Perez assessed individuals in

6   crisis—e.g., individuals with suicidal or homicidal ideation or serious disabilities

7   affecting their decision-making abilities—and consulted with other relevant parties

8   and professionals to determine whether the individual met criteria for involuntary

9   commitment.  ECF No. 287 at 119-21.

10         87.     DCR Perez noted that R.W. attributed his current symptoms to

11  changes to his daily life, returning to school full time, sleep deprivation, and stress

12  about his grades, which was causing mood changes and irritation.  ECF No. 287 at

13  133-34; Tr. Ex. 69 at 4.  She noted R.W. had been feeling "overwhelmed" and

14  "depressed recently," although "prior to returning to school he was doing just

15  fine."  Tr. Ex. 69 at 3.

16         88.     DCR Perez noted that R.W. reported having homicidal thoughts

17  triggered by his anger at receiving poor grades and feedback from his CBC

18  instructors.  ECF No. 287 at 134, 159-60; ECF No. 290 at 153; Tr. Ex. 69 at 4.

19         89.     DCR Perez noted that R.W. said he first experienced thoughts of

20  harming three of his instructions on the Tuesday of the prior week, and he had

ORDER - 22

thoughts about setting an instructor's office on fire and attacking an instructor from behind with a saw.  ECF No. 287 at 134-35, 159; ECF No. 290 at 153-54; Tr. Ex. 69 at 4.

90.   DCR Perez noted that R.W. specifically identified the individuals involved in his homicidal ideations as "Kim Tucker," "Valerie Topham," and "Alma."  ECF No. 290 at 154; Tr. Ex. 69 at 6, 8, 10.

91.   DCR Perez noted that R.W. denied he was actively planning to act on the homicidal ideations.  ECF No. 287 at 135; ECF No. 349 (testimony of R.W.); Tr. Ex. 69 at 4.

92.   R.W. recalled that when DCR Perez asked if he had a plan, he responded, "Well, kind of.  I don't know," because he was uncertain what would amount to a plan.  ECF No. 290 at 173.

93.   DCR Perez considers it to be the start of a plan if an individual imagines killing someone using a particular mechanism.  ECF No. 287 at 157-58.

94.   Based on her evaluation, DCR Perez concluded that R.W. presented a risk of harm to others.  ECF No. 287 at 158-59.

95.   DCR Perez is required by law to consider the least restrictive treatment option.  For example, voluntary treatment would be less restrictive than involuntary commitment if the individual earnestly agreed to comply with treatment recommendations on a voluntary basis.  ECF No. 287 at 120-21, 123.

ORDER - 23

96.    DCR Perez informed R.W. that if he refused to go to inpatient treatment voluntarily, she would seek to have him involuntarily committed.  ECF No. 287 at 172-73, 237; ECF No. 290 at 155.

97.    Because R.W. agreed to go to inpatient treatment on a voluntary basis, DCR Perez concluded that voluntary inpatient treatment was the least restrictive treatment option and, therefore, that he did not meet the criteria for involuntary commitment.  ECF No. 287 at 137, 140, 168; Tr. Ex. 69 at 3, 5.

98.    DCR Perez informed R.W. she was a mandated reporter and had a duty to warn law enforcement and the identified potential victims about what she had learned from his evaluation.  ECF No. 287 at 138, 160; Tr. Ex. 69 at 5.

99.    DCW Perez concluded that, under protocol, she had a duty to warn because R.W. had disclosed homicidal ideation toward identified individuals.  ECF No. 287 at 166.

100.    DCR Perez referred R.W. to Transitions, an inpatient mental health "crisis triage" facility in the Lourdes Health network,[4] which evaluated R.W.'s

_____

[4] Witnesses alternatively referred to this facility as "Transitions," "Lourdes Counseling," "Lourdes," or "Carondelet" (the name of the street where the facility is located).  *See, e.g.*, ECF No. 287 at 176-78, 212-13, 243-44, 257; ECF No. 288 at 113-14, 204-05, 219.

ORDER - 24

symptoms and accepted him for placement there.  ECF No. 287 at 136-37, 177-78, 181; Tr. Ex. 69 at 3, 5.

101.    R.W.'s wife, who was present for part of DCR Perez's interview with R.W., agreed to transport R.W. to Transitions.  ECF No. 287 at 137-38; Tr. Ex. 69 at 5.

102.    R.W. went home with his wife to pack before he checked in to Transitions.  ECF No. 290 at 120.

103.    On March 6, 2017, at approximately 5:55 p.m., DCR Perez called Franklin County dispatch and requested a return call from an officer so she could file a duty to warn report.  ECF No. 287 at 143-44; Tr. Ex. 69 at 10.

104.    DCR Perez also called CBC as part of her duty to warn the potential victims.  Because it was after business hours, she was transferred to Ms. Hoerner's voicemail, and she left a message asking for a return call first thing in the morning. ECF No. 287 at 144-45; Tr. Ex. 69 at 10.

ORDER - 25

*Intake at Transitions*

105.    Laurie Schoffstall, a mental health counselor at Transitions, conducted R.W.'s intake interview on March 6, 2017.  ECF No. 287 at 180-81; Tr. Ex. 68 at 57;[5] ECF No. 290 at 121.

106.    Transitions generally only admitted patients on a voluntary basis for up to 14 days, with an average stay of three to five days.  ECF No. 287 at 178, 182.

107.    R.W. was admitted to Transitions on a voluntary basis.  ECF No. 287 at 182.

108.    Based on information provided by R.W. and DCR Perez, Ms. Schoffstall noted that R.W. was in his last quarter of school; very stressed, including financial stress; and had experienced homicidal ideation toward his professors.  ECF No. 287 at 183, 203-04; Tr. Ex. 68 at 57.

_____

[5] Exhibit 68, totaling 84 pages, was admitted in full at the jury trial, *see* ECF No. 287 at 322, though the parties have implied that only pages 79 to 81 were previously admitted, ECF No. 343 at 7.  The parties offered a 148-page "complete" version of Exhibit 68 for the bench trial that was ultimately not admitted.  ECF No. 349-1 at 5.  Accordingly, citations to Exhibit 68 refer solely to the jury trial version of Exhibit 68.

ORDER - 26

109.   R.W. described his homicidal ideation to Ms. Schoffstall as "irrational" and not specifically aimed at his professors.  He attributed the thoughts to the fact that he was around his professors a lot.  ECF No. 287 at 183-84; Tr. Ex. 68 at 57.

110.   Ms. Schoffstall considers homicidal ideation to be something to take seriously and an indicator of potential danger to others.  ECF No. 287 at 202-04.

111.   R.W. told Ms. Schoffstall that he felt he was constantly in "flight or fight mode" and highly anxious.  ECF No. 287 at 184; Tr. Ex. 68 at 57.

112.   R.W. reported poor eating habits, poor sleep (averaging about four hours of sleep per night), constant stress, and an inability to relax.  ECF No. 287 at 184-85; Tr. Ex. 68 at 57.

113.   R.W. told Ms. Schoffstall that there were guns at his home but that his wife had moved them to an unknown location.  ECF No. 287 at 204-05; Tr. Ex. 68 at 58.

114.   When asked about strengths he could draw on for treatment, R.W. told Ms. Schoffstall, "I talked to my doctor, thinking I needed some help.  He thought I needed more help than what he could give me.  I'm trying to get some help."  ECF No. 287 at 188; Tr. Ex. 68 at 58.

115.   Ms. Schoffstall's assessment of R.W. included unspecified depressive disorder, adjustment disorder with mix of anxiety and depression, concurrent

medical conditions of epilepsy and chronic back pain, and school and financial stressors.  ECF No. 287 at 191-94; Tr. Ex. 68 at 58-59.

116.   R.W.'s goals for treatment were to reduce stress and anxiety, get set up with outpatient mental health services, and improve his sleep.  ECF No. 287 at 197-99; Tr. Ex. 68 at 59.

117.   Ms. Schoffstall independently concluded that she had a duty to warn the CBC nursing school, but she was aware that DCR Perez had already completed this.  ECF No. 287 at 205-07; Tr. Ex. 68 at 58.

**D. March 7, 2017**

*DCR Perez's Notice to Richland Police Department*

118.   On March 7, 2017, at 9:32 a.m., DCR Perez returned a voicemail she had received from Richland Police Officer Erik Noren.  ECF No. 287 at 145-46; Tr. Ex. 69 at 11.  She informed him that R.W. had reported symptoms of depression, lack of sleep, anger, agitation, and homicidal thoughts toward his instructors as of February 28, 2017, including thoughts about setting an "office on fire and closing door taking off from campus or using a saw and attacking the instructor from their back"; and that R.W.'s longtime primary care provider reported he had never seen R.W. with such symptoms before.  ECF No. 287 at 146-47; Tr. Ex. 69 at 11.

ORDER - 28

119.    Officer Noren inquired whether R.W. would follow through with the homicidal ideations; DCR Perez reported that R.W. had presented as remorseful and seeking help, and he did not qualify for involuntary commitment because he was willing to accept voluntary placement.  ECF No. 287 at 164-65; Tr. Ex. 69 at 11.

120.    DCR Perez did not recall telling Officer Noren that, in her opinion, R.W.'s threats did not appear to be serious, and she noted it would have been unusual for her to say that something was "in [her] opinion" or that homicidal ideation was not serious.  ECF No. 287 at 152-53, 156-57, 165 (referencing Tr. Ex. 21 at 4).  DCR Perez found R.W.'s situation serious.  ECF No. 287 at 157, 167.

### *Initial Notice to CBC*

121.    Around 8:00 a.m. on March 7, 2017, Pasco Police Department contacted CBC Officer Mike Hahn and notified him of R.W.'s reported homicidal ideation.  ECF No. 288 at 108-11; Tr. Ex. 23 at 2.  Officer Hahn's notes reflect that he was advised R.W. had "admitted to having homicidal ideations toward staff at CBC, talking about lighting offices on fire and attacking people with saws"; had "specifically" mentioned his instructors, Ms. Tucker, Ms. Cooke, and Alma Martinez; and was "getting help and may not be an immediate threat."  Tr. Ex. 23 at 2.

ORDER - 29

122.    In Winter Quarter 2017, Mr. Reagan was CBC's Assistant Dean for Student Conduct and Activities and CBC's Student Conduct Officer for student disciplinary matters.  ECF No. 289 at 10, 88; ECF No. 349 (testimony of L. Thornton, R. Reagan).

123.    CBC's Campus Security and Safety Supervisor Levi Glatt notified Mr. Reagan about the report from Pasco Police.  ECF No. 288 at 106, 111; ECF No. 289 at 88; ECF No. 349 (testimony of R. Reagan).

124.    Based on what was reported to him through campus security, Mr. Reagan understood that law enforcement and medical professionals were communicating this information to CBC because of their duty to warn.  ECF No. 289 at 116; Tr. Ex. 45 at 1; ECF No. 349 (testimony of R. Reagan).

125.    Mr. Reagan holds a master's degree in counseling.  Based on this part of his background, he understood that a medical professional would ordinarily break confidentiality requirements for their duty to warn only if, in their professional judgment, there was a serious concern.  ECF No. 289 at 116; ECF No. 349 (testimony of R. Reagan).

126.    Accordingly, Mr. Reagan took the reporting about R.W. seriously and felt he had an obligation to respond.  ECF No. 289 at 116-17.

ORDER - 30

127.   Around 10:30 a.m. on March 7, 2017, Mr. Glatt emailed CBC's four vice presidents a copy of Mr. Hahn's notes and advised Mr. Reagan was working on a trespass order.  ECF No. 288 at 110-12, 126-27; 203-04; Tr. Ex. 23 at 1.

### *Interim Trespass*

128.   On March 7, 2017, Mr. Reagan issued an interim trespass prohibiting R.W. from entering any of CBC's campuses.  ECF No. 338 at 3 (stipulated fact no. 3); ECF No. 289 at 15; ECF No. 290 at 121; Tr. Ex. 8.

129.   In the trespass notice to R.W., Mr. Reagan cited CBC's Student Code of Conduct provision on abusive conduct (WAC 132S-100-205) as the basis for the trespass decision, pending further investigation.  ECF No. 289 at 15-17; Tr. Ex. 8.

130.   This provision, as quoted in the trespass notice, defined "abusive conduct" as "[p]hysical and/or verbal abuse, threats, intimidation, harassment, online harassment, coercion, bullying, cyberbullying, retaliation, stalking, cyberstalking, and/or other conduct which threatens or endangers the health or safety of any person or which has the purpose or effect of creating a hostile or intimidating environment."  ECF No. 338 at 4-5 (stipulated fact no. 13); Tr. Ex. 8.

131.   Mr. Reagan had discussed the trespass with his supervisor Pat Campbell, CBC's Vice President of Student Services, before issuing it.  ECF No. 288 at 201.

ORDER - 31

132. Mr. Reagan intended for the initial trespass to be a temporary safety measure to protect the named instructors and the campus in general, given the limited information they had at the time. ECF No. 289 at 89-90, 119.

133. R.W. received notice of the trespass that day, while at Transitions, and receiving this information exacerbated his stress levels. ECF No. 290 at 121-23, 176-77; ECF No. 349 (testimony of R.W.).

134. At 11:40 a.m., Mr. Reagan notified CBC staff that R.W. had been trespassed. ECF No. 289 at 235, 248; ECF No. 349 (testimony of B. Beus); Tr. Ex. 24 at 1.

### *Notice to Instructors from Richland Police Department*

135. On March 7, 2017, Officer Noren and CBC Security Officer Zachary Flieger went to Ms. Tucker's office to advise her about R.W.'s homicidal ideations. ECF No. 287 at 256-59; ECF No. 288 at 108; Tr. Ex. 21 at 4.

136. Ms. Tucker subsequently received a phone call from Crisis Response, who gave her the same information that Officer Noren provided. ECF No. 287 at 259-60, 278-79.

137. Officer Noren told Ms. Tucker that DCR Perez had reported R.W.'s homicidal ideation. Officer Noren described this as a "threat." ECF No. 287 at 261-62, 279.

ORDER - 32

138.    Officer Noren told Ms. Tucker that R.W. had the idea of locking her in her office and burning the office or cutting her with a saw.  ECF No. 287 at 262.

139.    Ms. Tucker recalled Officer Noren advising that he "wouldn't even allow [R.W.] in [the] parking lot."  ECF No. 288 at 73.

140.    Ms. Tucker interpreted Officer Noren's report as serious.  ECF No. 288 at 103.

141.    Officer Noren did not inform Ms. Tucker whether or not R.W. had acted on the thoughts; whether or not R.W. was remorseful about the thoughts; whether or not the situation appeared serious; whether or not R.W. had made any "direct threats"; or whether or not there would be any further investigation or criminal charges.  ECF No. 287 at 262-63; ECF No. 288 at 31-32, 47-48.

142.    Officer Noren told her that R.W. had voluntarily gone to Transitions, which Ms. Tucker understood to mean that R.W. would not be coming to campus while he remained at Transitions.  ECF No. 287 at 263.

143.    Ms. Tucker felt "blindsided," "shocked," "dumbfounded," "shook," "scared," and "unsafe" upon hearing the information from Officer Noren.  She recalled seeing R.W. the prior day and had never noticed anything in her interactions with him that might indicate "where this was coming from."  ECF No. 288 at 71-72, 103.

ORDER - 33

144.   Afterward, Ms. Tucker spoke with Ms. Hoerner by phone, spoke to campus security, and reviewed the nursing student handbook while considering what to do.  ECF No. 288 at 72.

145.   Ms. Tucker was concerned for her own safety, for the safety of the two other nursing faculty who had been threatened, and for the safety of the broader campus community.  ECF No. 288 at 72.

146.   Ms. Cooke recalled Ms. Tucker telling her that R.W. had specifically named them while threatening to kill them by lighting their offices on fire.  ECF No. 290 at 256-57.  Ms. Cooke considered this threat serious based on the specific method identified in the threat.  She was concerned that R.W., as an enrolled student, might be able to find out when she was in her office, where she lived, and what car she drove.  As a result, she asked family members to stay at her house for a few nights and switched cars with them.  She also asked campus security to walk her to and from her car when she arrived or left work.  ECF No. 290 at 256-58.

147.   Before then, R.W. had never done or said anything that gave Ms. Cooke a concern for safety.  ECF No. 290 at 264.

148.   Officer Noren also spoke with Ms. Martinez and Ms. Cooke at CBC on March 7, 2017.  ECF No. 288 at 169-70; ECF No. 290 at 256, 271.

ORDER - 34

149.   Ms. Martinez recalled Officer Noren asking her if she felt threatened or wanted to be walked to her car.  She declined to be walked to her car but voiced concern about the school.  ECF No. 288 at 170.

150.   Mr. Flieger prepared a Campus Security Report noting that around 10:00 a.m., Officer Noren informed him that R.W. made "homicidal threats" against Ms. Tucker, Ms. Cooke, and Alma Martinez and that there was a chance R.W. might come to campus for a planned meeting with Ms. Tucker at noon that day.  ECF No. 288 at 115-17; Tr. Ex. 22 at 2.

151.   Mr. Hahn also prepared a Campus Security Report noting that Pasco Police reported R.W. had "admitted" experiencing "homicidal ideations toward staff at CBC, talking about lighting offices on fire and attacking people with saws"; had specifically mentioned Ms. Tucker, Ms. Cooke, and Ms. Martinez; and was "currently at Carondelet voluntarily getting help, but may leave."  Tr. Ex. 22 at 5.

### *Nursing Program's Actions*

152.   The March 7, 2017 meeting between R.W. and his instructors was cancelled, and R.W. did not receive the two Academic Progress Alerts that had been prepared for delivery that day.  ECF No. 288 at 37-38; ECF No. 290 at 253.

153.   At 3:19 p.m., Ms. Tucker emailed Mr. Glatt, asking him to contact the security supervisor for Kadlec Medical Center about deactivating R.W.'s security

ORDER - 35

credentials with Kadlec, in light of R.W.'s trespass.  ECF No. 287 at 286-87; Tr. Ex. 6 at 1.  The nursing program had an educational contract with Kadlec whereby students would perform nursing and caregiving work for Kadlec patients.  Clinical students were given a badge allowing them access to the Kadlec facility and restricted areas.  ECF No. 288 at 76-77.

154.    Ms. Tucker was aware that R.W. would not be able to participate in clinical work due to the trespass, and she did not want him to have access to Kadlec without a clinical instructor.  ECF No. 287 at 288; ECF No. 288 at 77.

155.    Ms. Tucker did not remove R.W. from the nursing program, and she did not have any information as to whether R.W. had otherwise been removed from the nursing program.  ECF No. 288 at 46-47.

156.    Ms. Tucker was "very afraid" of R.W. at this time.  ECF No. 288 at 33.

### *At Transitions*

157.    Michelle Aronow, a board-certified psychiatric nurse practitioner, was working at Transitions in March 2017.  In this role, Ms. Aronow typically met with new patients right after their intake with the on-duty mental health professional, and she was the only provider prescribing medications at Transitions.  ECF No. 287 at 212, 214-18.

ORDER - 36

158.   Ms. Aronow met with R.W. on March 7, 2017.  ECF No. 287 at 219-20; Tr. Ex. 68 at 79.  R.W. told Ms. Aronow that he had been having trouble sleeping for several days, tried melatonin and Benadryl without success, and made a doctor's appointment to inquire about prescription sleep medications.  R.W. told Ms. Aronow that, in response to the doctor's questions, R.W. reported he was having violent negative thoughts against at least three of his professors in the CBC nursing program.  ECF No. 287 at 222-23; Tr. Ex. 68 at 79.

159.   R.W. told Ms. Aronow that he hoped to get rest and support at Transitions because he felt overwhelmed about school.  ECF No. 287 at 224; Tr. Ex. 68 at 79.

160.   R.W. told Ms. Aronow that the homicidal thoughts were unwanted and intrusive, which Ms. Aronow understood to mean that R.W. wanted to, but could not, stop having these thoughts.  ECF No. 287 at 225-26; Tr. Ex. 68 at 79.

161.   R.W. told Ms. Aronow that he had thought about plans to act on the homicidal ideation but would talk himself out of it by telling himself it wouldn't work.  He denied having gone anywhere or obtained anything to act on the homicidal ideation.  ECF No. 287 at 224-25, 238-39; Tr. Ex. 68 at 79.

162.   R.W. told her he could not recall specifics about the contents of his thoughts or about any plans, and Ms. Aronow did not recall reviewing DCW Perez's notes on these subjects.  ECF No. 287 at 238.

ORDER - 37

163.   R.W. told Ms. Aronow that he did not know why his homicidal ideation concerned those particular instructors except that those were the people he mainly interacted with at school.  ECF No. 287 at 227.

164.   Ms. Aronow found no basis in her conversation with R.W. to conclude that he had a current plan or intent to act on the homicidal ideation.  ECF No. 287 at 225, 240; Tr. Ex. 68 at 79.

165.   Ms. Aronow prescribed R.W. an increased dose of sleeping medication, beyond the dose that was available to Transitions residents without a prescription, for use as needed.  ECF No. 287 at 233-34; Tr. Ex. 68 at 80.

166.   Ms. Aronow understood that R.W. had been "barred" from the CBC campus and had a number of days to appeal the decision, and she felt comfortable recommending that he file the appeal.  ECF No. 287 at 234-35; Tr. Ex. 68 at 80.

167.   Except for her March 7, 2017 visit with R.W., Ms. Aronow did not recall having other interactions with him in the rest of the time he was at Transitions.  ECF No. 287 at 236.

**E.  March 8, 2017**

*Student Conduct Actions*

168.   On March 8, 2017, R.W. emailed Mr. Reagan from Transitions, asking what he needed to do in relation to the interim trespass.  ECF No. 338 at 3 (stipulated fact no. 4); ECF No. 289 at 43-44; ECF No. 290 at 122; Tr. Ex. 10 at 3.

ORDER - 38

169.   That day, Mr. Reagan wrote another letter to R.W. stating that Mr. Reagan was commencing a Student Conduct investigation.  ECF No. 338 at 3 (stipulated fact no. 5); ECF No. 288 at 211-12; ECF No. 289 at 31-32; Tr. Ex. 9.

170.   The Student Conduct investigation was separate from the interim trespass, though both were initiated by Mr. Reagan and the Student Conduct Office.  ECF No. 288 at 207.

171.   The March 8, 2017 letter to R.W. provided more information about the Student Conduct proceedings and set a Student Conduct meeting between R.W. and Mr. Reagan for March 16, 2017.  ECF No. 289 at 91-92; Tr. Ex. 9.

172.   The Student Conduct meeting was later rescheduled for March 22, 2017.  ECF No. 289 at 92-94, 121-22; Tr. Ex. 28; Tr. Ex. 45 at 2.

### *Nursing Director's Actions*

173.   On March 8, 2017, Ms. Tucker signed a Nursing Student Discontinuation Form for R.W.  ECF No. 287 at 289-90; ECF No. 288 at 38-39; Tr. Ex. 1.  The Nursing Student Discontinuation Form is meant to document the quarter that a student left the program, for the nursing program's internal purposes. ECF No. 287 at 290, 307; ECF No. 288 at 39-40; Tr. Ex. 1.  The Nursing Student Discontinuation Form itself does not affect the applicable student's enrollment status or standing within CBC, and Ms. Tucker did not provide this Form to R.W.

ORDER - 39

1    or Mr. Reagan.  ECF No. 287 at 307; ECF No. 288 at 32, 39-40, 75; ECF No. 289

2    at 38-39.

3        174.    Student withdrawals or dismissals are handled through separate CBC

4    administrative processes or through the CBC campus computer system.  ECF

5    No. 288 at 102.

6        175.    At that point, Ms. Tucker considered R.W.'s status in the nursing

7    program to be "incomplete" because he was trespassed from campus, with roughly

8    two weeks left in Winter Quarter 2017.  ECF No. 287 at 290-93; Tr. Exs. 1, 244.

9        176.    Ms. Tucker did not indicate on the Discontinuation Form whether or

10   not R.W. planned to return to the nursing program.  ECF No. 288 at 100-01; Tr.

11   Ex. 1.

12       177.    Also on March 8, 2017, Ms. Tucker drafted a letter dismissing R.W.

13   from the nursing program and barring him from reapplying based on his "breach"

14   of the professionalism standards for a nursing student by making "unprofessional

15   and unethical" communications on March 6, 2017, as reported by Richland police

16   and Crisis Response, and based on the nursing student handbook policies for

17   students who withdraw "due to immoral, unprofessional, unethical, illegal or

18   unsafe practices."  ECF No. 287 at 296-99, 316-17; Tr. Ex. 2; Tr. Ex. 73 at 33.

19

20

ORDER - 40

178.   Ms. Tucker sent the draft letter to Virginia Tomlinson, CBC's Vice President of Instruction, for review and input.  ECF No. 287 at 300-01; ECF No. 288 at 132-34; Tr. Ex. 2 at 2.

179.   Ms. Tomlinson was the direct supervisor for Ms. Hoerner. Ms. Hoerner was the direct supervisor for Ms. Tucker.  Ms. Tucker sent the letter to Ms. Tomlinson because Ms. Hoerner was out of town.  ECF No. 287 at 300-01; ECF No. 288 at 129; ECF No. 290 at 13.

180.   Ms. Tomlinson believed at the time that it was appropriate to dismiss R.W. from the nursing program, and she sent the draft letter back to Ms. Tucker with edits and approval.  ECF No. 288 at 134-35, 137-38; Tr. Ex. 2 at 3-5.

181.   Ms. Tucker sent the letter to Mr. Reagan and asked him to have a courier deliver it to R.W.  ECF No. 287 at 301-02; Tr. Ex. 2 at 6.

182.   Mr. Reagan discussed the dismissal letter with Ms. Campbell, and they agreed that the dismissal letter was not appropriate to send.  ECF No. 288 at 201-02; ECF No. 289 at 33.

183.   Mr. Reagan did not think the nursing program had the authority to dismiss R.W. from the nursing program without providing due process.  ECF No. 289 at 90-91, 132.

184.   Ms. Tucker was instructed not to send the dismissal letter because R.W. would be undergoing Student Conduct proceedings.  Ms. Tucker destroyed

ORDER - 41

the hard copy of the letter and never sent it to R.W.  ECF No. 287 at 307; ECF No. 288 at 74.

185.   After she was directed not to send the dismissal letter, Tucker had no further involvement in CBC's proceedings related to R.W.  ECF No. 288 at 32-33, 74-75, 78-79.

186.   Ms. Tucker considered R.W. to have been "paused" from the nursing program, which was a situation she had not encountered before.  ECF No. 287 at 291, 305; ECF No. 288 at 42.

187.   Ms. Tucker knew that CBC administration, namely Mr. Reagan, would be following up with R.W., but she was not involved and did not know what that would entail.  ECF No. 287 at 293, 306-07.

188.   In response to an inquiry from another CBC employee, Ms. Tucker stated that R.W.'s enrollment status was "[o]n hold right now until next week after he meets with Ralph Reagan."  ECF No. 288 at 26; Tr. Ex. 5 at 1.

**F.  March 9 to March 10, 2017**

189.   On March 9, 2017, Mr. Reagan emailed R.W. to request that R.W. provide a statement of the grounds for his appeal of the trespass.  ECF No. 289 at 44; Tr. Ex. 10 at 2.

ORDER - 42

190.   Also on March 9, 2017, DCR Perez reevaluated R.W. at Transitions because R.W. was requesting to be discharged against medical advice.  ECF No. 287 at 160-62; Tr. Ex. 69 at 15-16.

191.   R.W. wanted to leave Transitions because he was concerned about his status in the nursing program.  ECF No. 290 at 123, 158; Tr. Ex. 68 at 67 ("Client also reports '. . . My life is crumbling, I can[']t go back to school, I can[']t finish the semester because I am too far behind.  If I was not here I could at least text my instructors and ask them what I am missing, I would have access to my email.'"); Tr. Ex. 69 at 17 ("[H]e feels more stress as he has been terminated from the nursing program[.]").

192.   DCR Perez noted that R.W.'s answers on reevaluation conflicted with his answers from her initial evaluation and that he "appear[ed] to be minimizing symptoms."  ECF No. 287 at 162; Tr. Ex. 69 at 16.

193.   R.W. denied having ongoing homicidal ideations.  ECF No. 287 at 169-70; Tr. Ex. 69 at 16, 19; ECF No. 290 at 123.

194.   After the reevaluation, DCR Perez was able to convince R.W. to stay at Transitions on a voluntary basis.  ECF No. 287 at 162; Tr. Ex. 69 at 18.

195.   DCR Perez recommended that R.W. be closely monitored upon discharge from Transitions to ensure that he followed through with the recommended treatment.  ECF No. 287 at 163-64; Tr. Ex. 69 at 18.

ORDER - 43

196.    R.W. was reevaluated and discharged from Transitions on March 10, 2017, with a referral for outpatient counseling.  ECF No. 287 at 171, 246; ECF No. 290 at 124.

197.    On March 10, 2017, Mr. Reagan emailed R.W. a reminder to submit a statement for the Student Appeals Board to consider for his appeal of the trespass. R.W. responded that day and provided a statement.  ECF No. 338 at 4 (stipulated fact no. 6); ECF No. 289 at 44; Tr. Ex. 10 at 1-2.  In that statement, R.W. indicated he "originally had some violent thoughts over a week ago," did not act on them, sought and received inpatient treatment, and had been released that day upon the determination that he was not a threat to himself or others.  ECF No. 290 at 124-25; Tr. Ex. 10 at 1.

198.    R.W. did not know what information CBC personnel had received from Crisis Response, though he believed they were "probably scared."  ECF No. 290 at 125.

**G. March 13, 2017**

199.    On March 13, 2017, Ms. Tucker led a faculty meeting for the nursing program, during which R.W.'s trespass from campus was discussed.  ECF No. 287 at 302-04; ECF No. 290 at 270, 273-74; Tr. Ex. 7 at 2.

200.    Ms. Tucker denied that they decided whether R.W. would be allowed to return to the nursing program at this meeting.  ECF No. 287 at 304.

ORDER - 44

201.   Ms. Cooke attended this meeting and understood from the discussion that others above her in the chain of command had decided that R.W. would not be returning to campus.  Ms. Cooke was not involved in CBC's decision-making regarding R.W.  ECF No. 290 at 273-74; Tr. Ex. 7 at 1.

202.   Ms. Martinez attended this meeting and vaguely recalled being told at the time that R.W. would not be returning to CBC or the nursing program due to the trespass, but that they could not discuss it further.  ECF No. 288 at 172, 191; Tr. Ex. 7 at 1.

203.   Also on March 13, 2017, the Student Appeals Board met in relation to R.W.'s appeal of the trespass order and unanimously voted to affirm the trespass, based on their conclusion that there was adequate justification therefor.  ECF No. 288 at 222, 225; Tr. Ex. 25 at 2.

204.   Ms. Campbell emailed Mr. Reagan to report the Student Appeals Board's decision, and they discussed revisions to the letter informing R.W. of the decision.  ECF No. 288 at 222-24; Tr. Ex. 25.

**H. March 14, 2017**

205.   On March 14, 2017, the Student Appeals Board issued its decision affirming R.W.'s interim trespass.  ECF No. 338 at 4 (stipulated fact no. 7); ECF No. 288 at 216-17; Tr. Ex. 11.

ORDER - 45

206.   Also on March 14, 2017, Mr. Reagan conducted a Student Behavioral Intervention Team ("SBIT") meeting concerning R.W. with various CBC staff members, including Ms. Hoerner, Mr. Glatt, and Leslie Irwin.  ECF No. 288 at 183-85; ECF No. 289 at 33-34; Tr. Ex. 26 at 1; Tr. Ex. 45 at 2.

207.   The purpose of a SBIT meeting was to gather a team of CBC staff having some connection with a particular student to discuss a reported concern about the student.  ECF No. 288 at 213; ECF No. 289 at 34-35.

208.   At this SBIT meeting, a representative of the nursing program contended that the eventual outcome of the Student Conduct proceedings would not be binding on the nursing program's decision whether to allow R.W. to continue in the program.  Mr. Reagan found this contention to be factually incorrect.  ECF No. 289 at 35-38, 99; Tr. Ex. 45 at 2.

**I. March 15, 2017**

209.   At a follow-up visit on March 15, 2017, Dr. Cabasug noted R.W. appeared to have stabilized under the new treatment plan and reported having no further homicidal ideations.  ECF No. 287 at 53-55; Tr. Ex. 67 at 95.

210.   R.W. attributed these improvements to the sleep medication and adjusted antidepressant medication he received at Transitions.  ECF No. 290 at 125-26.

ORDER - 46

211.  Dr. Cabasug directed R.W. to return for another follow-up in one month and to continue with counseling and his medication regimen.  ECF No. 287 at 53-55; Tr. Ex. 67 at 96.

212.  Dr. Cabasug knew R.W. had not returned to the nursing program at the time of the March 15, 2017 visit.  ECF No. 287 at 108-09.

**J.  Remainder of Winter Quarter 2017**

213.  Classes for Winter Quarter 2017 concluded on March 17, 2017.  ECF No. 290 at 159; Tr. Ex. 244.

214.  Final exams for Winter Quarter 2017 were conducted between March 21 and March 23, 2017.  ECF No. 289 at 105-06; Tr. Ex. 244; ECF No. 349 (testimony of K. Myers); Bench Tr. Ex. 2000.

215.  R.W. did not take the final exams for his Winter Quarter 2017 courses.  ECF No. 349 (testimony of K. Tucker).

216.  CBC's deadline to report grades for Winter Quarter 2017 was March 27, 2017.  ECF No. 349 (testimony of K. Myers); Bench Tr. Ex. 2000.

217.  At some point after the deadline to report grades, the CBC Registrar's office changes remaining "incomplete" grades for the quarter into 0.0 grades.  ECF No. 349 (testimony of K. Myers).

218.  R.W. received grades of 0.0 in all his courses for Winter Quarter 2017.  ECF No. 288 at 296; ECF No. 349 (testimony of K. Myers); Tr. Ex. 46 at 4.

ORDER - 47

219.    On March 22, 2017, R.W. appealed the interim trespass and Student Appeals Board decision to Dr. Lee Thornton, who was CBC's Interim President from March to November 2017.  ECF No. 338 at 4 (stipulated fact no. 9); ECF No. 289 at 171; Tr. Ex. 13.

220.    On March 28, 2017, CBC's Financial Aid Department sent R.W. a notice that his eligibility for financial aid was being suspended due to insufficient academic progress—specifically based on his incomplete grades for Winter Quarter 2017.  ECF No. 289 at 252, 260-61; Tr. Ex. 30; Tr. Ex. 31 at 2-3.

221.    Although CBC allowed students to petition for reinstatement of their financial aid by demonstrating extenuating circumstances, R.W. was not eligible to do so as of Winter Quarter 2017 because he had already submitted, and CBC had already granted, two prior petitions.  ECF No. 289 at 252-53; ECF No. 349 (testimony of B. Beus); Tr. Ex. 31 at 3.

222.    If financial aid is suspended based on a student's incomplete grade, it can be reinstated if the student later finishes the course and receives a passing grade, albeit without financial aid.  This would have applied to R.W.'s Winter Quarter 2017 grades.  ECF No. 289 at 259-61.

223.    It was common for students with incomplete grades to take multiple weeks to resolve those incomplete grades for financial aid reinstatement.  ECF No. 289 at 261-62.

ORDER - 48

224.   In R.W.'s case, he needed to receive passing grades for 6 credits of his Winter Quarter 2017 classes to have his financial aid reinstated.  ECF No. 289 at 267-68; Tr. Ex. 31 at 3.

225.   Alternatively, R.W. could have completed one five-credit class without financial aid, at a GPA of 2.0 or better, to qualify for reinstatement of his financial aid.  The estimated tuition for a 5-credit class in 2017 would have been around $600.  ECF No. 289 at 264; Tr. Ex. 31 at 3.

226.   R.W. previously had to complete a quarter without financial aid to have his financial aid eligibility reinstated.  ECF No. 289 at 265-66.

227.   A student's suspended financial aid status only applies to their continuing attendance at CBC—it would not carry over if the student attended another college.  ECF No. 289 at 262-63, 266.

**K. Interim Student Conduct Proceedings**

*Investigation*

228.   Mr. Reagan's Student Conduct investigation included communicating with CBC personnel, R.W., R.W.'s attorney, Dr. Cabasug, and R.W.'s treating mental health personnel, and reviewing R.W.'s medical records.  ECF No. 287 at 240; ECF No. 289 at 48-49, 126-27; ECF No. 349 (testimony of B. Beus and R. Reagan); Tr. Ex. 67 at 1-3.

ORDER - 49

229.    On March 22, 2017, Mr. Reagan met with R.W. and R.W.'s attorney at CBC's Pasco campus, with campus security escorting R.W.  ECF No. 338 at 4 (stipulated fact no. 8); ECF No. 289 at 45; ECF No. 290 at 126-27; ECF No. 349 (testimony of R. Reagan, R.W.); Tr. Ex. 29.

230.    At the meeting, Mr. Reagan and R.W. discussed the recent events from both R.W.'s and CBC staff's perspectives and next steps.  ECF No. 289 at 94-95.

231.    Mr. Reagan noted R.W. denied having said he had thought about lighting anything on fire, though Mr. Reagan thought R.W. might have been confused or unable to remember.  ECF No. 289 at 95; Tr. Ex. 45 at 3.

232.    Mr. Reagan noted that R.W. acknowledged having thought about using a saw to harm Ms. Tucker, Ms. Cooke, and Ms. Martinez after seeing saws at a store.  Tr. Ex. 45 at 3.

233.    Mr. Reagan asked R.W. to provide medical records from his primary care doctor and Lourdes.  Mr. Reagan intended for R.W. to provide any records on a voluntary basis, and he did not tell R.W. that this was a requirement.  R.W. agreed to provide the requested records.  ECF No. 289 at 46, 95-96; ECF No. 290 at 126-27; ECF No. 349 (testimony of R. Reagan); Tr. Ex. 45 at 3.

234.    Mr. Reagan noted that R.W. had indicated, in his statement appealing the trespass, that his medical providers were willing to advocate for him, and

ORDER - 50

Mr. Reagan thought it would be helpful to have these providers' assurances or support for R.W.'s representations.  ECF No. 289 at 96-97; Tr. Ex. 45 at 3; *see also* Tr. Ex. 10 at 1.

235.   At the end of the meeting, Mr. Reagan felt there was a mutual understanding with R.W. and R.W.'s attorney about the reasons for CBC's actions given recent events.  Mr. Reagan specifically recalled a recent shooting at a school campus in Umpqua.  ECF No. 289 at 97-98; Tr. Ex. 45 at 3.

236.   In general, Mr. Reagan felt that the Student Conduct proceedings were part of his duty to protect the CBC campus community and something he needed to take seriously, based on the specific circumstances of R.W.'s situation and in the broader context of heightened concerns for school safety.  ECF No. 289 at 113.

237.   At R.W.'s request, Dr. Cabasug wrote a letter stating that R.W.'s homicidal ideations that month were "very out of character," that R.W. had never shown aggressive behavior or language, and that R.W. was set up with continuing treatment.  ECF No. 287 at 56-57; Tr. Ex. 67 at 6.

238.   At this time of this letter, R.W. was compliant with Dr. Cabasug's recommendations, and Dr. Cabasug saw no indication that R.W. was a danger to others or would be mentally or physically unable to attend school.  ECF No. 287 at 57.

239.    Dr. Cabasug was not asked to provide, nor could he have provided, assurances that R.W. would not experience homicidal ideation in the future or upon his return to the nursing program.  ECF No. 287 at 98, 105-06.

240.    In early April 2017, Mr. Reagan received more of R.W.'s primary care medical records than he had expected when he had requested R.W.'s relevant medical records—specifically, about two years' worth of records beyond what he had expected to receive.  He nevertheless reviewed all records provided.  ECF No. 289 at 49-52.

241.    Mr. Reagan and Ms. Campbell reviewed R.W.'s medical records and spoke with his treating providers in search of information about the circumstances of R.W.'s past homicidal ideations and whether there was a possibility that the ideations might recur.  ECF No. 288 at 231, 249; ECF No. 289 at 99-100.

242.    Mr. Reagan did not see anything in Dr. Cabasug's letter that provided reasonable assurances that R.W.'s homicidal ideations would not recur or that R.W. would never act upon them.  ECF No. 289 at 100, 128-29.

243.    On April 4, 2017, R.W. began seeing Alex Soulia monthly for outpatient mental health counseling, based on the evaluation for outpatient treatment conducted at Transitions.  ECF No. 287 at 246-47, 250.

ORDER - 52

244.   On April 10, 2017, Mr. Reagan obtained R.W.'s authorization to speak with R.W.'s mental health providers at Lourdes.  ECF No. 289 at 53-54; Tr. Ex. 32 at 2.

245.   On April 13, 2017, Mr. Reagan and Ms. Campbell spoke with Ms. Aronow, Mr. Soulia, and a Risk Manager for Lourdes, Anita Kongslie, by phone.  ECF No. 288 at 232-35, 239-40; ECF No. 289 at 55-56; Tr. Ex. 33; Tr. Ex. 34 at 2.

246.   This meeting was the first time Mr. Reagan and Ms. Campbell had received information from R.W.'s mental health providers regarding his homicidal ideations.  ECF No. 289 at 163.

247.   Ms. Aronow told Mr. Reagan and Ms. Campbell that R.W. had no explanation for the homicidal ideations and had not attributed them to school-related stress, which he had barely mentioned.  But Ms. Aronow thought school-related stress was a factor in his sleep issues.  ECF No. 288 at 241, 243; Tr. Ex. 34 at 2.

248.   Ms. Aronow told Mr. Reagan and Ms. Campbell that she understood this was the "only mental health issue [R.W.] has had ever."  Tr. Ex. 34 at 2.

249.   Ms. Aronow stated that R.W. wanted to leave the day after he was admitted but that they were concerned about him leaving while he was still having

ORDER - 53

1 | sleep issues. They thought his sleep issues could be causing him to have intrusive

2 | thoughts. ECF No. 288 at 243; Tr. Ex. 34 at 2.

3 |     250. Mr. Soulia told Mr. Reagan and Ms. Campbell that R.W. had thought

4 | medication issues may have been causing the homicidal ideations. ECF No. 288 at

5 | 244; Tr. Ex. 34 at 2.

6 |     251. Mr. Soulia told Mr. Reagan and Ms. Campbell that R.W. denied

7 | having any problems with his professors. Tr. Ex. 34 at 2.

8 |     252. At the time Mr. Soulia spoke to Mr. Reagan and Ms. Campbell, he

9 | had only had one counseling session with R.W., and he was next scheduled to meet

10 | with R.W. in May. ECF No. 287 at 250; ECF No. 289 at 57; Tr. Ex. 34 at 2.

11 |     253. Ms. Campbell believed that the meeting with Ms. Aronow and

12 | Mr. Soulia did not provide reasonable assurance about R.W.'s status, as R.W. had

13 | only seen them for a short time. ECF No. 288 at 249-50.

14 |     254. Ms. Campbell was also hoping one of R.W.'s medical providers could

15 | give them written assurance that R.W.'s homicidal ideations would not recur in the

16 | future, but this did not happen. ECF No. 288 at 249-52, 255-57, 281; ECF No. 289

17 | at 163-64.

18 |     255. Ms. Kongslie specifically told Ms. Campbell that she was "never

19 | going to get" such a written assurance. ECF No. 289 at 164.

20 |

ORDER - 54

256.   Based on his investigation, Mr. Reagan understood that R.W.'s homicidal ideations appeared to be "an episode out of character" for R.W. and the "result of a combination of stress, anxiety, sleep deprivation, depression and possibly medication issues."  ECF No. 289 at 61-62; Tr. Ex. 35 at 1.

257.   Mr. Reagan noted that R.W. was receiving treatment for these triggering factors; had not shown "serious concerns" for his treating providers after his first few days in treatment; was continuing outpatient treatment; and did not have current homicidal ideations.  ECF No. 289 at 62-63; Tr. Ex. 35 at 1.

### *Partial Lift of the Trespass*

258.   On April 19, 2017, Dr. Thornton issued his determination on R.W.'s appeal of the trespass order, by which he lifted the interim trespass from CBC's Pasco campus but left in place the interim trespass from CBC's Richland campus. ECF No. 338 at 4 (stipulated fact no. 10); ECF No. 289 at 66; Tr. Ex. 13.  The nursing program was located at the Richland campus, and the instructors identified in R.W.'s homicidal ideations had offices and taught classes there.  ECF No. 288 at 267-68, 270; ECF No. 290 at 127.

259.   As a result, R.W. could go to the Pasco campus for administrative purposes, such as registration or financial aid matters, but he was still required to arrange any visits to the Richland campus through Mr. Reagan.  ECF No. 288 at

ORDER - 55

267-68; ECF No. 289 at 28-29; ECF No. 290 at 127; ECF No. 349 (testimony of L. Thornton); Tr. Ex. 13; Tr. Ex. 37 at 1.

260.   Dr. Thornton considered the situation to be serious based on his understanding that homicidal threats had been made against three CBC faculty, and he felt that the interim trespass was necessary to allow time for the Student Conduct process to proceed while ensuring campus safety.  ECF No. 289 at 196, 202.

261.   Dr. Thornton understood that the trespass was intended to maintain campus safety, not to prohibit R.W. from completing his course work, though R.W. was consequently unable to complete his course work.  ECF No. 349 (testimony of L. Thornton).

262.   By April 19, 2017, Dr. Thornton had concluded R.W. was not a direct threat to campus, but he was also hoping for some type of assurance of campus safety—i.e., that R.W. would not pose a threat to campus in the future or have a recurrence of the homicidal ideations.  ECF No. 289 at 176-77.

263.   Dr. Thornton understood the difficulties in asking providers to provide assurance of anything, but he understood that R.W. and Mr. Reagan were working together to see what could be done to move forward.  ECF No. 289 at 177-78.

ORDER - 56

1

**L. Student Conduct Findings**

2      264.   On April 20, 2017, Mr. Reagan issued his determination in the

3   Student Conduct proceedings, concluding that R.W. had violated the Student Code

4   provision on abusive conduct.  ECF No. 338 at 4 (stipulated fact no. 12); ECF

5   No. 289 at 20-21; ECF No. 290 at 127-28; ECF No. 349 (testimony of R. Reagan);

6   Tr. Ex. 14.

7      265.   In particular, Mr. Reagan found by preponderance of the evidence that

8   R.W.'s homicidal ideations had the effect of creating a hostile and intimidating

9   environment, whether or not R.W. had intended to do so.  ECF No. 289 at 20-22,

10  25; ECF No. 349 (testimony of R. Reagan); Tr. Ex. 14 at 1; Tr. Ex. 35 at 1.

11     266.   Mr. Reagan reached this conclusion after completing his Student

12  Conduct investigation.  ECF No. 289 at 21.

13 **M. Sanctions**

14     267.   Mr. Reagan also imposed disciplinary sanctions pursuant to WAC

15  132S-100-400(4)(a)(ii) based upon the finding of a Student Code violation.  ECF

16  No. 289 at 21-23; ECF No. 349 (testimony of R. Reagan); Tr. Ex. 14; Tr. Ex. 71 at

17  14.

18     268.   Mr. Reagan articulated the sanctions to R.W. as follows:

19          • You must continue to participate in your current mental
              health counseling and follow through with all
20            recommendations from your Counselor.

ORDER - 57

- You must keep open communication with me regarding the status of your continued mental health counseling and allow me access to communicate with your Counselor if the need arises.
  - I will contact you prior to obtaining information from your Counselor.
- During October 2017, you must schedule a time to meet with me and provide a status update from your counselor regarding the overall progress of your counseling sessions.
- If you choose to re-enroll at CBC, you must meet with me once a month during enrollment until I deem it no longer necessary.
- The trespass order for the Richland CBC campus will remain in effect until you are enrolled in a program that requires you to be at the Richland facility. If you need to visit the Richland campus while the trespass is active, you must contact me to make arrangements and only valid reasons to visit the campus will be accepted.

Tr. Ex. 14.

269. Mr. Reagan considered these sanctions to fall under either the "Loss of privileges" category or the "Discretionary sanctions" category of sanctions, both of which were authorized in WAC 132S-100-430. ECF No. 349 (testimony of R. Reagan); Tr. Ex. 71 at 20.

270. Mr. Reagan did not consider the sanctions, including the continuing trespass, to be a suspension, which would have required that R.W. be "separated" from CBC. Mr. Reagan did not believe R.W. had been separated from CBC or the nursing program. ECF No. 289 at 77-79; Tr. Ex. 71 at 20.

ORDER - 58

271.    Mr. Reagan understood that R.W. was still a CBC student who was simply not enrolled in classes at that time.  ECF No. 289 at 26-27, 76-77, 108.

272.    Mr. Reagan had concluded R.W. was not an immediate, serious threat to the CBC campus at that time.  ECF No. 289 at 71-72; ECF No. 349 (testimony of R. Reagan).  However, Mr. Reagan remained concerned about R.W.'s return to the stress of the nursing program, which had contributed to R.W.'s previous homicidal ideations.  R.W. had been out of classes and, therefore, had not been under that type of stress since the previous homicidal ideations.  ECF No. 289 at 101-02, 115; ECF No. 349 (testimony of R. Reagan).  Mr. Reagan also felt that the investigation had not yielded a full guarantee of safety.  ECF No. 289 at 101, 114-15.

273.    Mr. Reagan believed that R.W. had done the right thing in seeking help for the homicidal ideations.  ECF No. 289 at 114.

274.    Mr. Reagan imposed these sanctions in response to the effect R.W.'s homicidal ideations previously had on the CBC campus.  ECF No. 289 at 71-72.

275.    Mr. Reagan meant for the sanction conditions to be measures to increase the likelihood that R.W. would not have further homicidal ideations; would have access to more resources for dealing with stress; and would not present a risk to campus safety in the future.  ECF No. 289 at 67-68, 101-02, 115.

ORDER - 59

276.   Mr. Reagan imposed the first two conditions to ensure that R.W. was following through with his mental health treatment plan.  ECF No. 289 at 102-03.

277.   Mr. Reagan imposed the third condition, regarding the October 2017 meeting, to set a definite time to check back in with R.W. before Winter Quarter 2018.  ECF No. 289 at 103-04.

278.   Mr. Reagan chose October 2017 as the date to follow-up with R.W. based on his understanding that the courses R.W. needed to resume were next available in Winter Quarter 2018, for which registration would occur in late October or early November 2017.  ECF No. 289 at 76-77, 104-07; ECF No. 349 (testimony of R. Reagan).

279.   Mr. Reagan understood that R.W. could not take nursing classes during Spring Quarter 2017, which began on April 3, 2017, because of the sequential structure of the program and given that R.W. had not completed the classes from Winter Quarter 2017.  ECF No. 289 at 106-07, 136; Tr. Ex. 244.

280.   Mr. Reagan imposed the fourth condition, requiring R.W. to meet with him periodically, as a way for him to stay informed about R.W.'s situation and to remain available to R.W. as a resource.  ECF No. 289 at 107-08.

281.   Mr. Reagan imposed the last condition, which continued the trespass from CBC's Richland campus, as a safety measure, given his understanding that

ORDER - 60

1   R.W. would not have class-related reasons to be on campus for some time.  ECF
2   No. 289 at 109.

3                    ***Effect on R.W.'s Status in Nursing Program***

4          282.   Mr. Reagan was aware that R.W. wanted to continue with the CBC
5   nursing program.  ECF No. 349 (testimony of R. Reagan).

6          283.   Mr. Reagan intended for these sanctions to provide a route for R.W. to
7   return to the nursing program as soon as possible, which would be in Winter
8   Quarter 2018 due to the sequential nature of the program.  ECF No. 289 at 106-07;
9   ECF No. 349 (testimony of R. Reagan); Tr. Ex. 43 at 1.

10         284.   Mr. Reagan expected that after he and R.W. met in October 2017,
11  R.W. would resume with his classes.  ECF No. 289 at 109.

12         285.   Mr. Reagan did not think R.W. would need to restart the nursing
13  program from the beginning.  ECF No. 289 at 42.

14         286.   According to the policy of the CBC nursing program, a student could
15  only seek reentry into the nursing program once, for a total of two enrollments.
16  ECF No. 349 (testimony of K. Tucker); Tr. Ex. 73 at 33-34.

17         287.   As of Winter Quarter 2017, R.W. had already sought and received
18  reentry into the nursing program once, making him ineligible to apply for reentry
19  under the terms of the nursing student handbook.  ECF No. 288 at 42-43; ECF
20  No. 349 (testimony of K. Tucker); Tr. Ex. 73 at 33-34.

ORDER - 61

288.    Rebekah Woods became CBC President in November 2017 and remains in that position.  ECF No. 338 at 3 (stipulated fact no. 1); ECF No. 290 at 20; ECF No. 349 (testimony of R. Woods).

289.    Dr. Woods, Ms. Hoerner, and Dr. Thornton were aware that the policies in the nursing student handbook would not have allowed R.W. to reenter the nursing program in Winter Quarter 2018, but they believed that the CBC President had the authority to override that policy.  ECF No. 289 at 187; ECF No. 290 at 14-16, 19, 21.

290.    Ms. Tucker had never been threatened by a student before, and the nursing student handbook, which was prepared by Ms. Tucker, does not contain guidance on such situations.  ECF No. 288 at 9, 79.

291.    R.W.'s father was of the understanding that CBC initially tried to "go through the process to get R.W. back into school and find a way that he could graduate," but he was not involved in further discussions about this once it became a legal matter.  ECF No. 290 at 35.

292.    Mr. Reagan believed he would not have needed the Nursing Director's approval to allow a student back into the nursing program so long as the CBC President concurred.  ECF No. 289 at 42, 80-81.

293.    Ms. Hoerner understood that Dr. Thornton's ultimate decision on this matter was for R.W. to follow the Student Conduct sanctions, but because R.W.

ORDER - 62

1  did not do so, they "didn't have a chance to find out" whether Dr. Thornton had the

2  authority to reinstate R.W. into the nursing program.  ECF No. 290 at 17-19.

3      294.  Dr. Woods believed that the plan Mr. Reagan imposed for R.W.

4  following the Student Conduct proceedings would have allowed R.W. to reenroll

5  in the nursing program for Winter Quarter 2018.  But she understood that this did

6  not ultimately happen because R.W. did not comply with Mr. Reagan's plan by the

7  time Winter Quarter 2018 began.  ECF No. 290 at 21-24.

8  *Effect on Grades*

9      295.  By April 20, 2017, Mr. Reagan believed it was not possible for R.W.

10  to do make-up work to complete his Winter Quarter 2017 courses.  ECF No. 289 at

11  130-31.  Mr. Reagan was not aware that R.W. had received failing grades for

12  Winter Quarter 2017.  ECF No. 289 at 26.

13      296.  Mr. Reagan had not experienced other situations where a student

14  received Student Conduct sanctions that prevented the student from completing

15  their course work.  ECF No. 349 (testimony of R. Reagan).

16      297.  Dr. Thornton had never before experienced a situation where a student

17  had been trespassed from campus.  But he believed that Ms. Tucker would have

18  the authority to offer R.W. an opportunity to convert his incomplete grades for

19  Winter Quarter 2017 into letter grades, provided R.W. complied with Mr. Reagan's

20

ORDER - 63

1    requirements for his return to campus.  He did not think he had that specific

2    authority as CBC President.  ECF No. 349 (testimony of L. Thornton).

3        298.   In contrast, Dr. Woods believed the CBC President had the authority

4    to change the 0.0 grades on R.W.'s record for Winter Quarter 2017.  ECF No. 349

5    (testimony of R. Woods).

6        299.   Ms. Tucker believed that the nursing program could have worked with

7    R.W. to help him complete his missing course work for Winter Quarter 2017, even

8    after the end of that quarter, once the Student Conduct proceedings were

9    completed.  ECF No. 349 (testimony of K. Tucker).

10                    ***Effect on Summer Course Work***

11       300.   Because he had completed at least one year of the nursing program,

12   R.W. was academically eligible to take practical nursing courses during Summer

13   Quarter 2017.  But these courses were ordinarily taken by students right after their

14   first year of the nursing program, so that they could take the licensing exam to

15   become a licensed practical nurse and then work in that capacity during their

16   second year.  ECF No. 349 (testimony of K. Tucker).

17       301.   R.W. had previously opted to take these practical nursing courses

18   during the summer after his first year in the nursing program, although he later

19   withdrew for health reasons.  Thereafter, he was aware that he needed to let the

20   nursing program know in advance if he wanted to participate in the practical

ORDER - 64

1  nursing courses, because he had done so previously.  ECF No. 287 at 283-84; ECF

2  No. 288 at 52-53; ECF No. 290 at 82-83, 86; Tr. Ex. 44 at 1-2.

3      302.   At the time of his April 20, 2017 letter, Mr. Reagan did not realize

4  R.W. was eligible to take any nursing courses during Summer Quarter 2017, given

5  his understanding about the sequential nature of the nursing program.  Neither

6  R.W. nor R.W.'s attorney  expressed an interest in the possibility of R.W. taking

7  these courses to Mr. Reagan.  As a result, it was unclear whether R.W. could, in

8  fact, have taken the optional Summer Quarter 2017 courses, and there was no

9  opportunity for Mr. Reagan to address this issue.  ECF No. 289 at 108, 129; ECF

10  No. 349 (testimony of R. Reagan).

11  **N. Appeal of Student Conduct Findings**

12      303.   On May 4, 2017, R.W. appealed Mr. Reagan's finding of a Student

13  Code violation to the Student Appeals Board.  ECF No. 338 at 5 (stipulated fact

14  no. 14).

15      304.   R.W. appealed because he wanted to be able to return to the nursing

16  program without being required to comply with the requirements of the sanctions

17  imposed in the letter.  ECF No. 290 at 129-30.

18      305.   On May 24, 2017, the Student Appeals Board unanimously affirmed

19  the finding of a Student Code violation.  ECF No. 338 at 5 (stipulated fact no. 15);

20  ECF No. 289 at 143-45; ECF No. 290 at 130; Tr. Ex. 16.

ORDER - 65

306.   On June 7, 2017, R.W. appealed the finding and Student Appeals Board decision to Dr. Thornton.  ECF No. 338 at 5 (stipulated fact no. 16); ECF No. 290 at 130.

307.   Dr. Thornton, as CBC President, was the final decision maker as to violations of the CBC Student Code of Conduct and the Student Conduct proceedings against R.W.  ECF No. 338 at 4-5 (stipulated fact nos. 11, 18).

308.   On June 12, 2017, Dr. Thornton denied R.W.'s appeal.  ECF No. 338 at 5 (stipulated fact no. 17); Tr. Ex. 18.

309.   In the denial letter, Dr. Thornton advised R.W. to review the nursing student handbook and contact Mr. Reagan to discuss the possibility of completing his winter quarter coursework and being readmitted to the nursing program.  ECF No. 289 at 198; ECF No. 290 at 133; Tr. Ex. 18 at 4.

310.   Dr. Thornton understood Mr. Reagan's decision and sanctions to be providing a way for R.W. to return to the nursing program where he left off, which he understood would be in Winter Quarter 2018.  ECF No. 289 at 196-97.

311.   Dr. Thornton noted in the letter that R.W. had not been "expelled, suspended or unenrolled" from CBC as a result of his homicidal ideations.  ECF No. 289 at 194-95; ECF No. 290 at 162; Tr. Ex. 18 at 2.

312.   The fact that R.W. was not currently enrolled in classes at CBC did not mean he had been disenrolled as a student from CBC.  ECF No. 289 at 189-90.

ORDER - 66

313.   Dr. Thornton understood that the nursing program did not have unilateral authority to remove R.W. from the nursing program, and certainly could not have removed R.W. while the Student Conduct proceedings were ongoing. ECF No. 289 at 195.

314.   Dr. Thornton understood that students could appeal program-specific decisions to CBC administration if they contended the decision was unenforceable as a matter of law or CBC policy.  ECF No. 289 at 200.

**O. R.W.'s Response to Sanctions**

315.   Before receiving the April 20, 2017 letter, R.W. was willing to do "whatever it took" to address CBC's concerns, but that changed once he received the letter.  ECF No. 290 at 131-32.

316.   At some point after receiving the April 20, 2017 letter, R.W. requested a copy of the nursing student handbook, which Mr. Reagan provided on May 3, 2017.  ECF No. 289 at 40; ECF No. 290 at 129; Tr. Ex. 38; Tr. Ex. 45 at 4.

317.   R.W. did not contact Mr. Reagan thereafter, despite Dr. Thornton's letter advising him to contact Mr. Reagan to discuss returning to the nursing program.  ECF No. 290 at 162-64.

318.   R.W. claimed he did not think he would be allowed to complete his coursework for Winter Quarter 2017, notwithstanding Dr. Thornton's letter, based on his understanding of the student handbook.  ECF No. 290 at 163-64.

ORDER - 67

319.    On July 12, 2017, R.W. sent an email to Ms. Tucker asking if he would need to restart the nursing program from the beginning in order to complete his nursing degree at CBC.  ECF No. 287 at 309; ECF No. 290 at 134-35; ECF No. 349 (testimony of R. Reagan); Tr. Ex. 43 at 2.

320.    R.W. emailed Ms. Tucker, not Mr. Reagan.  ECF No. 290 at 177.

321.    Ms. Tucker sought input from Ms. Hoerner and Mr. Reagan about what to do because she did not know R.W.'s status with CBC administration or the outcome of the Student Conduct proceedings.  ECF No. 287 at 309-10; ECF No. 288 at 78-79; ECF No. 289 at 72-73; ECF No. 349 (testimony of R. Reagan); Tr. Ex. 43 at 2.

322.    Mr. Reagan understood that R.W. was still a student at CBC and therefore that he could resume course work the following Winter Quarter provided the nursing program did not object.  ECF No. 349 (testimony of R. Reagan).

323.    Mr. Reagan took some time to confer with CBC leadership, who confirmed that R.W. could return to the nursing program if he complied with Mr. Reagan's requirements.  ECF No. 349 (testimony of R. Reagan); Tr. Ex. 43 at 1.

324.    On July 31, 2017, Mr. Reagan responded to R.W. to reiterate the requirements of the Student Conduct sanctions, stating that they would "talk more about how [R.W.] can enroll again at CBC" at their October 2017 meeting if R.W.

ORDER - 68

followed through with these requirements.  ECF No. 289 at 73-74; ECF No. 290 at 136-37; ECF No. 349 (testimony of R. Reagan); Tr. Ex. 43 at 4.

325.   Based on Mr. Reagan's July 2017 email and the nursing student handbook, R.W. believed he could reenroll at CBC but might not be allowed to return to the CBC nursing program.  He was not interested in reenrolling in CBC if he could not return to the nursing program.  ECF No. 290 at 136-38.

326.   R.W. believed the sanction related to his medical records to require him to give Mr. Reagan broad access to all of his HIPAA-protected records indefinitely.  ECF No. 290 at 128.

327.   R.W. did not want to comply with the requirements of the Student Conduct sanctions and specifically did not want to give Mr. Reagan "indefinite access to [his] medical records and counseling appointments."  As a result, R.W. decided not to meet with Mr. Reagan, though he understood that the sanctions would remain in place until that meeting occurred.  ECF No. 290 at 137-38, 162.

328.   R.W. was otherwise capable of complying with the requirements of the Student Conduct sanctions.  ECF No. 290 at 160-62.

329.   R.W. registered for two CBC courses in Summer Quarter 2019, but he withdrew from one course and was dropped from the second course due to nonpayment of tuition or fees.  ECF No. 349 (testimony of K. Myers).

ORDER - 69

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      The Court has original jurisdiction over this claim pursuant to 28 U.S.C. § 1331.

2.      To prevail on a First Amendment retaliation claim, a plaintiff must prove that (1) he or she engaged in a constitutionally protected activity; (2) the defendant subjected him or her to adverse action that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the protected activity and the adverse action.  *O'Handley v. Weber*, 62 F.4th 1145, 1163 (9th Cir. 2023) (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)).

**A. Protected Activity**

3.      The Court finds that R.W.'s First Amendment claim fails on the first element, as the speech at issue was an unprotected true threat.

4.      "True threats of violence . . . lie outside the bounds of the First Amendment's protection[]"—in other words, true threats constitute a "historically unprotected category of communications."  *Counterman v. Colorado*, 600 U.S. 66, 72, 74 (2023) (citations omitted).

5.      In the civil context, speech is a true threat if it was reasonably foreseeable "that the statement would be interpreted by those to whom the [speaker] communicate[d] the statement as a serious expression of intent to harm

ORDER - 70

1    or assault." *Boquist v. Courtney*, 32 F.4th 764, 781 (9th Cir. 2022) (quoting

2    *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021)) (quotation marks

3    omitted).

4        6.    The speech must be examined "in light of its entire factual context,

5    including the surrounding events and reaction of the listeners." *Id.* (quoting

6    *Corales v. Bennett*, 567 F.3d 554, 563-64 (9th Cir. 2009)) (quotation marks

7    omitted).

8        7.    Based on the following facts from the record, a reasonable person

9    would have foreseen that R.W.'s statements describing his homicidal ideations to

10   crisis responders would be interpreted by those who heard them as a serious

11   expression of intent to harm or assault.

12           a.    In the speech at issue, R.W. described having involuntary thoughts of

13               harming specific people (Ms. Tucker, Ms. Cooke, Ms. Martinez) by

14               specific means (setting their offices on fire while they were inside or

15               attacking them with a saw).

16           b.    R.W. found these homicidal ideations very frightening, to the point

17               where he had trouble sleeping and made a doctor's appointment the

18               next day.  He admitted they were unwanted, but also said that they

19               were intrusive and that he could not control them.

20

ORDER - 71

c.  Dr. Cabasug concluded that R.W.'s reporting about the homicidal ideations necessitated an evaluation by Crisis Response.

d.  DCR Perez independently concluded that R.W.'s reporting about the homicidal ideations triggered her duty to warn.

e.  Ms. Schoffstall independently concluded that R.W.'s reporting about the homicidal ideations triggered her duty to warn.

f.  R.W.'s wife hid R.W.'s firearm from him when she took him home to pack for his stay at Transitions.

g.  Although R.W. described the homicidal ideations as unwanted, he also stated the ideations felt out of his control.

8.  The Supreme Court has held that a true threat in the criminal context also requires showing that the speaker "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69.

9.  Neither the Ninth Circuit nor the Supreme Court have extended the *Counterman* standard to the civil context to date.

10.  The justifications for the *Counterman* standard in the criminal context, where the speaker is confronted with criminal prosecution and punishment based on their speech, strike a different balance in the civil context.

ORDER - 72

11.    *Counterman* does not modify the applicable legal standard for imposing civil liability on a state actor's response to threatening speech, as set forth in *Boquist*.

12.    The Court gives limited weight and credibility to R.W.'s testimony, particularly his testimony about the nature and seriousness of his homicidal ideations, for the following reasons.

       a.    There were significant inconsistencies in R.W.'s testimony about the homicidal ideations between the 2022 jury trial and the 2025 bench trial.  For example, at the 2022 jury trial, R.W. testified that he experienced the homicidal ideations while he was studying at home, recalling that he was sitting over one of his nursing textbooks.  ECF No. 290 at 112.  At the 2025 bench trial, R.W. testified that he experienced the homicidal ideations while with his family at Walmart and specified that he was probably showing his children fishing equipment in the outdoors section of the store.  ECF No. 349 (testimony of R.W.).  It is difficult to reconcile these two accounts with one another, or with R.W.'s testimony at both trials that he only experienced the homicidal ideations once.  ECF No. 290 at 112; ECF No. 349 (testimony of R.W.).

ORDER - 73

1    b. There are also significant inconsistencies between R.W.'s testimony

2    about the homicidal ideations, and what other people noted he had

3    told them at the time.

4    For example, in describing the homicidal ideations at both

5    trials, R.W. never mentioned his homicidal ideations had specifically

6    involved Ms. Tucker, Ms. Cooke, and Ms. Martinez. *See, e.g.,* ECF

7    No. 290 at 112 ("[R.W.:] . . . There was somebody in front of me, and

8    the face was just very brief, but it was changing, like *it wasn't any one*

9    *person in particular*. . . . And I saw my arms move against my will

10   with a saw at – at *whoever it was*. But I do remember seeing *those*

11   *three people's faces* just briefly for moments on *whatever body* it was

12   in *whoever's office* it was. But it was – there was *never anything*

13   *specific*.") (emphases added).

14   In contrast, Dr. Cabasug noted that R.W. had "allude[d] to

15   professors at CBC" at the March 6, 2017 appointment. ECF No. 287

16   at 39; Tr. Ex. 67 at 92. DCR Perez also noted that R.W. had identified

17   the subject of his homicidal ideations as his CBC instructors,

18   specifically "Kim Tucker, Valerie Topham, and Alma unknown last

19   name." ECF No. 287 at 134-35; Tr. Ex. 69 at 4, 6, 8, 10.

20

ORDER - 74

1      When asked about these notes on cross-examination at the 2022

2      trial, R.W. equivocated about whether he had told Dr. Cabasug and

3      DCR Perez about these things.  ECF No. 290 at 153-55.  He also

4      claimed that he had only mentioned the homicidal ideations to

5      Dr. Cabasug when he was specifically asked whether he was having

6      thoughts of harming others, despite having testified at his deposition

7      that he told Dr. Cabasug up front that the homicidal ideations were the

8      reason for the appointment.  ECF No. 290 at 168-70.

9   c. As a second example, R.W. testified at both trials that he only

10     experienced the homicidal ideations once, with no recurrences at the

11     time of his March 6, 2017 appointment with Dr. Cabasug, and no

12     recurrences thereafter.  ECF No. 290 at 112; ECF No. 349 (testimony

13     of R.W.).

14     In contrast, the records prepared by medical and mental health

15     professionals regarding R.W.'s statements on March 6, 2017, strongly

16     imply that R.W. told them the homicidal ideations were recurring.

17     *See, e.g.*, Tr. Ex. 67 at 92 ("[D]oes have thoughts of hurting someone

18     or possibly more than 1 fatally with a plan for about 1 week now.");

19     Tr. Ex. 69 at 3 ("[H]e reports last Tuesday was the *first* he identif[ied]

20     his thinking, about homicidal thoughts toward his instructors.")

ORDER - 75

1   (emphasis added), 4 ("[He] reports last week on Tuesday was *the first*

2   *time* he realize[d] he had thoughts to harm instructors.") (emphasis

3   added), 6 (within section "D. DANGER TO OTHERS," "Ongoing

4   threats" is checked); Tr. Ex. 68 at 79 ("He said *there had been some*

5   *plans* and *he would talk himself out of it*, stating that 'that wouldn't

6   work,' . . . . He says *they come and go*, mainly only are in his mind

7   when he is talking about this, but again he has no intent to harm

8   himself or anyone else.") (emphases added).

9       13.    Accordingly, R.W.'s speech about his homicidal ideations constituted

10  an unprotected true threat, and R.W. has failed to prove the protected-speech

11  element of his First Amendment claim.

12  **B. But-For Causation**

13      14.    Separately, R.W. has also failed to prove the third element of his First

14  Amendment claim, but-for causation, even if R.W. had proven that his speech was

15  protected.

16      15.    Under the third prong of a First Amendment retaliation claim, "if the

17  outcome (the adverse action) would not have occurred without the government

18  official's retaliatory animus, then that animus was a but-for cause of the adverse

19  action." *Boquist*, 32 F.4th at 778 (citing *Bostock v. Clayton County*, 590 U.S. 644,

20  656 (2020)).

ORDER - 76

16.     The Court addresses how R.W. has failed to prove but-for causation as to each of his three theories of "adverse action" by CBC officials.

### *Interim Trespass*

17.     Mr. Reagan imposed the interim trespass on R.W. based on the conclusions from law enforcement and medical and mental health professionals that R.W. presented a sufficiently serious threat to the safety of Ms. Tucker, Ms. Cooke, and Ms. Martinez as of March 6, 2017, to implement the duty to warn protocol.

18.     At the time Mr. Reagan imposed the interim trespass, the only information available to him was what he had received from the duty-to-warn notification.

    a.  To the extent that Mr. Reagan received any information about R.W.'s speech, it came to him through several layers of hearsay, i.e., through DCR Perez, a police officer, Mike Hahn, and Levi Glatt.

    b.  Mr. Reagan understood, based on his background in counseling, that a medical professional would ordinarily only act on their duty to warn if it was their professional opinion that the patient presented a serious risk to themselves or others, given that the duty to warn would require breaking patient confidentiality.

ORDER - 77

1          c.   Accordingly, Mr. Reagan understood that DCR Perez and law

2              enforcement had concluded that R.W. presented a serious risk of harm

3              to others.

4          d.   This was not outweighed by Mr. Hahn's comment that R.W. was

5              "getting help and *may* not be an *immediate* threat." Tr. Ex. 23 at 2

6              (emphases added).

7     19.    The interim trespass was not motivated by animus or retaliatory

8 motive against R.W.'s speech.

9          a.   Mr. Reagan credibly testified that he intended the interim trespass to

10             be a temporary safety measure until he could investigate further, and

11             that he felt it was his duty to act to ensure the safety of the CBC

12             community. *See Capp v. County of San Diego*, 940 F.3d 1046, 1057

13             (9th Cir. 2019) (noting the defendants could defeat the First

14             Amendment retaliation claim by proving they "were motivated

15             primarily by their legal obligation to investigate allegations of child

16             abuse" and would have acted "for that reason alone") (citation

17             omitted).

18          b.   Mr. Reagan had heightened concerns for school safety based on his

19             awareness of school shooting events, with a recent school shooting in

20             Umpqua specifically coming to his mind.

ORDER - 78

c.   Mr. Reagan took actions that would have been squarely inconsistent with retaliatory animus against R.W.'s speech.  For example, Mr. Reagan intervened to stop Ms. Tucker from summarily dismissing R.W. from the nursing program.  As another example, Mr. Reagan sent R.W. an email on March 10, 2017, reminding R.W. to submit a statement for his appeal of Mr. Reagan's trespass order.

20.   The preponderance of the evidence demonstrates that Mr. Reagan imposed the interim trespass for legitimate, non-retaliatory reasons, not because of any retaliatory animus against R.W.'s speech.  Therefore, R.W. has not met his burden to show that retaliatory animus was the but-for cause of the interim trespass, his first theory of adverse action.

### *Student Conduct Findings & Sanctions*

21.   Mr. Reagan issued the April 20, 2017 findings and sanctions at the end of his Student Conduct investigation, which had included meeting with R.W. and R.W.'s attorney; reviewing R.W.'s medical records; and speaking with Ms. Aronow and Mr. Soulia about R.W.'s mental health care to date.

22.   Mr. Reagan imposed conditions on R.W.'s return to campus that were designed to assess R.W.'s stabilization and compliance with his mental health treatment plan.  Although termed "sanctions," these conditions were not intended to punish R.W.

ORDER - 79

1    23.    The medical and mental health information available to Mr. Reagan at

2  that time provided grounds for concern about R.W.'s continued stability and

3  adherence to his treatment plan.

4        a.  At the March 22, 2017 meeting, R.W. denied that his homicidal

5            ideations had involved lighting anything on fire, which Mr. Reagan

6            noted conflicted with the medical records.

7        b.  Although there was indication that R.W.'s homicidal ideations had

8            been aberrant, the apparent catalyst for the homicidal ideations was

9            school-related stress, which Mr. Reagan knew was likely to recur

10           based on the nature of the nursing program.

11       c.  R.W.'s improved status was the result of medical and mental health

12           treatment he received while he was out of school, and his stability had

13           not yet been tested under a resumption of his school-related stress.

14       d.  R.W. downplayed his mental health history and the impact of school-

15           related stress on his homicidal ideations in speaking with

16           Ms. Aronow.

17       e.  R.W. also downplayed the impact of school-related stress on his

18           homicidal ideations in speaking with Mr. Soulia, instead saying he

19           had no problems with his professors and that he thought medication

20           issues may have contributed to the homicidal ideations.

ORDER - 80

     f.  Ms. Aronow reported R.W. had tried to leave Transitions the day after being admitted, which would have been the day he received Mr. Reagan's trespass notice.

     g.  R.W. had only just begun outpatient counseling, was attending on a monthly basis, and had only completed one counseling session with Mr. Soulia at the time Mr. Soulia spoke with Mr. Reagan.

     h.  Although Mr. Reagan did not think R.W. intended to harm or threaten his instructors, R.W. had reported that the homicidal ideations felt out of his control.

     i.  No medical or mental health provider could reasonably guarantee that R.W.'s homicidal ideations would not recur, particularly when R.W. returned to the stressful environment of the nursing program.

24.   Mr. Reagan's Student Conduct findings and sanctions were not motivated by animus or retaliatory motive against R.W.'s speech.

25.   R.W. has not shown by a preponderance of the evidence that CBC officials' retaliatory animus toward his speech was the but-for cause of the Student Conduct findings or sanctions, his second theory of adverse action.

### *Collateral Effects*

26.   The negative effects that occurred after the interim trespass and the Student Conduct findings and sanctions were caused by R.W.'s unwillingness to

ORDER - 81

1  engage with Mr. Reagan regarding his return to the nursing program, not by CBC

2  staff's animus or retaliatory motive toward R.W.'s speech.

3    a.  Mr. Reagan did not know that R.W. had received failing grades for

4        Winter Quarter 2017.

5    b.  The CBC President and/or Ms. Tucker believed they would have had

6        the authority to remedy these failing grades if R.W. had completed the

7        requirements for his return to campus.

8    c.  R.W.'s financial aid could have been reinstated had his failing grades

9        been converted into passing grades in at least 6 credits' worth of his

10       classes.

11   d.  Mr. Reagan reasonably believed that the soonest R.W. could resume

12       his nursing courses would be during Winter Quarter 2018.

13   e.  Mr. Reagan did not know at the time that R.W. was eligible to take

14       the practical nursing courses in Summer Quarter 2017, and to the

15       extent R.W. was, in fact, interested in doing so, he did not raise the

16       issue with Mr. Reagan.

17   f.  The CBC President would have had the authority to direct that R.W.

18       be allowed to continue with the nursing program where he left off, or

19       otherwise to override the nursing student handbook policy barring

20

ORDER - 82

students from reentering the nursing program for the second time, if R.W. had completed the requirements for his return to campus.

27.    Mr. Reagan, Dr. Thornton, and Ms. Tucker had never before experienced a situation like R.W.'s, and therefore, it was reasonable for them not to know every detail about their relative authority or about what would happen in R.W.'s situation.

28.    Similarly, it was reasonable that the nursing student handbook would not contain comprehensive guidance on how the nursing program would handle a situation like R.W.'s.

29.    Mr. Reagan and Dr. Thornton intended to have R.W. and Mr. Reagan work together toward R.W.'s return to campus by completing the sanction conditions, given the complexity and novelty of the situation.

30.    R.W. refused to engage with Mr. Reagan regarding his return to the nursing program after receiving the April 20, 2017 Student Conduct decision.

31.    At no point did CBC officials tell R.W. he was barred from returning to the nursing program.

32.    R.W. appears to have misunderstood the extent to which the provisions in the nursing student handbook would be binding on his situation, and he appears to have misconstrued the scope of Mr. Reagan's request for future access to his counselor.

ORDER - 83

33.    However, R.W. did not seek clarification from Mr. Reagan about his specific concerns.

34.    R.W. did seek clarification from Ms. Tucker about his status with the nursing program, and the response he later received from Mr. Reagan did not provide a clear answer to the question he was asking.

35.    Despite this lack of clarity, R.W. chose not to follow up with Mr. Reagan at that time, and he again chose not to follow up with Mr. Reagan in October 2017.

36.    R.W. has failed to prove that retaliatory animus was the but-for cause of the various negative impacts he experienced after the Student Conduct findings and sanctions, under his last theory of adverse action.

**C. Student Speech Doctrine**

37.    Even if R.W. had satisfied the protected-speech and but-for causation elements, the First Amendment claim would fail on a third, independent ground, as the Court finds that CBC officials acted within their constitutionally permissible authority to regulate student speech that invades the rights of other students and school staff to bodily safety on campus.

38.    The Supreme Court has instructed courts to "apply the First Amendment 'in light of the special characteristics of the school environment'" that justify "special leeway" when public schools regulate certain types of student

ORDER - 84

speech.[6]  *See Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 187-88 (2021) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)).

39.    Courts have recognized various special characteristics in applying the school speech doctrine, including the following examples:

a.  Public primary and secondary schools act *in loco parentis* over students on school grounds and therefore have a responsibility "to protect children—especially in a captive audience—from exposure

---

[6] Courts typically identify this principle by reference to a particular foundational case.  *See, e.g.*, *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706-07 (9th Cir. 2019) ("[T]he First Amendment standard for school regulation of speech set out in *Tinker* [*v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)]."). But these foundational cases also represent distinct subparts of the broader test.  *See, e.g., Mahanoy Area Sch. Dist.*, 594 U.S. at 187-88 (identifying the "specific categories of student speech that schools may regulate" by reference to the case that addressed each category).  The Court finds it more helpful to label this broader legal standard as the "student speech doctrine," as the Ninth Circuit sometimes does.  *See e.g.*, *Oyama v. Univ. of Haw.*, 813 F.3d 850, 860-62 (9th Cir. 2015).

ORDER - 85

to sexually explicit, indecent, or lewd speech." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986).

b. Public primary and secondary schools are tasked with "inculcati[ng]" certain "fundamental values necessary to the maintenance of a democratic political system." *Id.* at 683 (citations omitted).

c. Public primary and secondary schools "have a duty to prevent the occurrence of disturbances" of school activities and, in doing so, "are entitled to exercise discretion in determining when student speech crosses the line between hurt feelings and substantial disruption of the educational mission." *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 776 (9th Cir. 2014) (quoting *Karp v. Becken*, 477 F.2d 171, 175 (9th Cir. 1973); *Zamecnik v. Indian Prairie Sch. Dist. # 204*, 636 F.3d 874, 877-78 (7th Cir. 2011)).

40.    In particular, the student speech doctrine cases have permitted schools to regulate the following types of student speech consistent with the First Amendment: "(1) indecent, lewd, or vulgar speech uttered during a school assembly on school grounds . . . ; (2) speech, uttered during a class trip, that promotes illegal drug use. . . [;] (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored

ORDER - 86

newspaper . . . [; and (4)] speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Mahanoy Area Sch. Dist.*, 594 U.S. at 187-88 (quoting *Bethel Sch. Dist.*, 478 U.S. at 685; *Morse v. Frederick*, 551 U.S. 393, 409 (2007); *Kuhlmeier*, 484 U.S. at 271; *Tinker*, 393 U.S. at 513) (quotation marks and alterations omitted).

41.    To date, the Supreme Court and Ninth Circuit have not extended the student speech doctrine to the context of colleges and universities, although neither court has concluded that the doctrine could never apply to colleges and universities. *See Oyama*, 813 F.3d at 862-63 (citing *Hazelwood*, 484 U.S. at 273 n.7); *O'Brien v. Welty*, 818 F.3d 920, 932-33 (9th Cir. 2016).

42.    In several cases addressing the free speech rights of high school students, the Ninth Circuit has "recognized repeatedly that the specter of school violence places a weighty social responsibility on school districts to ensure that 'warning signs' do not turn to tragedy." *McNeil*, 918 F.3d at 708 (citation omitted).  The Ninth Circuit's references to this issue have become increasingly solemn over the years:

> We recognize that violence is prevalent in public schools today, and that teachers and administrators must take threats by students very seriously.

*Lovell by and through Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 374 (9th Cir. 1996).

ORDER - 87

[W]e live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis. The recent spate of school shootings have put our nation on edge and have focused attention on what school officials, law enforcement and others can do or could have done to prevent these kind of tragedies. After Columbine, Thurston, Santee and other school shootings, questions have been asked about how teachers or administrators could have missed telltale "warning signs," why something was not done earlier and what should be done to prevent such tragedies from happening again.

*LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001).

With the advent of the Internet and in the wake of school shootings at Columbine, Santee, Newtown and many others, school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights. It is a feat like tightrope balancing, where an error in judgment can lead to a tragic result.

*Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1064 (9th Cir. 2013).

In the twelve years since *LaVine* was decided, many more names have joined this tragic list. When we decided *LaVine*, the shooting at Columbine High School, in which thirteen people died, was the deadliest school shooting to date. Since then there have been two even deadlier school shootings: at Virginia Tech and at Sandy Hook Elementary School.

*Id.* at 1069 n.6 (citation omitted).

To require school officials to precisely identify the source of a violent threat before taking readily-available steps to quell the threat would burden officials' ability to protect the students in their charge—a particularly salient concern in an era of rampant school violence, much of it involving guns, other weapons, or threats on the internet . . . .

ORDER - 88

*Dariano*, 767 F.3d at 778 (citations omitted).

> The number of reported tragic school shootings over the past two decades emphasizes the need for school districts to have the authority to take disciplinary action when faced with a credible threat of school violence.

*McNeil*, 918 F.3d at 712 (citation omitted).

43.    In the cases most analogous to R.W.'s circumstances—*Lovell*, *LaVine*, *Wynar*, and *McNeil*— the Ninth Circuit addressed claims brought by public high school students who alleged their schools violated their free speech rights by suspending or expelling them in based on their expressions of violent ideation against other students or school staff.  *See Lovell*, 90 F.3d at 368 (involving a high school student who was suspended for three days for reportedly threatening to shoot a school counselor); *LaVine*, 257 F.3d at 983-84, 986 (involving a high school student who gave his English teacher a poem implying that he intended to harm other students or himself; the school expelled the student, though it rescinded the expulsion a few weeks later); *Wynar*, 728 F.3d at 1064-65 (involving a high school student who was temporarily expelled for sending friends "a string of increasingly violent and threatening instant messages," e.g., messages about shooting specific classmates and "invoking the image of the Virginia Tech massacre"); *McNeil*, 918 F.3d at 703, 710 (involving a high school student who was suspended and ultimately expelled for making a "hit list" of 22 specific classmates and one former school employee in his personal journal).

ORDER - 89

a.  In three of these cases, *LaVine*, *Wynar*, and *McNeil*, the Ninth Circuit applied the student speech doctrine and concluded that the schools had not violated the students' free speech rights.[7]

b.  More particularly, the Ninth Circuit found that the students' expressions of violent ideation fell within the student speech doctrine's prong for "speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *See LaVine*, 257 F.3d at 992 (substantial disruption and material interference with school activities); *Wynar*, 728 F.3d at 1070-72 (substantial disruption and invasion of "the rights of other students to be secure"); *McNeil*, 918 F.3d at 710-11 (substantial disruption and invasion of "the rights of other students to be secure and to be let alone").

44.  As noted above, the student speech doctrine is grounded on the special characteristics involved in the environment of a public primary or secondary school. *Mahanoy Area Sch. Dist.*, 594 U.S. at 188; *see also Wynar*, 728 F.3d at

---

[7] Conversely, in *Lovell*, the Ninth Circuit found it unnecessary to apply the student speech doctrine because it found that the speech at issue was an unprotected true threat.  90 F.3d at 371.

ORDER - 90

1  1064 (quoting *Kuhlmeier*, 484 U.S. at 266).  However, *LaVine*, *Wynar*, and *McNeil*

2  do not expressly say what special characteristics of the school environment, in

3  particular, permit a high school to regulate students' expressions of violent ideation

4  against its staff or students.

5      45.    *Oyama* and *O'Brien*, the cases in which the Ninth Circuit declined to

6  extend the student speech doctrine to the university/college context, did not

7  involve expressions of violent ideations against college staff or students.

8      a.  In *Oyama*, the plaintiff was enrolled in a post-baccalaureate

9          program to obtain certification as a secondary school teacher, which

10          required him to complete a semester as a student teacher.  813 F.3d

11          at 855-56.  School authorities rejected his application for a student-

12          teacher position based on his past statements endorsing "child

13          predation" and student-teacher relationships and claiming most

14          students in special education were "fakers."  *Id.* at 856-59.

15      b.  In *O'Brien*, the plaintiff was a university student who alleged the

16          university had disciplined him in retaliation for his public criticism

17          of the university's administration.  818 F.3d at 933.  University

18          officials contended that the discipline was based on a later incident,

19          in which the plaintiff aggressively confronted two professors in

20          their offices with a video camera and refused to leave.  *Id.* at 929.

ORDER - 91

1    The Ninth Circuit found that the plaintiff's retaliation claim was

2    sufficient to survive a Rule 12(b)(6) motion. *Id.* at 933. However,

3    the court warned that its ruling was "by no means intended to

4    protect from discipline students whose speech or conduct may

5    reasonably be seen as threatening or constituting a danger to

6    members of the university committee." *Id.* at 935. Several months

7    after remand, the parties stipulated to dismiss the case with

8    prejudice. *See* Order Closing Case in Light of Stipulation for

9    Dismissal with Prejudice, *O'Brien v. Welty*, No. 12-CV-2017 (E.D.

10    Cal. Dec. 1, 2016), ECF No. 50.

11    46.    Further, the Ninth Circuit has previously distinguished the high school

12    and college contexts on factors that are not particularly relevant to the instant

13    circumstances. The *Oyama* court focused on the prongs of the student speech

14    doctrine concerning vulgar speech, speech promoting illegal conduct, and speech

15    bearing the school's "imprimatur." *See Oyama*, 813 F.3d at 861-62 (summarizing

16    *Fraser*, *Morse*, and *Kuhlmeier* to illustrate the "circumstances in which a high

17    school may restrict its students' speech). The court then highlighted the contrast

18    between primary and secondary school students' relative immaturity and need for

19    pedagogical structure, and college students' relative maturity and need for

20    academic freedom. *Id.* at 863-64. These distinctions have obvious relevance when

ORDER - 92

1  a school regulates speech that is offensive, promotes illegality, or uses school

2  resources.  But the emotional maturity or academic sophistication of a school's

3  students has little relevance to a school's legitimate interest in regulating

4  expressions of violence against members of its community.

5      47.     The Court finds no distinction between the high school and college

6  environments to explain why the First Amendment would prohibit a college from

7  taking similar actions, in similar circumstances, to those found permissible in

8  *LaVine*, *Wynar*, and *McNeil*.  Primary, secondary, and postsecondary schools alike

9  have a similar, strong interest in regulating speech that invades the rights of its

10 students and staff to bodily safety on campus.  Accordingly, the Court applies the

11 principles of the student speech doctrine as set forth in *LaVine*, *Wynar*, and

12 *McNeil*.

13     48.     A school may regulate off-campus speech that has a "sufficient nexus

14 to the school."  *McNeil*, 918 F.3d at 707 (citing *Wynar*, 728 F.3d at 1068)

15 (quotations omitted). "There is always a sufficient nexus between the speech and

16 the school when the school district reasonably concludes that it faces a credible,

17 identifiable threat of school violence."  *Id.* at 707-08 (citing *Wynar*, 728 F.3d at

18 1069).

19         a. Although R.W.'s homicidal ideations occurred off campus, CBC

20            officials reasonably concluded that it faced a credible, identifiable

ORDER - 93

1    threat of violence, based on the same factors noted in the Court's

2    earlier analysis of the objective true-threat test.  Moreover, that

3    threat of violence was clearly aimed at the school—the homicidal

4    ideations involved killing three specific instructors in an on-

5    campus setting (setting fire to the instructors' offices), and the

6    ideations were plainly interlinked with R.W.'s school-related stress

7    and overwhelm.  Therefore, it was reasonable for CBC officials to

8    conclude that R.W. "presented a credible threat of severe harm to

9    the school community."  *See McNeil*, 918 F.3d at 709.  That

10    consideration alone "establishes a sufficient nexus between the

11    speech and the school to permit regulation."  *See id.* (citing *Wynar*,

12    728 F.3d at 1069).

13    b.  So long as the school reasonably determines that it is facing an

14        identifiable and credible threat of school violence, it may take

15        disciplinary action to respond to a student's off campus speech

16        "regardless of the speaker's intent or how speech comes to [the

17        school's] attention."  *Id.* at 708 (citing *Wynar*, 728 F.3d at 1069).

18        Accordingly, CBC officials could take disciplinary action

19        regardless of whether R.W. intended to threaten Ms. Tucker, Ms.

20

ORDER - 94

1    Cooke, and Ms. Martinez or to keep his homicidal ideations secret

2    from anyone at CBC.

3    c.    CBC had "a right, indeed an obligation, to address a credible threat

4    of violence involving the school community." *See id.* at 710.

5    49.    Finally, Mr. Reagan took appropriate action to address speech that

6    invaded others' rights to be secure and let alone. *See id.* at 710-11. To the extent

7    the interim trespass constituted any "disciplinary action," it was reasonable given

8    the limited information available to Mr. Reagan. By the time of his Student

9    Conduct decision, Mr. Reagan had already concluded that R.W. had not intended

10   to threaten the CBC community but also that the threatening aspects of R.W.'s

11   speech—the underlying homicidal thoughts—were not something R.W. could fully

12   control. Accordingly, he conditioned R.W.'s return to the nursing program on

13   R.W.'s agreement to ongoing counseling and open lines of communication. This

14   action was based on "reasonable, ongoing concerns of campus safety," not a

15   "punitive, retrospective response" to his speech. *See id.* at 711.

16   50.    In summary, even if R.W.'s speech was not an unprotected true threat,

17   and even if CBC officials' actions were motivated by retaliatory animus against

18   that speech, those actions were constitutionally permissible under the principles set

19   forth in *McNeil*, *Wynar*, and *LaVine*.

20

ORDER - 95

**CONCLUSION**

It is worth underscoring that all parties and the Court concur that R.W. did the right thing in seeking professional help for an upsetting and unwanted mental health event.  But the record also shows that CBC officials acted, in a situation of great uncertainty and high stakes, to preserve campus safety, while also affording R.W. process and an opportunity to move forward in his desired program—not to retaliate against him for his speech.  For the three separate reasons set forth above, their actions did not constitute a violation of R.W.'s First Amendment rights. Therefore, R.W. has not met his burden of proof to prevail on his Section 1983 claim for injunctive relief.

Accordingly, **IT IS HEREBY ORDERED:**

1.      Judgment shall be entered in favor of Defendant Woods on Plaintiff R.W.'s Section 1983 claim for injunctive relief.

2.      Judgment was previously entered in favor of Defendant Columbia Basin College on Plaintiff's Section 1983 claim, ECF No. 152, and in favor of Defendants on Plaintiff's WLAD, ADA, and RHA claims, ECF No. 252.

**IT IS SO ORDERED.**  The District Court Clerk is directed to enter this Order, provide copies to counsel, enter final judgment for Defendants on all claims, and **CLOSE the file**.

ORDER - 96

DATED June 16, 2025.

*s/Mary K. Dimke*
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE

ORDER - 97